IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| STEVEN ALAN THOMAS<br><br>       Petitioner,<br><br>  v.<br><br>BOBBY LUMPKIN,<br><br>Director, Texas Department of Criminal Justice Institutions Division,<br><br>      Respondent. | Civil Action No. 1:23-cv-01005<br>CAPITAL CASE |

**PETITION FOR A WRIT OF HABEAS CORPUS**

James E. Zucker
Katherine S. Dannenmaier

YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

August 24, 2023

ATTORNEYS FOR PLAINTIFF
STEVEN ALAN THOMAS

Tᴀʙʟᴇ ᴏꜰ Cᴏɴᴛᴇɴᴛs

Introduction......................................................................................................... 1

Jurisdiction and Venue......................................................................................... 2

Parties ................................................................................................................. 2

Facts and Procedural History ............................................................................... 3

    I.      Police Investigation................................................................................. 3

    II.     Culpability Phase of Trial ....................................................................... 6

    III.    Sentencing Phase ................................................................................... 9

    IV.    Appellate and State Post-Conviction Proceedings............................... 10

        A.    Steven Shockey................................................................................ 11

        B.    Medical Tape DNA .......................................................................... 14

        C.    Childhood abuse .............................................................................. 16

Grounds for Relief .............................................................................................. 18

    I.      In violation of Napue, Texas knowingly elicited material testimony, which
            it knew or should have known to be false, from witness Steve Shockey that
            he had received no consideration for his testimony.............................. 18

        A.    Texas knowingly elicited material testimony, which it knew or should have
            known to be false, from Shockey that he had received no consideration for his
            testimony, violating Napue. .......................................................................... 20

            1. Shockey's testimony was false. ...................................................... 25

            2. The State knew or should have known that the testimony was false............... 25

            3. This false testimony meets the low Napue harm standard............................. 26

        B.    28 U.S.C. § 2254(d) does not bar relitigation................................................. 28

            1.The relitigation bar does not preclude relief because Mr. Thomas satisfies the
            "contrary to" clause of Section 2254(d)(1)........................................................ 29

            2.The relitigation bar does not preclude relief because Mr. Thomas satisfies the
            "unreasonable application" clause of Section 2254(d)(1). ................................... 31

3. The relitigation bar does not preclude relief because Mr. Thomas satisfies the "unreasonable determination" clause of Section 2254(d)(2). ............................. 32

    C.    This Court must consider all the suppressed evidence cumulatively when deciding whether it was material. ................................................................ 36

II.    The State violated Mr. Thomas's right to due process under *Brady* by withholding exculpatory evidence of a deal with jailhouse informant Steven Shockey, the State's only source of direct evidence. ............................................ 37

    A.    The State violated *Brady* by failing to disclose its deal with Shockey ............ 38

    1. The prosecution failed to disclose the impeachment evidence against Shockey in violation of *Brady*. ............................................................................... 38

    2. The undisclosed evidence favored Mr. Thomas. ............................................. 39

    3. There is at least a reasonable probability that the result would have been different if the State had complied with *Brady*. .................................................. 43

    B.    28 U.S.C. § 2254(d) does not bar relitigation because the State habeas court made unreasonable determinations of fact. ....................................... 46

    1. The State habeas court's materiality finding was an unreasonable determination of the facts under Section 2254(d)(2). ................................................. 46

    2. The State habeas court's disclosure finding was based on prejudice and an unreasonable determination of the facts under Section 2254(d)(2). ..................... 47

III.    If Shockey's deal with prosecutors was disclosed to the defense, then trial counsel was constitutionally ineffective for failing to use it. ............................... 50

    A.    Absent trial counsel's deficient performance, there is a reasonable probability that Mr. Thomas would not have been convicted. ........................................... 50

    1. Trial counsel performed deficiently by failing to cross-examine Shockey about his deal with the State when he lied on the stand and said the State had made no promises to him. ................................................................................. 50

    2. There is a reasonable probability that the result of the trial would have been different had trial counsel correctly cross-examined Shockey. ........................... 52

    B.    Good cause exists for a Rhines stay so that this claim may be exhausted in state court. ...................................................................................... 54

IV.    The State's presentation of false and misleading evidence that the DNA evidence connected to Mr. Thomas had to be from sperm independently violated *Napue*. ................................................................................. 54

A.   Texas violated Napue by presenting false evidence about the certainty that the DNA matching Mr. Thomas was from sperm. ............................................... 55

1. The State knowingly elicited false testimony about the certainty that the source of Mr. Thomas's DNA on the tape was from sperm ............................................. 55

2. These misrepresentations about Mr. Thomas's DNA had a reasonable likelihood of affecting the trial outcome. ............................................................................. 62

B.   Although the *Napue* claim is exhausted, it was not adjudicated on the merits in state habeas court and it is therefore unrestricted by 28 U.S.C. § 2254(d) ..... 63

V.   Trial counsel was constitutionally ineffective for failing to retain a DNA expert to investigate and identify the flaws in the States' DNA evidence ............ 65

A.   Absent trial counsel's failure to retain a DNA expert to assess the State's DNA evidence, there is a reasonable probability that Mr. Thomas would not have been convicted. ............................................................................................... 65

1. Failure to retain a DNA expert to critically examine the State's DNA evidence fell below an objective standard of reasonableness. ............................................. 65

2. Trial counsel's deficient performance prejudiced Thomas ............................... 67

B.   Good cause exists for a Rhines stay so that this claim may be exhausted in state court. ......................................................................................................... 69

VI.   Mr. Thomas was deprived of his constitutional right to effective assistance of counsel at the punishment phase of his trial. ................................................... 70

A.   Trial counsel's deficient performance in presenting mitigating evidence prejudiced Mr. Thomas and violated his Sixth Amendment right to effective assistance of counsel. ...................................................................................... 70

1. Trial counsel acted deficiently by failing to investigate and present red flags of child abuse. ....................................................................................................... 70

2. Counsel's deficient performance prejudiced Mr. Thomas because, had the defense team investigated further, extensive evidence of Mr. Thomas's childhood abuse and trauma was readily available. ............................................................. 76

B.   The adjudication on the merits in State court proceedings resulted in a decision that was contrary to and involved an unreasonable application of clearly established federal law. ................................................................................... 81

1. 28 U.S.C. § 2254(d) does not bar this claim because, in its evaluation of deficient performance, the state habeas court relied on an unreasonable determination of the facts, so Mr. Thomas meets the Section 2254(d)(2) exception ............................. 82

2. Mr. Thomas satisfies 28 U.S.C. § 2254(d)(1) because, in evaluating deficient performance, the state court failed to identify or apply an objective standard; and applying the appropriate standards, trial counsel's performance was deficient. .. 83

3. Mr. Thomas satisfies 28 U.S.C. § 2254(d)(1) because the state habeas court failed to apply the proper prejudice inquiry.................................................................. 86

VII.    Mr. Thomas was convicted and sentenced to death without due process of law because the State lost the majority of the physical evidence collected from the crime scene during the thirty-four years that elapsed between the victim's death and his trial. ................................................................... 87

VIII.    Mr. Thomas was convicted and sentenced to death without due process of law because his jury was misinformed about how failing to answer penalty phase questions would determine whether he lived or died. ............................... 90

Conclusion ............................................................................................................. 92

Statement of Timeliness.......................................................................................... 93

Prayer for Relief...................................................................................................... 93

Steven Alan Thomas, through counsel, respectfully petitions this Court to grant him habeas relief from his unconstitutional conviction and sentence.

## Introduction

In 2014, Mr. Thomas was sentenced to death for the more-than-thirty-year-old murder of Mrs. Mildred McKinney. At the time of the murder in 1980, Mr. Thomas was 20 years old and sometimes performed pest control in Mrs. McKinney's home. Between the murder in 1980 and the trial in 2014, during which time two men confessed to the crime, the State lost most of the evidence it had collected. So, at trial, the State relied on just three pieces of evidence to link Mr. Thomas to the crime—a proverbial three-legged stool on which the State would rely to convict Mr. Thomas.

The first evidentiary leg of the stool was a thumbprint on an alarm clock (the alarm clock itself had been lost). But the thumbprint, on its own, was consistent with Mr. Thomas's pest control work. To explain how the physical evidence did more than show that Mr. Thomas had worked in pest control, the State turned to its only other two pieces of evidence: the testimony of a jailhouse snitch, Steven Shockey, who claimed that Mr. Thomas had confessed to him, and DNA supposedly from semen on a piece of medical tape found on the victim's thumb.

Those last two evidentiary legs, however, were not what they seemed. So the State violated Mr. Thomas's due process rights in three ways to make that evidence more convincing:

1. The State knowingly elicited false testimony from Mr. Shockey that he had received no promises in return for his testimony;

2. The State failed to provide Mr. Shockey's full agreement with the prosecution to the defense; and

3. The State misrepresented the certainty of the source of the DNA evidence, inducing witnesses to misleadingly repeat that it was fresh semen, rather than DNA from skin or saliva cells that would have been left during Mr. Thomas's pest control work.

Given the thin evidence supporting Mr. Thomas's guilt, each due process violation prejudiced him.

- 1 -

The performance of Mr. Thomas's own trial counsel also violated his rights. Basic competency required trial counsel to investigate and assess each evidentiary leg of the State's stool. Yet Mr. Thomas's trial counsel failed to retain a DNA expert to review and assess the State's DNA evidence and develop their own assessment of the DNA evidence.

Additionally, Mr. Thomas's trial counsel failed to investigate a psychological expert's report of Mr. Thomas's childhood abuse. Instead of investigating that abuse, Mr. Thomas's trial counsel ignored the red flags, wrongly assuming that Mr. Thomas's family would contradict the expert's report. That assumption was unsupported and false. Trial counsel's failure to retain a DNA expert to assess key evidence and failure to discover readily available mitigating evidence of childhood abuse shows that they were ineffective.

### Jurisdiction and Venue

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a).

Venue is proper in the United States District Court for the Western District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Thomas was convicted and sentenced.

### Parties

Petitioner Steven Thomas is confined by the Texas Department of Criminal Justice. He is housed at the Polunsky Unit, Livingston, Texas.

Respondent Bobby Lumpkin is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Mr. Thomas. Mr. Lumpkin has custody under the

judgment and sentence of death entered against Mr. Thomas on November 18, 2014 in *State v. Steven Thomas*, No. 12-1237-K26 (26th District Court, Williamson County). CR.206–10.[1]

## Facts and Procedural History

### I.    Police Investigation

Mrs. Mildred McKinney was murdered in the middle of the night of November 3, 1980 or the early morning of November 4, 1980. *See* 21.RR.34–85. A 73-year-old woman, she was beaten, bound, sexually assaulted, and ultimately strangled by one or more people. *See id.* She was found in the morning with furniture stacked on top of her body. 20.RR.217-18. There were no witnesses. *See* 20-25 RR; 20 RR 27.

In 1980, as the State's evidence showed, Mr. Thomas had worked as a pest control technician. 20.RR.185–97; 27.RR.9, 44. Mrs. McKinney had been an occasional customer. 20.RR.186.

On November 4, state medical examiner Dr. Roberto Bayardo collected evidence from Mrs. McKinney's body: a mouth swab, a throat swab, a rectal swab, and a vaginal swab. 21.RR.78, 88. Dr. Bayardo found that the vaginal swab was positive for "fresh sperm," with "heads and tails" but that all other swabs were negative for sperm. 21.RR.87. The State also collected additional items with genetic material, including a piece of medical tape recovered from Mrs. McKinney's body, her left and right fingernail clippings, six hairs recovered from her body, a

---

[1]    Citations in this petition appear as follows:
- Citations to the Reporter's Record of Mr. Thomas's trial appear as [volume].RR.[page].
- Citations to the Clerk's record of Mr. Thomas's trial appear as CR.[page].
- The state habeas record is cited as [vol] SHR [page].
- The exhibits admitted at the evidentiary hearing in the State habeas writ proceeding are compiled in the state habeas record. Those are cited by their exhibit number in that proceeding, as Petitioner Exhibits (Pet. Ex.) and States' Exhibits (St. Ex.). Petitioner Exhibit 146 was not included in the state habeas record compilation, and so is provided separately as an attachment to this petition.

glove found under her head, and the pantyhose, phone cord, and string bindings used to tie her hands. 22.RR.23; 23.RR.56–57.

During the investigation, the police considered many suspects. In 1983 and 1984, notorious serial killers Henry Lee Lucas and Otis Toole confessed to the crime. Pet. Ex. 136; *see* 30.RR.225-32. Lucas and Toole were indicted. 20.RR.176–77. The indictment remained pending for years. 20.RR.29; 30.RR.239; 30.RR.244.

In that time, the State lost substantial physical evidence—including the victim's clothing, the victim's fingernail clippings, hairs found on her body, the glove found underneath her, some of the bindings, and any DNA accompanying those items. 20.RR.108-109. It has never been found. 20.RR.108–09.

When DNA testing became available in the 1990s, Texas Department of Public Safety Crime Lab forensic scientist Gary Molina had samples of the medical tape from the crime scene tested. 23.RR.67-78. (Other than Dr. Bayardo's samples, the other evidence with DNA had been lost. 23.RR.56-57, 70) Although Mr. Molina extracted the DNA using "differential extraction," which is meant to separate sperm cells from other types of cells, the process misfired—the extracted "sperm cell fraction," which supposedly included DNA only from sperm cells, also included Mrs. McKinney's non-sperm DNA. 23.RR.77–79, 242–43 (1999 analysis). Even so, two profiles were developed at the time: Mrs. McKinney's and an unknown male profile. 23.RR.207.

In 2010, investigator Kimberly Clement re-tested another part of the medical tape sample, using "differential extraction."  23.RR.221. She again only managed to extract a mixed "sperm cell fraction," a mixture of DNA from both Mrs. McKinney and a male. 23.RR.220 (2010 extraction). Both the 1999 and 2010 profiles were entered into the national DNA database, CODIS. 24.RR.24–25.

In 2012, Steven Thomas came into contact with law enforcement on a non-violent drug charge. 27.RR.244-266. As a matter of routine, his DNA was taken and entered in CODIS. 27.RR.268-69. Mr. Thomas's DNA hit for a possible inclusion for the DNA mixture on the medical tape found at the scene of Mrs. McKinney's murder. 27.RR.269. Investigators used the hit to obtain more of Mr. Thomas's DNA, 20.RR.136, and found only that he could not be excluded as a contributor to the mixture on the medical tape. *See* Section IV, *infra*.

Thomas's fingerprints were also compared to the copies of the latent fingerprints and palm prints found at the crime scene. The DPS crime lab found a likely match for only one thumb print—on an alarm clock on Mrs. McKinney's bedside table. 24.RR.139–44. But before the trial, the State lost the alarm clock, 20.RR.106, making it impossible for trial and post-conviction counsel to submit it for additional testing by independent experts. Mr. Thomas's palm was excluded as a source of any of the latent prints, including other ones on the bedside table. 24.RR.126–27.

Mr. Thomas denied participating in the capital murder. 20.RR.179. He was arrested on July 24, 2012. CR.at 6. 1

On October 9, 2012, a grand jury indicted Mr. Thomas with capital murder for intentionally causing the death of Mildred McKinney, while in the course of committing or attempting to commit burglary, robbery, and forcible rape. CR.at 14–15. On December 6, 2012, William "Steve" Brittain and Allan Williams were appointed to represent Mr. Thomas. CR.at 6. Counsel retained a mitigation specialist, Gerry Byington, who began working in February 2014. *See* Pet. Ex. 41.

Before the trial, further DNA testing by the Cellmark lab revealed that Thomas's DNA was not the only possible match on the medical tape—the tests showed multiple males contributed to the DNA. 24.RR.76–77, 31.RR.123-128. The testing was done by the "Y-STR" analysis, a "more sensitive" test, but one which generally does not extract DNA from semen. 24.RR.50–51, Pet.

Ex.146 ¶¶ 17–19. This Y-STR analysis could not exclude several longtime suspects as sources of DNA on the tape: Henry Lee Lucas, who previously confessed to the murder; the donor of a profile recovered from beer cans found near the scene; and Robert Stapleton, Mrs. McKinney's son-in-law, who apparently committed suicide years later. 31.RR.128; *see* Ex. 1, Note from Bob Stapleton folder.

The only other DNA evidence remaining from Mrs. McKinney's body came from a mouth swab, throat swab, vaginal swab, and anal swab. 23.RR.56-57, 70. *None* of that evidence matched Mr. Thomas. 31.RR.127-28. Investigators could not develop profiles from the mouth, vaginal, or anal swabs. 24.RR.73–74. Mr. Thomas was excluded as a contributor to the male DNA discovered on the throat swab. 24.RR.76.

## II.    Culpability Phase of Trial

Voir dire for Mr. Thomas's capital murder trial began on September 23, 2014, and concluded on October 14, 2014. The culpability phase of trial began on October 20, 2014. 20.RR.3. Mr. Thomas entered a plea of not guilty. 20.RR.20. The State presented a largely chronological accounting of the police investigation into Mrs. McKinney's murder, explaining why various suspects had been ruled out or, at least, not ruled in. According to the State, the evidence against Mr. Thomas was threefold: (1) Steven Shockey's testimony that Mr. Thomas had confessed to him in jail; (2) Mr. Thomas's DNA was on the medical tape; and (3) a fingerprint identified as Mr. Thomas's on the bedside alarm clock.

At trial, the State presented testimony analyzing genetic material from five pieces of evidence: a mouth swab, a throat swab, a rectal swab, a vaginal swab, and a piece of medical tape or ribbon. The DNA evidence was sampled and analyzed via differential extraction in 1999 and 2010, and via a Y-STR test in 2014.

***Throat Swab.*** In 1980, Dr. Bayardo labeled the throat swab negative for sperm. 21.RR.87. It was not re-analyzed until 2014, when it was sent to a new lab, Cellmark. Via the sensitive Y-STR test, Cellmark obtained a "partial Y-STR profile" of a male. 24.RR.73. Mr. Thomas was excluded as a contributor. 24.RR.76; 31.RR.123–28.

***Vaginal Swab.*** In 1980, Dr. Bayardo identified one slide as positive for sperm, with heads and tails. 21.RR.87. The swab was not re-analyzed until 2014, when it was sent to Cellmark. Cellmark did not obtain a profile. 24.RR.75.

***Rectal Swab.*** In 1980, Dr. Bayardo labeled the rectal swab negative for sperm. 21.RR.87. It was not re-analyzed until 2014, when it was sent to Cellmark. Cellmark identified male DNA on the anal slide, 24.RR.73, but could not generate a profile. 24.RR.75.

***Mouth Swab.*** In 1980, Dr. Bayardo labeled the mouth swab negative for sperm. 21.RR.87. It was not re-analyzed until 2014, when it was sent to Cellmark. Cellmark did not obtain a profile. 24.RR.75–76.

***Medical Tape/Ribbon.*** The medical tape was not analyzed for sperm in 1980. 30.RR.245-248. In 1999, Mr. Molina at DPS re-extracted the DNA using "differential extraction," but found that the "sperm cell fraction" also included Mrs. McKinney's non-sperm DNA. 23.RR.243 (1999 analysis). He entered the other profile developed from that analysis into CODIS in 1999. In 2010, Ms. Clement at DPS re-extracted the DNA and found again that the "sperm cell fraction" was a mixture with DNA from both the victim (a female) and a male. 23.RR.220 (2010 extraction). Both 1999 and 2010 profiles were entered into CODIS. 24.RR.24–25. Mr. Thomas's profile was not excluded as a source. 24.RR.41.

In 2014, a new lab, Cellmark, analyzed a new sample of the medical tape. 24.RR.63. In its analysis of the medical tape, Cellmark did not use the chemical used to break open sperm cells, so

Mr. Thomas's post-conviction DNA expert and Cellmark's DNA analyst agree that "it is unclear whether their testing captured DNA from sperm cells":

> Cellmark used a standard extraction procedure without DTT to extract DNA from these samples. DTT is the chemical which is used in the second extraction of a differential extraction in order to break open the sperm cells. Cellmark will sometimes perform a standard extraction supplemented with DTT to produce a single extract that contains DNA from both sperm cells and non-sperm cells, however, it does not look like they did that on Item 3. As such it is unclear whether their testing captured DNA from sperm cells.

Pet. Ex. 78 ¶37. Pet. Ex. 146 ¶¶17-19; St. Ex. 4 ¶¶ 22-24 (Cellmark's DNA analyst affidavit). Based on a new sample of DNA from the ribbon, Cellmark found that "the Y-STR profile obtained from the cuttings of the ribbon is a mixture of at least two males. Steven Alan Thomas cannot be excluded as the major contributor of this mixture." 24.RR.76–77.  On this test, no determination could be made about Henry Lee Lucas (who had previously confessed to the murder) or Robert Stapleton (Mrs. McKinney's son-in-law and longtime suspect) as minor contributors. *Id.* In 2014, DPS also re-analyzed the 1999 profile, again finding that it contained profiles from at least both Mr. Thomas and Mrs. McKinney. *See* 31.RR.111.

The state's witnesses testified repeatedly that because Mr. Thomas's profile was from the sperm cell fraction of the DNA differential extraction, the source of his DNA had to be sperm rather than an innocent source like skin cells. 23.RR.52–53, 56, 58, 67–68, 181, 206–07, 220–21, 224–25. (That testimony would turn out to be false.) The State also presented the testimony of Mr. Thomas's brother, William "Bruce" Thomas. He testified that his brother worked for him in 1980 as a pest control technician and would have had reason to be in Mrs. McKinney's house because she was a customer of theirs. 20.RR.187, 195.

The state rested on October 24, 2014. 24.RR.158. The defense rested that same day without presenting any witnesses. *Id.* at 163. The court charged the jurors, and they retired to deliberate on October 27, 2014. 25.RR.at 50–51.

During deliberations, the jury sent out a note to review the testimony of Williamson County Detective John Foster and Dr. Roberto Bayardo. CR.179; *see also* 25.RR.52.

The jury deliberated for five hours before returning a guilty verdict. CR.8, 182; *see also* 25.RR.53–54.

### III.    Sentencing Phase

The sentencing phase of trial began on October 28, 2014. 26.RR.6. In this phase, the State presented fifteen witnesses over two days who testified to various extraneous acts purportedly committed by Mr. Thomas. 26-27.RR. Testimony was presented that Mr. Thomas had faced criminal charges for firearm and drug possessions, was a drug addict who had used drugs around his son, had engaged in violent behaviors, had talked about killing a person while in an Alcoholics Anonymous group, vandalized property, had hit a man with a golf club, and had threatened his ex-wife and her new husband. *Id.* Additionally, James Sloan, a prison classifications expert, testified about the differences in custody classification levels between death row and prisoners facing a life sentence. 27.RR.149-199, 204-07.

To avoid a death sentence, defense counsel called seven witnesses on October 30, 2014, to testify on Mr. Thomas's behalf. 28 RR. The five fact witnesses included his brother, a family friend, a childhood friend, his niece, and an ex-sister-in-law. 28 RR 6-22 (brother), 34-40 (family friend), 45-53 (childhood friend), 60-65 (niece), 71-76 (ex-sister-in-law). They testified generally about the Thomas family and good qualities Mr. Thomas possessed. *Id.* Frank AuBuchon, a prison classifications expert, also testified about the custody level that Mr. Thomas would face if given a life sentence. 28 RR 84-98. Finally, physician Steve Yount testified that Mr. Thomas had been living with undiagnosed diabetes, had low testosterone, high blood pressure, an enlarged prostate, low vitamin D levels, and was at increased risk for early dementia. 28 RR 115-135. The State

presented one rebuttal witness, Mrs. McKinney's grandson Bob Stapleton, who provided victim impact testimony. 28 RR 151-157.

On October 31, 2014, the trial court charged the jury with four special issues under Texas Code of Criminal Procedure Article 37.0711, after which the jury retired to deliberate. *See* CR.202–05. After more than eight hours of deliberations, *see id.* at 8, the jury returned a verdict sentencing Steven Thomas to death. *See id.* at 202–05; *see also* 29.RR.52. They answered "Yes" to the first three special issues, and "No" to the presence of mitigating circumstances. CR.202–05. Mr. Thomas was formally sentenced to death on November 18, 2014. *Id.* at 206–10.

## IV.    Appellate and State Post-Conviction Proceedings

The court appointed Ariel Payan to represent Mr. Thomas as appellate counsel on January 7, 2015. CR.214–15. On January 12, 2015, Mr. Payan filed a one-page motion for new trial and reconsideration in the 26th District Court of Williamson County, Texas. *Id.* at 217. The motion for new trial was not ruled on and was thus denied by operation of law. The brief on appeal was filed in the Court of Criminal Appeals, on August 24, 2016. The State's brief in response was filed on March 24, 2017. Oral argument was held on May 17, 2017, in the Court of Criminal Appeals.  In 2018, the Texas Court of Criminal Appeals ("CCA") affirmed the judgment. *Thomas v. State*, 2018 WL 739093 (Tex. Crim. App. Feb. 7, 2018) (not designated for publication).

On November 6, 2014, the Office of Capital and Forensic Writes (OCFW) was appointed to represent Mr. Thomas to file his Initial Application for Writ of Habeas Corpus ("Initial Application") while his direct appeal was still pending. CR.211. In its investigation, the OCFW reviewed the files of the Williamson County District Attorney's Office pertaining to Mr. Thomas's case, its file on Steven Shockey's criminal charges, and investigated Mr. Thomas's background. Together, these sources revealed significant problems with the trial evidence. The state post-conviction application and hearing evidence showed the following:

### A.      Steven Shockey

State post-conviction counsel discovered a letter from Shockey sent shortly after Mr. Thomas's trial, in which Shockey represented that ADA Lytza Rojas had promised, in exchange for his testimony against Mr. Thomas, to request a transfer to a prison unit closer to his mother in Austin. *See* Pet. Ex. 2. Correspondence between Ms. Rojas and the Texas Department of Criminal Justice revealed that ADA Rojas followed through on her promise at Shockey's urging. *See* Pet. Ex. 1. A note made in Shockey's prosecution file showed that he had also received a reduced charge in exchange for his cooperation in another capital murder case, the prosecution of Mark Norwood for the killing of Christine Morton. *See* Pet. Ex. 3. Based on these discoveries, Shockey lied under oath when he testified that ADA Rojas told him that she "couldn't promise [him] and would not promise [him] anything in exchange for the testimony." 23.RR.154–55. These facts were not disclosed to the defense. Pet. Ex. 26.

Shockey, a jailhouse informant, claimed that Mr. Thomas had confessed the murder to him while both were in custody at the Williamson County Jail. 23.RR.144–56. His testimony was the only direct evidence of guilt in the trial.

Shockey was extremely motivated to be a snitch and curry favor with prosecutors. Shockey had a long criminal history and faced an extreme prison sentence on new charges for aggravated assault with a deadly weapon. On July 16, 2011, Shockey grabbed his wife by her hair and held a gun to her head. Pet. Ex. 5, at 2–3. Due to his prior felony convictions, Shockey was subject to a maximum sentence of life or ninety-nine years in prison. Pet. Ex. 5, at 5–7. Under this threat of life in prison, Shockey jumped bail and fled to Mexico on November 10, 2011. Pet. Ex. 8; Pet. Ex. 9, at 6. But wanting to come home to America, he was caught at the border and sent back to the Williamson County Jail. Pet. Ex. 9, at 6–7. It was there that he encountered prominent capital murder defendants Steven Thomas and, the most famous inmate in the jail, Mark Norwood.

In March 2012, Shockey contacted Williamson County prosecutors working on the indictment of Norwood claiming that Norwood had confessed to him. Pet. Ex. 10, at 3. Norwood was the man whom Williamson County prosecutors were belatedly charging with the murder of Christine Morton after they had wrongfully put her husband Michael Morton in prison for decades for allegedly killing her. Pet. Ex. 11, at 4. After he spent twenty-five years in prison, Williamson County prosecutors belatedly acknowledged[2] that Michael was not guilty of killing his wife, and the exoneration generated nationwide media coverage. *E.g.*, Brandi Grissom, *Inmate's Release Brings Call for New Evidence Law*, N.Y. TIMES, Oct. 8, 2011; Molly Hennessy-Fiske, *Texas Mail Jailed 25 Years for Murder Is Exonerated*, L.A. TIMES, Oct. 12, 2011.

The contents of the "confession" Shockey claimed to have heard from Norwood suspiciously tracks local media reports of the famous case:

- Michael Morton was exonerated by blood found on a red bandanna left at the crime scene. *Compare* Pet. Ex. 10, at 3, *with* Jordan Smith, *Arrest Made in Morton Murder Case*, AUSTIN CHRONICLE, Nov. 9, 2011 (explaining that Morton was exonerated after testing of a bloody *blue* bandana)[3];

- Mrs. Morton was beaten. *Compare* Pet. Ex. 10 at 5, *with* Brandi Grissom, *Suspect in Morton Case Arrested*, TEXAS TRIBUNE, Nov. 9, 2011 (reporting that "Christine Morton was found brutally beaten to death");

- He got to the house in the morning to watch Mrs. Morton's husband "leave about 4 or 5 o'clock and go to work." *Compare* Pet. Ex. 10 at 3, *with* Chuck Lindell, *Circumstantial Case Convicting Morton of Murder Now Under Attack*, AUSTIN-

---

[2]      Former Williamson County District Attorney Ken Anderson withheld exculpatory evidence from Morton's defense team. Pamela Colloff, *Why Michael Morton's Prosecutor Finally Resigned*, TEXAS MONTHLY, Sep. 26, 2013. Anderson, who later served over a decade as a district court judge in Williamson County, was ultimately sentenced to several days in jail and forced to give up his law license. Alexa Ura, *Anderson to Serve 9 Days in Jail, Give Up Law License as Part of Deal*, TEXAS TRIBUNE, Nov. 8, 2013. In his defense, "Anderson said he didn't remember everything that transpired a quarter century ago but that he was sure he did not intentionally withhold information." Brandi Grissom, *Anderson Denies Wrongdoing in Morton Murder Case*, TEXAS TRIBUNE , Nov. 16, 2011.

         Postconviction, the Williamson County District Attorney's office had to be pressganged into doing the right thing. Anderson's successor as Williamson County District Attorney, John Bradley, refused for years to permit DNA testing of the forensic evidence that ultimately exonerated Morton. Jordan Smith, *Morton Prosecutor Wrote the Book on Crime*, AUSTIN CHRONICLE, Nov. 18, 2011.

[3]      Shockey got the color of the bandana wrong in his tale to prosecutors.

AMERICAN STATESMAN, Oct. 3, 2011 (reporting that Mr. Morton testified his wife "was asleep and alive when he left for work at an Austin grocery store at his usual time, 5:30 a.m.");

- He threw things on top of Mrs. Morton's body while he ransacked the house. *Compare* Pet. Ex. 10 at 5, *with* Lindell, *supra* (reporting that Mrs. Morton's body was buried beneath a comforter, a suitcase, and a wicker basket);

- He went to the house looking for money. *Compare* Pet. Ex. 10 at 5, *with* Lindell, *supra* (reporting that dresser drawers were pulled open, and Mrs. Morton's purse was taken);

- He was calling himself "the thirteenth killer." *Compare* Pet. Ex. 10 at 3, *with* Grissom, *supra* (reporting that Mrs. Morton, Debra Baker, and Natalie Antonetti, in whose deaths Norwood was also suspected at the time, had all been killed on the thirteenth day of the month);

- He had stolen a gun from the house. *Compare* Pet. Ex. 10 at 4, *with* Lindell, *supra* (reporting that a gun was missing from the house);

- He worked as a carpet layer in the area. *Compare* Pet. Ex. 10 at 5, *with* Grissom, *supra* (reporting that Norwood worked as a carpet layer);

- He was also being questioned about the murder of "Debbie McMasterson or Masterson" in Austin. *Compare* Pet. Ex. 10 at 4, *with* Smith, *supra* (reporting that Norwood was a suspect in the murder of "Debra Masters Baker" of Austin).

Although the State ultimately did not use Shockey's testimony to convict Norwood, they did go so far as to bench warrant him to San Angelo (where the trial had been moved because of the high publicity) to be ready for the trial. Pet. Ex. 17 at 20; Pet. Ex. 18. Even though Shockey did not testify, he still benefitted handsomely from his cooperation: the State agreed to waive the habitual offender enhancement, thereby reducing the maximum punishment he could face for brutalizing his wife to twenty years in prison rather than ninety-nine years or life. Pet. Ex. 3; Pet. Ex. 5 at 7.

While Shockey must have been happy with this reduction in his maximum sentence, there was something he still wanted that the authorities could give him: a prison placement near his

ailing, widowed mother. *See* Pet. Ex. 19 at 12–13. Indeed, at his plea hearing, he asked the court that he be placed at a prison close to her. *Id.*

In February 2013, Shockey again reached out to Williamson County prosecutors, this time claiming he heard Mr. Thomas confess. Pet. Ex. 16. Because Shockey continued to seek a prison placement that would let his mother easily visit him, he had every incentive to offer another bargain to the State. *See infra*, Sections I-II. And as detailed below, the "confession" Shockey reported hearing was built of details about the crime scene that he could have found in the newspapers.

Ultimately, the prosecution did cut a new deal with Shockey, promising to help him get a better placement near his mother. *See infra*, Sections I-II. Unlike in the Norwood case, in this case, Shockey did testify. After Shockey testified against Mr. Thomas and helped the State to a conviction, prosecutors followed through on their bargain, calling Shockey "extremely useful in our case in chief" in a letter to prison authorities. Pet. Ex. 22 at 16.

But despite the importance of Shockey as the only fact witness offering direct evidence to finger Thomas, the State never disclosed to defense counsel that they had an agreement with Shockey to place him at a more desirable prison. *See infra*, Section I-II. On the contrary, they knowingly suborned perjury and bolstered him by soliciting testimony that he had not received any promises from the State. *See infra*, Section I.B. Naturally, defense counsel did not impeach Shockey at trial on this lie because the State neglected to tell them about their bargain with Shockey in the first place.

### B.    Medical Tape DNA

At the state habeas evidentiary hearing, the State put on evidence from Allison Heard, Section Supervisor of the DNA Section at DPS, and Mr. Thomas put on evidence from Dr. Simon Ford, a biochemist. St. Ex. 6, Pet. Ex. 78, 146. Ms. Heard and Dr. Ford provided further background and analysis of the DNA evidence found on the medical tape.

As to the 1999 and 2010 differential extractions, Ms. Heard acknowledged that the presence of Mrs. McKinney's DNA in the sperm cell fraction could be consistent with the differential extractions' "inability to obtain a clean separation due to number of epithelial or blood cells." St. Ex. 6 ¶ 70; *see also* St. Ex. 6 ¶¶ 43, 76. Ms. Heard also agreed that it "is commonly known that adhesives like the medical tape can impact the DNA analysis process." *Id.* ¶ 48. Dr. Ford explained that he would therefore expect that the "sperm cell fraction" would also include Mr. Thomas's non-sperm DNA:

> 22. In addressing the possibility that Mr. Thomas contributed non-sperm cells, Ms. Heard states that she would expect to see Mr. Thomas's DNA profile in the non-sperm fraction and not in the sperm fraction (paragraph 90). We know that Mrs. McKinney contributed non-sperm cells, but her profile did not show up in the non-sperm fractions in DPS's testing. As Ms. Heard points out, it is likely that inhibition and/or degradation caused Mrs. McKinney's non-sperm DNA to appear in the sperm fraction. I would expect Mr. Thomas's non-sperm DNA to be in the same fraction as Mrs. McKinney's, which is what we see.

Pet. Ex. 146; *see also* Pet. Ex. 78 ¶¶ 53–55. Thus, the trial testimony from prosecution team members that generating a profile from sperm cell fraction necessarily meant that the genetic material was from sperm was false and misled the jury.

Ms. Heard and Dr. Ford also agreed that, in the 2014 analysis, Cellmark *did not* add the critical reagent that reacts effectively with sperm cells, DTT. *See* 31.RR.123-128Pet. Ex. 146 ¶¶ 17–19; Pet. Ex. 78 ¶ 57; St. Ex. 6 ¶ 78; St. Ex. 4 ¶ 23. Thus, Dr. Ford explained,

> Viewing Cellmark's Y-STR testing of the tape samples in a vacuum and assuming that there are some sperm cells on the sample, the simplest explanation would be that the DNA profile of the major contributor came from non-sperm cells, because these are the types of cells that would burst efficiently with the extraction procedure that was used, and the DNA profile of the minor contributor or contributors may have arisen from the occasional sperm cell that burst prematurely. As such, this result offers support that Mr. Thomas's DNA on the tape came from a source other than sperm.

Pet. Ex. 146 ¶¶ 17–19. The trial testimony that only sperm cells could be in the sample taken from the tape was false.

- 15 -

### C.      Childhood abuse

The post-conviction investigation also uncovered critical information about Mr. Thomas's social history that the trial defense team did not investigate. Mr. Thomas experienced ongoing traumatic experiences when he was young. *See* Pet. Ex. 27. He was beaten, brutally, on a regular basis, the main target of his mother's violent outbursts, facts his brother would have confirmed. Pet. Ex. 114. By the age of 12, Mr. Thomas began self-medicating to alleviate the symptoms of his childhood depression, anxiety, and trauma with alcohol, and he quickly progressed to psychotropic medications, cocaine, and later methamphetamine. Pet. Ex. 27 at 1–2.   It was foreseeable that he would become an addict. *Id.* Yet, despite his troubled past, he managed to build and maintain meaningful relationships, and many of those people could have testified on his behalf. *See generally* 28.RR. Moreover, post-conviction counsel discovered that Mr. Thomas suffers from brain damage. *See* Pet. Ex. 58. Neuropsychological and neuroimaging evaluations indicate that Mr. Thomas has suffered stroke, likely due to his long-term drug use, and is likely exhibiting the early stages of dementia.  *Id.*

* * *

On August 7, 2017, Mr. Thomas applied for habeas corpus in state court. State Habeas App. The Application raised 9 grounds for relief based on the testimony of Shockey, the defense counsel's failure to present mitigating evidence, the State's loss of evidence, improper juror misconduct, problems with the jury instructions, and the arbitrary nature of Texas' system for administering the death penalty. *Id*.

On March 22, 2020, the habeas court designated additional issues for development at an evidentiary hearing, including:

- Whether DNA evidence or testimony presented at trial was false or misleading.

- If the DNA evidence or testimony presented at trial was false or misleading, whether there is a reasonable likelihood that the false or misleading testimony affected the culpability verdict.

- If the DNA evidence or testimony presented at trial was false or misleading, whether there is a reasonable likelihood that the false or misleading testimony affected the sentencing verdict.

- Whether relevant scientific evidence is currently available regarding the DNA evidence that was not available at the time of trial because the evidence was not ascertainable through the exercise of reasonable diligence before or during trial.

5 SHR 2025.

Mr. Thomas proposed findings of fact on whether the DNA evidence was misleading and material. Ex. 2, Thomas Proposed Findings of Fact and Conclusions of Law. The state habeas court held an evidentiary hearing on June 14, 2021, with closing arguments on August 16, 2021. 6-7 SHR. The trial court denied the application on September 20, 2021, based in part on its own recollections of the case. Ex. 3, Findings of Fact and Conclusions of Law. In its order, which repeated the State's proposed order, the state habeas trial court recognized that Mr. Thomas "asserts that the DNA evidence in this trial is false or misleading to such a degree that it affected the verdicts in this case." *Compare* Ex. 3 at ¶ 146, *with* Ex. 4, State Proposed Findings of Fact and Conclusions of Law.

Mr. Thomas objected to certain findings and conclusions of the state trial court. Ex. 5, Objections. In his objections to the state habeas trial court's findings, Mr. Thomas pointed out that the court "failed to address the misleading DNA evidence, that the source of Mr. Thomas's DNA was from DNA left at the time of the crime" and that "his DNA had to be from sperm rather than epithelial cells." *Id.* at 20–21.

On August 24, 2022, the CCA affirmed the trial court's denial of relief. Ex. 6, CCA Order.

- 17 -

**Grounds for Relief**

I.   **In violation of Napue, Texas knowingly elicited material testimony, which it knew or should have known to be false, from witness Steve Shockey that he had received no consideration for his testimony.**

The State "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976); *Giglio v. United States*, 405 U.S. 150, 154 (1972). In *Agurs*, the Supreme Court reaffirmed that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103 (internal citations omitted). To prevail on a *Giglio/Napue* claim, Mr. Thomas must show

  (1) the State presented false or misleading evidence;

  (2) the State knew or should have known the evidence was false or misleading; and

  (3) the evidence was material in that "the false testimony could in any reasonable likelihood have affected the judgment of the jury."

*Giglio*, 405 U.S. at 153–54 (citing *Napue*, 306 U.S. 264, at 269–71). Here, as will be shown below, the state court habeas judge found—and no party disputed—that ADA Rojas elicited false testimony from informant Steven Shockey that she had made him no promises (other than a truthful report to the parole board). There is no question, then, that the State knowingly concealed Shockey's motives for testifying. The state habeas court rejected the *Napue* claim based only on the third element—but that rejection used the incorrect standard, unreasonably applied another law, and unreasonably failed to consider critical facts.

The correct harm standard for *Napue* is low. The Supreme Court has noted that there is "little, if any difference," between this standard and a standard "requiring the beneficiary of a constitutional error," that is, *the State,* not the petitioner, "to prove beyond a reasonable doubt that

the error complained of did not contribute to the verdict obtained," so that the *Napue* rule "is equivalent to the *Chapman* harmless-error standard." *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Even if the prosecution's file is available and defense counsel fails to use it, that failure "does not relieve the government of its affirmative responsibility to correct false testimony." *United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) (vacating convictions and remanding for a new trial). Indeed, even when the defense is aware of the falsity of the testimony, deprivation of due process may result when the prosecutor asks misleading questions or the prosecutor reinforces the falsehood by capitalizing on it in its closing argument. *United States v. Barham,* 595 F.2d 231, 243 n.17 (5th Cir. 1979); *United States v. Sanfilippo*, 564 F.2d 176, 178–79 (5th Cir. 1977).

*Barham* is particularly instructive here. In *Barham,* the Fifth Circuit considered a situation where the prosecutor asked witnesses about "any promises they had received from the Government," eliciting the false response that they had received none. 595 F.2d at 243 n.17. Even though the defense counsel had received "a copy of the letter informing the prosecuting attorney of the promises," the Fifth Circuit still affirmed the finding of a *Napue* violation and remanded for a new trial. *Id*.

Here, the State presented false testimony about two of the only three pieces of evidence connecting Mr. Thomas to Mrs. McKinney's murder: the promises made to Steven Shockey and the source of the DNA evidence. Independently and collectively, this testimony violated Thomas's right to due process.

### A. Texas knowingly elicited material testimony, which it knew or should have known to be false, from Shockey that he had received no consideration for his testimony, violating Napue.

On the second-to-last day of the guilt phase of trial, the State called Steve Shockey. 23.RR.144–56. Shockey was incarcerated for an aggravated assault conviction. 23.RR.145. Shockey testified that, while in the Williamson County Jail awaiting trial on his aggravated assault charge, he and Mr. Thomas would talk in the dayroom. 23.RR.150.

Shockey told the jury that Mr. Thomas had confessed to him. 23.RR.152. Shockey testified that Mr. Thomas told him "about being high on cocaine, approaching a house, burglarizing it or, you know, going into the house, the wee hours of the morning; something about restraining the occupant or the person, having to restrain her before she got out of the bed, taking some money and jewelry." *Id.* Unbeknownst to the jury, this information was circulating publicly in the substantial media coverage of Mr. Thomas's case.[4] Shockey testified Thomas had said he planned to blame the capital murder on his dead friend, Glen Scongins. 23.RR.155. Detective Craig Ferguson of the Williamson County Sheriff's Office later testified that he did not find a "Glen Scongin," but that Mr. Thomas had a friend named Glen Sconci who had died several years before. 23.RR.167–69. The only thing that Shockey's testimony shows is that he had heard Thomas mention a friend's name.

---

[4]      *See* State Habeas Initial Application at 34, citing:

- Brandi Grissom, Williamson County Makes Arrest in 1980 Murder Case, TEXAS TRIBUNE, July 24, 2012 (Mrs. McKinney was 73 years old);
- Claire Osborn, Authorities Charge Man in 1980 Slaying of Williamson County Woman, AUSTIN AMERICAN-STATESMAN, July 24, 2012 (Mrs. McKinney "was restrained, beaten, sexually assaulted and strangled.");
- Claire Osborn, Authorities Charge Man in 1980 Slaying of Williamson County Woman, AUSTIN AMERICAN-STATESMAN, July 24, 2012 ("Thomas' arrest affidavit said a purse, jewelry and a silver tea set had been taken from McKinney's home.").

Shockey also testified that he had met with ADA Rojas and ADA Josh Reno in TDCJ in May 2013. *Id.* at 154. As to that meeting, the following exchange occurred:

ADA Rojas:     And do you recall me telling you that I also could not do anything for you regarding the aggravated nature of the offense that you pled guilty to?

Shockey:        Yes.

ADA Rojas:     And that I couldn't promise you and would not promise you anything in exchange for the testimony and the things that you told John Foster you heard?

Shockey:        Correct.

. . . .

ADA Rojas:     Is it true and fair that I did tell you that I would be honest with a Parole Board or whoever asked me regarding you giving information on a capital murder offense?

Shockey:        Correct.

ADA Rojas:     And is it true that that's the only thing that I said that I would do for you, and the same for [ADA] Reno?

Shockey:        Correct.

23.RR.154–55.

As the state habeas court found, "Shockey's testimony before the jury (that the only promise the prosecutors gave him was that the prosecutors would inform TDCJ and the Board of Pardons and Parole about his participation in the trial) was false." Ex. 3 ¶ 26.

Shockey wanted to be housed near his widowed mother. In May 2013, Shockey pleaded guilty to aggravated assault with a deadly weapon and was sentenced to fifteen years in prison. Pet. Ex. 5, at 7–12. At the plea colloquy, Shockey requested that he be placed close to his recently-widowed, 83-year-old mother, who lived in Austin and was "not in great health." *Id.* at 12–13. Shockey's mother stated that "One reason that [Shockey] agreed to testify at the man's trial was

- 21 -

because the prosecutors told my son that they would put him in a prison close to Austin so he could

be close to me." Pet. Ex. 64.

On October 21, 2014, ADAs Rojas and Reno met with Shockey at the jail. The next day,

October 22nd, Shockey called his mother and told her:

> They had a conference with me yesterday, they told me they weren't going to be
> able to do much for me on the sentencing side. That they were just going to be able
> to help me out as far as getting me a placement in Bryan/College Station, getting
> me away from the Holliday Unit, putting me in another transfer, or, uh,
> classification unit, they were gonna send all the papers over there to get it all
> straightened out. The guy was gonna talk to me on Friday and I was supposed to go
> to court today in the afternoon and it didn't happen. So it's probably gonna happen
> first thing in the morning. . . . They're going for the death penalty on this one. . . .
> It's kinda disappointing because they were telling me there is no motions to get a
> reduction of sentence for this.

Pet. Ex. 61 at 10/22/2014 call. Shockey continues:

> Well, I, uh, asked them to send me to, if they give me a trustee in Waco at the
> Hughes Unit, fine[.] . . . I chose the next best thing that would be medical is
> Bryan/College Station, which is just as close as Waco is. So, what you—if I do
> have, if I do go there like they're supposed to send me, you'll have an opportunity
> to visit me and not go through all the hoops and it will be a good visit. It will be
> contact. We can sit down for at least two or three hours. . . . It's a place where I can
> do time without having a lot of problems because it's low security. . . . I chose that
> one because it's the closest one besides Hughes. . . . and it's the same distance, they
> said. If you look at it, it's the same distance.

*Id.*

ADA Rojas had notes of her direct examination points for Shockey. Pet. Ex. 65. Her direct

examination largely follows her notes. *Compare* 23.RR.154–55 *with* Pet. Ex. 65 at 1. Rojas's notes

about the "different prison unit" appear on the second line of a three-line bullet point, in the middle

of the page. Pet. Ex. 65 at 1. The bullet point reads as a compound question, "Stated I would be

honest with the parole board and *could request movement to a different prison* but couldn't undo

Shockey's underlying conviction . . ." *Id.* (emph. added). Rojas skipped any mention of a prison

transfer in the examination before the jury. 23.RR.154-155.

The evening after he testified, Shockey spoke to his mother and told her the State arranged for him to be transferred to the Pack Unit in Bryan/College Station. Pet. Ex. 61 at 10/23/2014 call. He said ADAs Rojas and Reno "promised me all this and this and that." *Id.*

On October 28th, Shockey told his mother that Detective Ferguson called to tell him about Mr. Thomas's guilty verdict. *Id.* at 10/28/2014 call. Ferguson told Shockey "they were very impressed with everything I did. I helped them quite a bit." *Id.* He confirmed that Detective Ferguson would arrange for transfer to the Pack or Goree Unit. 4 *Id.*

On October 29th, after Shockey's name appeared in the news, he explained his participation in Mr. Thomas's trial to his mother: "I did this to try to get home for you. . . . I did this to try to get out. That's exactly what I was trying to accomplish, to get out. I've tried to be with you, tried to be closer to home. I did it for us, not for me." *Id.* at 10/29/2014 call.

Originally, following Thomas's trial in October 2014, Shockey was transferred back to state custody and assigned to the Robertson Unit in Abilene, nearly four hours from Austin. Pet. Ex. 22 at 12; Pet. Ex. 23 at 3.

But within months, Shockey wrote to ADA Rojas, reminding her of her promise to him—a promise that he had denied under her questioning in front of a jury.  On January 21, 2015, Shockey sent a letter to ADA Rojas stating that when she came to see him at the Holliday Unit,

> I was told by you that I would get to a unit near my Mom. . . . I did what was needed[.] . . . I want what I was promised a unit close to home. . . . I did what was asked now do what you said.

Pet. Ex. 2 at 1–2. Shockey also wrote that Williamson County Sheriff's Office Detective Craig Ferguson "sent a letter to my Mom and told her that I would be close to home it was a done deal." *Id.* at 2. Shockey requested to be transferred to the Hughes Unit in Gatesville, only a 90-minute drive from his mother, or the Goree Unit in Huntsville. *Id.* Apparently realizing that if the terms of his deal with the prosecutors were to become public that it would create negative implications

- 23 -

for the DA's office, Shockey wrote that "I have had reporters write and ask me for a meeting to discuss the case how Williamson handles things since Morton, your case was thing [sic] promised etc. I've at this time declined any meeting." *Id*.

Mr. Shockey's letter was received by the DA's office two days later, on January 23. *Id.* at 3. Three days later, Detective Ferguson emailed TDCJ Classification Chairman Kelly Enloe stating that part of Mr. Shockey's request in exchange for his testimony was that he be placed in a unit closer to his mother. Pet. Ex. 4 at 1. According to Detective Ferguson, TDCJ had been sent a copy of Mr. Shockey's testimony, "which helped." *Id.* Four days after that, ADA Rojas sent another letter to Chairman Enloe, writing:

> In exchange for his testimony, I informed Mr. Shockey that I would reach out to TDCJ and the Parole board to make it known he provided truthful testimony. I also told Mr. Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease . . . . I am currently writing to request that inmate Steven Richard Shockey be considered for placement at either the Hughs [sic] Unit or the Goree Unit.

Pet. Ex. 1 at 1.

On February 17, Chairman Enloe responded to Detective Ferguson's email, writing that Shockey was "being reassigned to a unit closer to his family." Pet. Ex. 4 at 1. On February 20, Shockey was transferred to the Stevenson Unit in Cuero, less than two hours from Austin. Pet. Ex. 22 at 11; Pet. Ex. 23 at 3.

ADA Rojas led Shockey to testify that speaking with the Parole Board "or whoever asked me" was "the only thing that I said that I would do for you." 23.RR.154–55. But, in fact, ADA Rojas had "also told Mr. Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease." Pet. Ex. 1 at 1. Thus, Shockey's testimony was false.

- 24 -

1.      **Shockey's testimony was false.**

As to the first *Napue* element, as the state habeas court found, "Shockey's testimony before the jury (that the only promise the prosecutors gave him was that the prosecutors would inform TDCJ and the Board of Pardons and Parole about his participation in the trial) was false." Ex. 3 ¶ 26. In fact, ADA Rojas had "also told Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease." Pet. Ex. 1 at 1.

2.      **The State knew or should have known that the testimony was false.**

As to the second *Napue* element, the State knew or should have known that Shockey's testimony was false. All that is required to meet the knowledge element is that someone in the prosecutor's office be aware of the promise. For example, in *Giglio v. United States*, 405 U.S. 150 (1972), the Court found a *Napue/Giglio* violation when the prosecutor elicited false testimony that the witness had received no promises—even though the prosecutor who tried the case and elicited the testimony was personally unaware of his office's promises. 450 U.S. at 154.

This case is even stronger, because ADA Rojas, who questioned Shockey on the stand, had herself entered into a deal with him in exchange for his testimony before Mr. Thomas's trial. Pet. Ex. 1 at 1 ("In exchange for his testimony, I . . . told Mr. Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease.").

ADA Rojas provided an affidavit to the state habeas court. She "recall[s] Shockey telling us that his mother was sick and that he wanted to relocate to a prison that was closer to her. I told Shockey that I was aware that TDCJ had the ability to transfer prisoners. I told him that in addition to talking to the Board of Pardon and Paroles, I would pass on his request to TDCJ." St. Ex. 2 ¶ 22. Rojas spoke to a member of TDCJ after her interview with Shockey and "verified that they would be able to make changes in housing." *Id.* ¶ 23.

Rojas reviewed her notes for examining Shockey, which "reference his request to move prison units . . . as an area I intended to cover in the direct examination of Shockey." *Id.* ¶ 30. Rojas's notes in her file for her direct examination corroborate her recollection. Rojas wrote bullet points in her notes for her direct examination of Shockey, including: "Stated I would be honest with the parole board *and could request movement to a different prison* but couldn't undo Shockey's underlying conviction . . . ." Pet. Ex. 65 at 1 (Rojas Direct Examination Notes) (emph. added). Despite her note, Rojas failed to elicit the testimony regarding the request to move to a different prison. Even if Rojas's failure was inadvertent, the elicited testimony is no less false, and there can be no doubt the State knew (or should have known) that Shockey's testimony was false at the time he testified.

### 3.     This false testimony meets the low Napue harm standard.

As to the final *Napue* element, this false testimony is sufficiently harmful. As discussed, the standard for *Napue* materiality is low: Mr. Thomas need only demonstrate that the "false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271. The Supreme Court has noted that there is "little, if any difference," between this standard and a standard "requiring the beneficiary of a constitutional error," here, the *State*, "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Bagley*, 473 U.S. at 680 (plurality op.) (quoting *Chapman v. California*, 386 U.S. at 24). The *Napue* rule "is equivalent to the *Chapman* harmless-error standard." *Id.*

Under the correct standard, there can be no question that the impeachment evidence on Shockey was material, for three reasons.

*First*, the prosecutors themselves believed that Shockey's testimony was important for the jury, making any impeachment evidence material. Unlike in the Michael Morton case, where prosecutors ultimately did not put Shockey on the stand, in Mr. Thomas's case, they needed his

testimony. ADA Rojas herself wrote to TDCJ Chairman Enloe that Shockey's testimony was "extremely useful in our case in chief" and that it "assisted the State in securing the conviction." Pet. Ex. 22 at 16. Likewise, Detective Ferguson also wrote a parole letter. Ex. 62 at 30. He states, "I received information from Steven Shockey which greatly helped my investigation. During this trial, Steven Shockey provided information and testified against Steven Thomas leading to his conviction and a death sentence. *If it wasn't for the information/cooperation by Steven Shockey this case may have not turned out the way it did*." *Id.* (emph. added). Therefore, any evidence undermining Shockey's testimony had a "reasonable likelihood" of "affect[ing] the judgment of the jury." *Napue*, 360 U.S. at 271.

The prosecutors' belief in the materiality of Shockey's credibility and his agreement is underlined by ADA Rojas's questioning technique. ADA Rojas would not have structured a whole series of questions to mislead the jury into believing that Shockey had no motive to lie if she believed that Shockey's credibility did not matter. *See* 23.RR.154–55.

Indeed, the first piece of evidence that the State mentioned in closing was Shockey's testimony. 25.RR.16. The State claimed that "what was important about what [Shockey] came and told y'all" was that Shockey "knew things that only the defendant knew," *id.*, and described Shockey's testimony as "a piece of evidence that connects this defendant." 25.RR.17.

*Second*, Shockey testified that Mr. Thomas confessed to capital murder. Courts have repeatedly recognized that a confession is the most potent evidence that the State can wield in a criminal trial. *See Miranda v. Arizona*, 384 U.S. 436, 466 (1966), (explaining that a confession is "the most compelling possible evidence of guilt" (citing *Mapp v. Ohio*, 367 U.S. 643,685 (1961) (Harlan, J., dissenting))); *Hopt v. Utah*, 110 U.S. 574, 584–85 (1884) (recognizing that "a deliberate, voluntary confession of guilt is among the most effectual proofs in the law"). In many

cases, the presence of an unchallenged confession will nearly guarantee a finding of guilt. *See Colorado v. Connelly*, 479 U.S. 157, 182 (1986) (Brenann, J., dissenting) (citing E. Cleary, McCormick on Evidence 316 (2d ed. 1972)) (observing that "[t]riers of fact accord confessions such heavy weight in their determinations that 'the introduction of a confession makes the other aspects of a trial in court superfluous'"). So any evidence impeaching this testimony is material.

*Third* and finally, aside from Shockey's testimony, the prosecution's case against Mr. Thomas was entirely circumstantial. Testimony adduced by the State at trial established that Mr. Thomas had sometimes serviced Mrs. McKinney's house as a pest control technician, thus providing an alternative, and innocent, explanation for the presence of his DNA and fingerprint in her home. 20.RR.185–97; 27.RR.44. At the same time, Mr. Thomas was excluded from the male DNA found inside Mrs. McKinney. 23.RR.237–38; 24.RR.61–62, 76. The defense's theory at trial was that Mr. Thomas's fingerprint and DNA had been left at Mrs. McKinney's house when he was servicing it as a pest control technician earlier in the month, long before her murder in the middle of the night on November 4. 24.RR.90, 153; 25.RR.30, 38. Shockey's testimony was the only evidence that not only placed Mr. Thomas in Mrs. McKinney's house but contemporaneously connected him to her death, and thus directly undermined the defense's theory.

### B. 28 U.S.C. § 2254(d) does not bar relitigation.

Because this claim was adjudicated on the merits, to obtain relief, Mr. Thomas must show that the state habeas court's adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). And, a claimant can satisfy Section 2254(d)(1) by showing

either that the state decision (a) was *contrary* to clearly established Supreme Court law or (b) an unreasonable application of it. *See Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Here, the state court adjudicated the *Napue/Giglio* claim on the merits. The state court habeas trial judge found that Shockey had testified falsely and without correction. Ex. 3 ¶¶ 26, 50. The only basis on which the state court denied habeas relief was that Mr. Thomas had not met the materiality/harm element. *See id.* ¶¶ 51–65, Ex. 6 at 3. But the state habeas court's decision was contrary to clearly established Federal law in two independent ways, each of which entitle Mr. Thomas to relief. It was also an unreasonable determination of the facts, a third reason he is entitled to relief. Each of these three reasons independently explains why the Section 2254(d) relitigation bar does not bar relief; each of them, on its own, is sufficient to overcome the relitigation bar.

### 1.    The relitigation bar does not preclude relief because Mr. Thomas satisfies the "contrary to" clause of Section 2254(d)(1).

Under Section 2254(d)(1), the state court must "identif[y] the correct governing legal principle." *Williams*, 529 U.S. at 413. Thus, the relitigation bar will not restrict relief if the state habeas court "used the wrong standard." *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 737 (5th Cir. 2011) (reversing and granting habeas relief). Here, the state court used the wrong standard for *Napue* materiality.

*Napue* clearly establishes that testimony is material if there is any "reasonable likelihood" that the false testimony could "have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *see Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) (recognizing this standard).  Since then, the Supreme Court has noted that there is "little, if any difference," between this *Napue* standard and a standard "requiring the beneficiary of a constitutional error," that is, *the State,* not the petitioner, "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," so that the *Napue* rule "is equivalent to the *Chapman* harmless-error

standard." *United States v. Bagley*, 473 U.S. 667, 680 n. 9 (1985) (citing *Chapman v. California*, 386 U.S. 18 (1967)).

Also emphasizing that the petitioner has a low burden under *Napue*, the Fifth Circuit has held that the Supreme Court has established that the *Napue* "reasonable likelihood" standard is considerably lower than the *Brady* "reasonable probability" standard:

> We observe that different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence. The materiality standard for *Brady* claims, regardless of whether the defense made a specific or general request (or no request at all) for the withheld evidence prior to trial, is as follows: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Conversely, if the prosecutor has knowingly used perjured testimony or false evidence, [a *Napue* claim], the standard is considerably less onerous: the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict...."

*Kirkpatrick*, 992 F.2d at 497 (citations and quotations omitted) (allowing habeas claim to go forward); *see also Bagley*, 473 U.S. at 678–80.

But the Texas Court of Criminal Appeals cited the wrong standard, incorrectly requiring Mr. Thomas to prove "by a *preponderance of evidence* that the false testimony contributed to his conviction or punishment." Ex. 6 at 3 (emph. added). This requirement is far too high. Even for *Brady* materiality, a petitioner "need not show that he 'more likely than not' would have been acquitted had the new information been admitted"; he may prevail even if the information "may not have affected the jury's verdict." *Wearry v. Cain*, 577 U.S. 385, 392 & n.6 (2016) (quoting *Smith v. Cain*, 563 U.S. 73, 75 (2012)); *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (*Brady* materiality "does not require demonstration by a preponderance"); *Long v. Hooks*, 972 F.3d 442, 458–60 (4th Cir. 2020) (en banc) (in *Brady* case, holding that Section 2254(d)(1) met because state habeas court incorrectly required petitioner to show "by a preponderance of the evidence" that the

- 30 -

result of the proceeding would have been different"). And the *Napue* standard is "considerably less onerous." *Kirkpatrick*, 992 F.2d at 497; *see also Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex. Crim. App. 1996) (recognizing that the same standard applied by the CCA in Mr. Thomas's case was higher than the *Napue* standard). Therefore, the state adjudication was contrary to clearly established Federal law as determined by the Supreme Court of the United States in *Napue*. 28 U.S.C. § 2254(d)(1).

**2.    The relitigation bar does not preclude relief because Mr. Thomas satisfies the "unreasonable application" clause of Section 2254(d)(1).**

The state court's factual findings that Mr. Thomas had not "proven by a preponderance of the evidence that the false testimony contributed to his conviction or punishment," Ex. 6 at 3, is also an unreasonable application of *Napue*, a second independent reason that the relitigation bar does not apply. A state habeas court's decision is based on an unreasonable application of law if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams*, 529 U.S. at 405–06.

Here, the CCA presumably adopted the state habeas trial court's findings of fact and conclusions of law, which unreasonably applied clearly established law regarding the effect of other attacks on the source of the false testimony. The state habeas court concluded that the Shockey impeachment evidence was not material in part because it concluded jurors already had some reason to doubt Shockey's credibility, mitigating the false testimony's impact. Ex. 3 ¶¶ 59–63.

But facing the same facts, the *Napue* court came to a different conclusion. In *Napue*, the Supreme Court held, "we do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned

what was otherwise a tainted trial into a fair one." 360 U.S. at 270. As in *Napue*, the fact that jurors had some reason to discredit Shockey does not end the inquiry. This is a second independent reason that the state adjudication involved "an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." 26 U.S.C. § 2254(d)(1).

### 3. The relitigation bar does not preclude relief because Mr. Thomas satisfies the "unreasonable determination" clause of Section 2254(d)(2).

The state court's factual finding that Mr. Thomas had not "proven by a preponderance of the evidence that the false testimony contributed to his conviction or punishment," Ex. 6 at 3, was also an unreasonable determination of the facts. The CCA presumably adopted the state habeas trial court's findings. *E.g.*, *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). The state habeas trial court concluded that the truth about the Shockey agreement was not material because (a) Shockey's testimony was not "critical" to the State's case; (b) other evidence corroborated Shockey's testimony and the conviction; and (c) the jury had other reasons to doubt Shockey's credibility. Ex. 3 ¶¶ 51–63. Each was an unreasonable determination of the facts. *See Woodward v. Epps*, 580 F.3d 318, 331 (5th Cir. 2009). In sum, the State habeas trial court's order unreasonably fails to consider the weakness of the State's overall case against Mr. Thomas and underestimates the effect of showing that the prosecution's only fact witness who could finger Mr. Thomas was a perjurer.

Preliminarily, the state habeas trial judge's reasoning further reveals his reliance on the incorrect legal standard, as discussed in Section B.1 of this claim. Mr. Thomas does not have to show that Shockey's testimony was critical, and Mr. Thomas may prevail even if the impeachment information "may not have affected the jury's verdict." *Wearry*, 577 U.S. at 392 n.6. The court's use of a legal standard contrary to Federal law is an independent reason that Mr. Thomas may be entitled to relief. *See* 28 U.S.C. § 2254(d)(1).

*Shockey's testimony was important to the State's case.* The state habeas trial court unreasonably found that "Shockey's testimony was not critical to the State's case." September 22, 2021 Findings of Fact & Conclusions of Law ¶ 52. In making this determination, the state habeas trial court failed to consider, or even cite, the extensive evidence of the importance of Shockey's testimony, including the evidence that prosecutors themselves believed that Shockey's testimony affected the jury's verdict. ADA Rojas herself wrote to TDCJ Chairman Enloe that Shockey's testimony was "extremely useful in our case in chief" and that it "assisted the State in securing the conviction." Pet. Ex. 22 at 16. Likewise, Detective Ferguson wrote, "During this trial, Steven Shockey provided information and testified against Steven Thomas leading to his conviction and a death sentence. *If it wasn't for the information/cooperation by Steven Shockey this case may have not turned out the way it did*." Pet. Ex. 62 at 30 (emph. added). The state habeas court's conclusions fail to discuss this direct evidence from the prosecution's own words of the important role Shockey played in convicting Mr. Thomas. This is evidence that the state habeas trial court needed to consider. *See Allen v. Stephan*, 42 F.4th 223, 250 (4th Cir. 2022) (holding that, where prosecution's own experts agreed that defendant was mentally ill, judge's conclusion that defendant was not mentally ill showed that he had not considered all the evidence, and conclusion to the contrary was unreasonable), *cert. denied*, 143 S. Ct. 2517 (2023).

To show that Shockey's testimony was unimportant, the state habeas trial court stated that prosecutors downplayed Shockey in their closing statements. Findings of Fact & Conclusions of Law, ¶ 52. The court wrote, "In final arguments, Ms. McLeod reviewed Shockey's testimony in nineteen lines of the record concluding with, 'and y'all can do what you will with what Steven Shockey told you. It's just a piece of evidence that connected the defendant.'" *Id.*

But this statement is an unreasonable evaluation of the extent to which prosecutor McLeod relied on Shockey during closing argument. His testimony was the first evidence she mentioned. 25.RR.16–17. She said:

> Okay. You heard from Steven Shockey. Now, I am not here to tell you that Steven Shockey is a good person. You'll never hear that coming from our mouths. But what was important about what he came and told y'all? He knew things that only the defendant knew. Okay. They struck up a conversation. Steven Shockey went to Round Rock High School; the defendant went to Lanier. They were in the same dayroom. And don't you know that defendants in the jail talk about their cases? They do. That's the biggest thing going on in their life right now. And he knows the defendant said he's going to blame it on somebody name Glen Scongin, and he reports it. Well, lo and behold, back in the 1980s the defendant's friends with somebody name Glen Sconci who's dead. Okay. Now, they weren't friends back when the murder happened, but we're also not telling you it was a good plan. It's not a good plan to blame it on Glen Sconci. Okay. But Steven Shockey knew things that the defendant said, and y'all can do what you will with what Steven Shockey told you. It's just a piece of evidence that connects this defendant.

*Id.* Thus the state habeas court's analysis misrepresents McLeod's reliance on Shockey's testimony. Understanding that the jury might doubt Shockey's veracity, ADA McLeod tried to bolster his credibility. For example, she says, "He knew things that only the defendant knew." Similarly, she tried to make his claim to be Mr. Thomas's confessor more credible by reminding the jury that "Steve Shockey went to Round Rock High School; the defendant went to Lanier" and that they "were in the same dayroom." By considering only the words "and y'all can do what you will with what Steven Shockey told you," the State habeas court unreasonably ignored the broader context that McLeod sought during closing to convince the jury that Shockey was a credible witness and the prosecutors' later statements to the same effect.

***The other evidence did not corroborate Shockey's testimony.*** The state habeas court also found that "the DNA evidence corroborated Shockey's testimony regarding Applicant's confession." September 22, 2021 Findings of Fact & Conclusions of Law ¶ 55. This finding was also unreasonable in light of the evidence for two reasons.

- 34 -

First, that's just not what corroboration means in this context. It's not the existence of other evidence that Mr. Thomas committed the offense. It's supposed to be evidence that corroborates that the reported conversation occurred. The State presented nothing that corroborated the existence of the alleged conversations between Shockey and Mr. Thomas as reported by Shockey.

Second, for the reasons also explained above and below, the DNA evidence was confused and misleading. Contrary to what one might expect after a grisly murder and rape, there was very little DNA ultimately used at trial. For example, the only place where a match for Shockey's DNA was found was on a small piece of tape, and the State had to elide the fact that this DNA was not demonstrated to have come from sperm. This last fact left the DNA evidence fully consistent with Thomas's version of the events—that he had only been in the home to spray for bugs. It was therefore unreasonable for the state habeas court to find that the DNA evidence corroborated Shockey's narrative testimony with details about Thomas's alleged confession.

**The jury had other reasons to doubt Shockey's credibility.** The state habeas court also concluded that Shockey had been discredited as a witness by his criminal past and testimony that the State promised Mr. Thomas that they would let the parole board know of Shockey's cooperation. Ex. 3 ¶¶ 53, 60–63. As discussed above in Section B.1 of this claim, this conclusion applies the wrong legal standard under *Napue*.

The weight given to this factor was also unreasonable in light of evidence from the mouths of prosecutors that Shockey's testimony played a big role in their trial win. As just shown, the prosecutors did not give up on Shockey during their closing arguments but were still trying to convince the jury he deserved credence until the very end of trial. And, as discussed above, prosecutor Rojas specifically stated in letters to the Texas prisons system that Shockey's testimony

was "extremely useful in our case in chief" and "assisted the State in securing the conviction." Pet. Ex. 22, at 16.

Thus, for three independent reasons, the state habeas court's determinations do not bar Mr. Thomas's claim under 28 U.S.C. § 2254(d).

### C. This Court must consider all the suppressed evidence cumulatively when deciding whether it was material.

Under both *Brady* and *Napue*, the "materiality inquiry is applied to the suppressed evidence collectively, and not item by item." *United States v. McCarty*, 177 F.3d 978 (5th Cir. 1999) (citations omitted). The State's obligation "turns on the cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 420. This Court must consider all of the suppressed evidence cumulatively when deciding whether it was material.

In this case, the State violated *Brady* and *Napue* in two ways: (1) by knowingly offering the perjured testimony of jailhouse snitch Steven Shockey without disclosing his deal with the State to the defense team; (2) through false and misleading testimony about the supposed source of DNA in sperm. While each *Brady* and *Napue* violation is presented separately in this Petition for the sake of analytic clarity, the materiality prong of each claim must account for Shockey's false testimony that the State did not promise him anything for his testimony, the State's suppression of Shockey's deal from defense counsel, and the misleading DNA evidence. Because the State relied on just three pieces of inculpating evidence—the thumbprint, the DNA testimony, and Shockey's report that Mr. Thomas confessed to him—the loss of two out of three of those would raise reasonable doubts about the accuracy of the verdict. *See Bagley*, 473 U.S. at 680 n.9.

**II.     The State violated Mr. Thomas's right to due process under *Brady* by withholding exculpatory evidence of a deal with jailhouse informant Steven Shockey, the State's only source of direct evidence.**

To prove that Mr. Thomas had committed a murder more than thirty years in the past, the State had very little evidence. Most of the physical evidence from the crime scene had been lost. Steven Shockey's testimony that Mr. Thomas confessed to him while both were held in the Williamson County jail was the prosecution's missing puzzle piece. But as the state habeas court found, the source of this missing evidence turned out to be an opportunistic liar. Mr. Thomas's constitutional rights under *Brady* were violated by the State's failure to disclose the impeaching evidence of Shockey's deal with the State, which defense counsel could have used to show the jury Shockey's lies and self-interest and the prosecution's willingness to suborn perjury. The state habeas court's decision to the contrary relied on its factually unreasonable determination that the prosecutors had disclosed the Shockey deal to the defense.

The State's case at trial relied on just three pieces of evidence connecting Mr. Thomas to the crime scene: DNA on a small strip of tape, a fingerprint on the bedside alarm clock, and the perjured testimony of jailhouse snitch Steven Shockey. Although the State now belittles his importance to its case, Shockey was the prosecutors' only witness who could directly inculpate Mr. Thomas—the other legs of the stool were purely circumstantial and, alone, did not show that Mr. Thomas had any role in the murder.

As discussed above, the state habeas court found that Shockey lied by denying that he had received any consideration from the State for his testimony. The prosecution knew that Shockey's testimony was false, but they had failed to disclose the deal to Mr. Thomas's defense counsel, who could not therefore cross-examine him about it.

Because Shockey was one leg of the prosecutors' three-legged stool, their failure to disclose the deal they had made with Shockey to move him closer to his dying mother violated

Mr. Thomas's constitutional *Brady* rights and undermines confidence in the outcome of his trial. Under *Brady*'s liberal standard for materiality, Mr. Thomas will show a reasonable probability that if the jury only knew that Shockey had been promised what he desperately wanted—transfer to a prison nearer his ailing, aged mother—they would not have found him guilty.

While the state habeas court rightly found that Shockey lied to the jury about his deal, the court also found that defense counsel had been informed of the deal but simply declined to challenge Shockey about it—an unreasonable determination of the facts in light of the evidence. This determination was unreasonable because defense counsel would not miss a chance to call the State's primary witness out as a perjurer before the jury.[5]

### A.  The State violated *Brady* by failing to disclose its deal with Shockey.

The "State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith*, 565 U.S. at 75. To obtain relief, an applicant must show: (1) that the State failed to disclose evidence; (2) that the withheld evidence is favorable to him, and (3) that the evidence is material. *Id.*

Passive compliance by the prosecution is not enough to satisfy the Constitution: *Brady* imposes an affirmative duty on the prosecution to "learn of any favorable [defense] evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437.

### 1.    The prosecution failed to disclose the impeachment evidence against Shockey in violation of *Brady*.

The defense timely filed a "Motion for Disclosure of Evidence Favorable to Defendant." CR.24–30. Counsel specifically requested any evidence that "could adversely affect the credibility

---

[5]    Nonetheless, if the State did disclose this *Brady* material to the defense, then defendant's trial counsel were constitutionally ineffective for failing to use it against Shockey. Counsel's ineffective performance more likely than not prejudiced Mr. Thomas. *See infra*, Section III.A.

of any witness or testimony offered against the Defendant," including "[a]ny evidence of a benefit, concession or reward . . . that has in any way been promised to, alluded to in front of, or applied for by any witness whom the State anticipates calling at trial or by any person who instigated the instant accusations against Defendant." CR.24–26. The trial court granted the defense's motion. 6.RR.6.

In defiance of *Brady* and the court's order, the State failed to disclose the State's agreement with Shockey to help move him to a TDCJ unit close to his elderly and ailing mother. Mr. Thomas's defense counsel confirmed the prosecution's failure to disclose in their affidavits: "I have no recollection of the fact that the prosecutor had agreed to send a letter recommending that Mr. Shockey be incarcerated near his mother's residence." Pet. Ex. 26 ¶ 5. He continued, "Nor do I recall being informed that Mr. Shockey had been an informant in another capital murder case during the course of our representation of Mr. Thomas." *Id.*; *see also* Pet. Ex. 60 ¶ 5 (same testimony from co-counsel). He then explains, "Had the prosecutors disclosed to us the facts about the deal Mr. Shockey received in exchange for testifying against Mr. Thomas, as well as the fact that he had also offered informant testimony against Mr. Norwood, we could have used this information to impeach Mr. Shockey's credibility." Pet. Ex. 26 ¶ 6. State habeas counsel learned these key facts about Shockey for the first time only after reviewing the district attorney's file. State Habeas App. at 28.

### 2.    The undisclosed evidence favored Mr. Thomas.[6]

Taken by itself, the undisclosed evidence that the State promised to move Shockey to a prison close to his mother would have undermined Shockey's credibility by showing his strong motive to testify for the State. And that credibility-undermining effect would have been

---

[6]    To the extent that subsection II.A.3 (materiality/prejudice) covers any additional evidence that the undisclosed evidence was favorable, that evidence is incorporated by reference here.

supercharged in the particular circumstances of the trial: when Shockey testified at Thomas's trial, he specifically denied that the State had promised him anything in exchange for testifying that Mr. Thomas confessed to him. Therefore, the evidence that Shockey had been promised a transfer to a prison nearer his sick mother heavily favored the defense by undermining Shockey's credibility. Not only would this evidence show Shockey's bias and interest in testifying for the State, but it could have been used to show the jury that he had just lied to them under oath.

The evidence would also have shown that the prosecutor was untrustworthy. The prosecution took pains to bolster Shockey's credibility by asking him if prosecutors or police had offered him anything in exchange for fingering Mr. Thomas as Mrs. McKinney's killer. The prosecutor asked him if detectives had "promise[d] [him] anything in regards to the information that you were providing." 23.RR.153. Shockey lied, "No." *Id.* The prosecutor also asked him if she and her office had made any deals with Shockey:

ADA Rojas:    And do you recall me telling you that I also could not do anything for you regarding the aggravated nature of the offense that you pled guilty to?

Shockey:    Yes.

ADA Rojas:    And that I couldn't promise you and would not promise you anything in exchange for the testimony and the things that you told John Foster you heard?

Shockey:    Correct.

                                    . . . .

ADA Rojas:    Is it true and fair that I did tell you that I would be honest with a Parole Board or whoever asked me regarding you giving information on a capital murder offense?

Shockey:    Correct.

ADA Rojas:    And is it true that that's the only thing that I said that I would do for you, and the same for [ADA] Reno?

Shockey:    Correct.

23.RR.154–55. These were flat lies that defense counsel could not impeach to cut down Shockey's credibility because the prosecution failed to disclose the truth about Shockey's deals with the authorities. Indeed, the trial court reviewing the state habeas application found that Shockey's statements were false. Ex. 3 ¶¶ 25–26.

Shockey was ripe for impeachment by a constitutionally informed defense attorney. He had much to gain by giving the authorities what they wanted, whether or not he genuinely possessed it. Shockey was in prison for grabbing his wife by the hair and holding a gun to her head. Pet. Ex. 5 at 2–3. He had been arrested for aggravated assault with a deadly weapon. *Id.* This added to Shockey's long history of crimes committed in Texas and California over the preceding decades. 23.RR.146–48; Pet. Ex. 5 at 5–6; Pet. Ex. 6; Pet. Ex. 7; Pet. Ex. 12. Due to his long criminal record, Shockey faced a maximum sentence of life in prison on his aggravated assault charge. Pet. Ex. 5, at 5–7.

Judging by his own account, Shockey was the Forrest Gump of the Williamson County Jail: he told authorities that suspects in two of the county's most infamous unsolved murder cases had confessed to him. Besides claiming that Mr. Thomas had confessed to capital murder to him, Shockey had also claimed that Mark Norwood had confessed capital murder to him. Pet. Ex. 10 at 3. Norwood was the man that Williamson County authorities charged with murdering Christine Morton. Pet. Ex. 11 at 4–16. Christine was the wife of famous exoneree Michael Morton, who was convicted and sentenced to life in prison after overzealous, unethical Williamson County prosecutors withheld key evidence that later exculpated Morton and led them instead to Norwood. *Id.*

Shockey was heavily motivated to get in the State's good graces and obtain leniency that would let him be closer to his sick mother. Shockey's father died while he was confined to the

Williamson County Jail. Pet. Ex. 13. Before he passed, on a recorded jail call with his sister, Shockey discussed how much he wanted to get out of jail to help her take care of his parents. Pet. Ex. 14 at 1:33, 3:54. Shockey told his sister, "They put that stupid serial killer [Norwood] in our cell," so he was "trying to work on that to get out of here" and "working every angle . . . to get out there and help you." *Id.* at 3:54. On another call with his ex-wife, he told her, "the District Attorney would like to give me a deal but she won't give me the deal until what's-his-name goes to court for his serial killings." Pet. Ex. 15 at 0:18.

After Shockey testified against Thomas, he was eager to collect from the State on the bargain they had made with him. At first, ADA Rojas did not live up to their deal to move Shockey closer to his mom: she sent a letter to the Texas prisons informing them that Shockey had testified against Mr. Thomas and that in return she had offered "to inform the officials at TDCJ as well as the Parole Board regarding the truthful testimony given by Mr. Shockey." Pet. Ex. 22 at 15. She called Shockey's testimony "extremely useful in our case in chief" and said it "assisted the State in securing the conviction." *Id.* at 16.

Shockey knew that he had been promised more than that by the prosecution, so he wrote Rojas a letter: "I was told by you that I would get to a unit near my Mom. . . . I did what was needed . . . . I want what I was promised a unit close to home . . . . I did what was asked now do what you said." Pet. Ex. 2 at 1–2.

A few days after this letter to Rojas, Williamson County law enforcement reacted with a series of new messages to TDCJ on Shockey's behalf. A detective emailed the prisons to say that part of what Shockey had requested in exchange for his testimony was a transfer to a prison closer to his mother. Pet. Ex. 4 at 1. The detective again affirmed that Shockey's testimony had "helped"

them win a conviction against Mr. Thomas. *Id.* Finally, Rojas kept her bargain by weighing in on

Shockey's behalf with a new letter to the prisons:

> In exchange for his testimony, I informed Mr. Shockey that I would reach out to TDCJ and the Parole Board to make it known he provided truthful testimony. I also told Mr. Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease. . . . I am currently writing to request that inmate Steven Richard Shockey be considered for placement at either the Hughs [sic] Unit or the Goree Unit.

Pet. Ex. 1 at 1–2. This time, the prisons followed through: TDCJ officials wrote Rojas back

confirming that Shockey was "being reassigned to a unit closer to his family." Pet. Ex. 4 at 1.

### 3.   There is at least a reasonable probability that the result would have been different if the State had complied with *Brady*.

Applying the materiality standard of harm used for *Brady* claims, Mr. Thomas was harmed

by the prosecution's decision to withhold exculpatory evidence. Mr. Thomas need not show harm

by a preponderance of the evidence: "A reasonable probability does not mean that the defendant

'would more likely than not have received a different verdict with the evidence,' only that the

likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the

trial.'" *Smith*, 565 U.S. at 75 (alteration in original) (quoting *Kyles*, 514 U.S. at 434).

The effect of a confession on a jury cannot be overestimated. Shockey testified that Mr.

Thomas confessed to capital murder. The Supreme Court has repeatedly said that juries are easily

swayed by hearing that a defendant has confessed to his alleged crime. The Supreme Court

recognizes that a confession is "the most compelling possible evidence of guilt." *Miranda*, 384

U.S. at 466 (1966); *see also Aranda v. Lumpkin*, No. 20-70008, 2022 WL 16837062, at *4 (5th

Cir. Nov. 9, 2022) ("We remain cognizant that 'confessions have profound impact on the jury.'"

(quoting *Bruton v. United States*, 391 U.S. 123, 140 (1968) (White, J., dissenting))). The Court has

held, "A confession is like no other evidence. . . . [A] full confession in which the defendant

discloses the motive for and means of the crime may tempt the jury to rely upon that evidence

alone in reaching its decision." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). This fundamental difference between confessions and other inculpatory evidence has been empirically confirmed: psychologists who have studied mock juries to test the Court's claims agree that confession evidence is uniquely potent in the jury room. *See* Saul M. Kassin & Katherine Neumann, *On the Power of Confession Evidence: An Experimental Test of the Fundamental Difference Hypothesis*, 21 Law & Human Behavior 469 (1997).

Absent Shockey's testimony, the prosecution's case was nothing but a small set of dry and circumstantial evidence furnished by technicians talking about one finger print and one piece of tape. *Cf. Aranda*, 2022 WL 16837062, at *4 ("Given the profuse amount of evidence presented against Petitioner at trial, we are convinced that the admission of the confession did not have 'a substantial and injurious effect or influence' in the context of the trial as a whole."). As demonstrated below, *see* Section IV, *infra*, the prosecution's forensic evidence was fully consistent with the innocent fact, accepted by both the prosecution and the defense, that Mr. Thomas had been in McKinney's home previously to spray for bugs. Shockey not only provided the only direct evidence linking Mr. Thomas to McKinney's home on the day of her murder, but he was the only witness the prosecution could use to tell a story about how and why the alleged crime occurred.

Through Shockey, the prosecution established a motive: "high on cocaine," "taking some money and jewelry." Shockey also gave the prosecution a rough timeline of events, "approaching a house, burglarizing it or, you know, going into the house, the wee hours of the morning; something about restraining the occupant or the person, having to restrain her before she got out of the bed, taking some money and jewelry." Without Shockey's testimony, the prosecution could not have put Mr. Thomas in the house at the time of the murder. The forensic evidence could not give Mr. Thomas a motive for a bizarre crime (deviant, sadistic sexual assault of an elderly woman,

stacking furniture on the victim's body) or explain the sequence of events the night of her murder. Shockey's mercenary testimony filled that gap for the prosecution.

In the eyes of the jury, Shockey's testimony against Mr. Thomas must have been damning. Shockey explained that he had waited for his own trial in the Williamson County Jail. According to Shockey, Mr. Thomas would talk to him in the dayroom and that in "little outbursts and mumbles," Mr. Thomas had admitted his guilt to him. 23.RR.152. Shockey said Mr. Thomas told him "about being high on cocaine, approaching a house, burglarizing it or, you know, going into the house, the wee hours of the morning; something about restraining the occupant or the person, having to restrain her before she got out of the bed, taking some money and jewelry." *Id.* Although these details made Shockey appear credible to jurors who had been selected for their ignorance of the news coverage of the case, they would have been well-known to anyone who had been following the media coverage—the information was straight out of the newspaper reports on Mrs. McKinney's killing. *See Williamson County Makes Arrest in 1980 Murder Case*, TEX. TRIB., JULY 24, 2012 (establishing McKinney's age); Claire Osborn, *Authorities Charge Man in 1980 Slaying of Williamson County Woman*, AUS. AM. STATESMAN July 24, 2012 (establishing that she "was restrained, beaten, sexually assault and strangled" and that "a purse, jewelry and a silver tea set had been taken from McKinney's home").

Naturally, the prosecution relied on Shockey's testimony during closing argument. They told the jury that Shockey "knew things that only the defendant knew." 25.RR.16. The State affirmed that Shockey's testimony was a "piece of evidence that connects this defendant" to McKinney's murder. 25.RR.17.

After the trial, Thomas's prosecutors continued to say that Shockey was vital to their case. As discussed earlier, Rojas wrote a letter to the chair of the Texas prison system to let him know

that Shockey's work on the stand was "extremely useful in our case in chief" and "assisted the State in securing the conviction." Pet. Ex. 22 at 16.

The materiality test on a *Brady* claim is one of the easiest known to the law (*Napue* being even easier), for all that is necessary is that the undisclosed evidence "undermine confidence in the outcome" of Mr. Thomas's trial. *See Smith*, 565 U.S. at 75 (citations and quotations omitted). When the prosecution's case rests on just three things—a fingerprint, DNA on a piece of tape, and testimony from a man claiming to have heard the defendant confess—the only reasonable conclusion a postconviction court can reach is that failure to disclose that the State purchased the testimony undermines confidence in the outcome. Furthermore, the State's *Brady* violation should not be considered without weighing the prosecution's other sins along with it. Every instance where the State suppressed evidence or knowingly offered false testimony must be weighed all together to decide materiality. *See supra*, Section I.B.6 (explaining cumulative error).

**B.  28 U.S.C. § 2254(d) does not bar relitigation because the State habeas court made unreasonable determinations of fact.**

The CCA denied Mr. Thomas's *Brady* claim on the merits. Ex. 6 at 2. Because the CCA did not explain its reasoning, the Court should look through the CCA's opinion to the state habeas trial court decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018). The state habeas trial court unreasonably found that the evidence of Shockey's deal was not material and that it had been disclosed to the defense.[7] Both findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d).

**1.    The State habeas court's materiality finding was an unreasonable determination of the facts under Section 2254(d)(2).**

---

[7]    The CCA also stated that Mr. Thomas failed to show that the evidence of Shockey's deal was favorable to him. But this was not a finding of the trial court; in its findings of fact and conclusions of law, the trial court only found that the evidence had been disclosed and that it was not material. To the extent that the state habeas courts did not find that evidence of Shockey's deal was favorable to Mr. Thomas, this finding was also unreasonable for the same reasons that the materiality finding was unreasonable.

The state habeas trial court's analysis of *Brady* materiality was the same as its analysis of *Napue* materiality of the Shockey claims. Ex. 3 ¶ 51. For the same reasons that the state court's analysis of *Napue* materiality for the Shockey claims was unreasonable and against the evidence, then, the *Brady* materiality analysis was also unreasonable. *See* Section I.B.3, above.

Moreover, the state habeas court's conclusion that Shockey's credibility was already weakened ignores the difference, discussed above, between (1) impeaching Shockey with the prosecution's deal to prove his interest in testifying for the State and (2) impeaching Shockey with the deal to prove that he perjured himself. The latter is more devastating impeachment evidence because it shows not only that Shockey was willing to lie to the jury under oath, but also that the prosecution was willing to suborn perjury by leading him to testify that he had received no promises from the State in return for his testimony.

### 2. The State habeas court's disclosure finding was based on prejudice and an unreasonable determination of the facts under Section 2254(d)(2).

The state habeas court found that the prosecution disclosed the impeachment evidence against Shockey to defense counsel. But the court's finding was "based on an unreasonable determination of the facts in light of the evidence presented" and does not bar this Court from granting relief. *See Woodward*, 580 F.3d at 331.

The state habeas court based its unreasonable determination that Rojas disclosed Shockey's deal to defense counsel on (1) Rojas's affidavit and (2) its pre-formed judgment that Rojas was an honest and professional prosecutor. Ex. 3 ¶¶ 37–39.

It was unreasonable for the state habeas court to rely on Rojas's affidavit for three reasons. *First*, the affidavit does not affirm that Rojas disclosed Shockey's deal to defense counsel. Instead, Rojas speaks in the conditional about what she believes she "would" have done given her "standard operating procedure":

> I do not have specific notes indicating my disclosure to defense counsel that the purpose for Shockey's request to transfer to a unit closer to his ailing mother or that I agreed to make such a request of TDCJ. However, given my standard operating procedure as a tenured prosecutor, given the complete and open disclosure I had with the defense team in this case, and given the multitude of conversations leading up to trial—including conversations regarding Shockey's cooperation—I do believe that information would have been given to the defense team.

St. Ex. 2 ¶ 32. This is weak tea. Rojas does not deny that she failed to disclose Shockey's deal to the prosecution. She does not affirm she made the disclosure; she does not state when, where, and to whom she made it. In contrast, defense counsel said plainly, "I have no recollection of the fact that the prosecutor had agreed to send a letter recommending that Mr. Shockey be incarcerated near his mother's residence." Pet. Ex. 26 ¶ 5. Additionally, defense counsel made clear that they would have put this impeachment evidence to good use:

> Mr. Shockey was a critical witness against Mr. Thomas because he testified that Mr. Thomas had confessed to murdering Mrs. McKinney. Mr. Thomas had never made any inculpatory statement to law enforcement. Had the prosecutors disclosed to us the facts about the deal Mr. Shockey received in exchange for testifying against Mr. Thomas, as well as the fact that he had also offered to provide informant testimony against Mr. Norwood, we could have used this information to impeach Mr. Shockey's credibility. I believe these facts would have substantially undermined his testimony against Mr. Thomas, and created a reasonable doubt about whether Mr. Thomas participated in the murder of Mrs. McKinney.

*Id.* ¶ 6. It was unreasonable for the state habeas court to treat Rojas's equivocal, conditional as probative of whether or not the prosecution disclosed Shockey's deal. *See Haynes v. State of Wash.*, 373 U.S. 503, 510 (1963) ("He conceded that the petitioner 'could have' made such a request. No legal alchemy can transmute such wholly equivocal testimony into a denial or refutation of the petitioner's specific recitation of events."); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 868 (5th Cir. 1993) (discounting "highly equivocal testimony").

*Second*, and even worse, the state habeas court cited its own bias—its own predisposition to believe Rojas—as a reason for its finding that a disclosure was made:

> As the Judge who presided over Applicant's trial, I had the opportunity to observe and interact with Lytza Rojas many times. Further, I served as the presiding Judge of the 368th Judicial District Court in Williamson County, Texas, for twenty-four years. During a portion of that time, Lytza Rojas was assigned to my court and routinely appeared before me on hundreds of cases. I am well acquainted with Rojas' practices, procedures, and veracity.
> *Based on that experience*, as well as the totality of the record before me in this cause, I find Lytza Rojas' affidavit credible.

Ex. 3 ¶¶ 38–39 (emph. added). While a factfinder is entitled to evaluate the demeanor of witnesses and judge their credibility, that is not what the court did in the quoted paragraphs. Rojas did not give live testimony at the habeas proceeding; the court could only consider her written affidavit. At the habeas proceeding, the court, as factfinder, should have evaluated the credibility of every witness starting with a blank slate, judging his or her truthfulness and reliability solely based on the record. While a judge presiding over a state habeas proceeding is entitled to rely on his own recollections of the trial, Tex. Code Crim. Pro. Ann. Art. 11.071, § 9(a), Rojas did not give evidence at the trial—she gave evidence only in the habeas proceeding. The court's privilege to consider its own recollection of what occurred at trial is not a privilege to rely on its own favorable opinion or preconceived notion of a witness's "veracity" in order to evaluate that witness's credibility. A judge presiding over a habeas proceeding who also presided over the trial of the applicant is not thereby privileged to rely on a prejudice in favor of a witness formed over "hundreds of cases"[8] in the past. In sum, the habeas court's determination that Rojas was a credible

---

[8]     Such a long history of working on the same cases is a known obstacle to judicial impartiality. *See* Roberta K. Flowers, *An Unholy Alliance: The Ex Parte Relationship Between the Judge and the Prosecutor*, 79 NEB. L. REV. 251, 265–66 (2000). "Although the judge and prosecutor are active participants in the adversary system, their relationship often develops into a more interdependent and cooperative relationship than would be enjoyed by the defense attorney or the attorneys in a civil case." *Id.* "The entities may develop an affinity for each other out of a sense that each is serving the public in a common goal of efficiently and fairly processing the hundreds of cases that are assigned to their courtroom." *Id.* at 269.

witness was not a proper exercise of a factfinder's prerogative to assess the credibility of witnesses but an overt application of the court's own prefixed opinion that Rojas was an honest person.

*Third*, defense counsel would not fail to give the lie to Shockey and prove him to be a perjurer if they had known about his deal to be moved closer to his mother. Any competent defense counsel would have leaped at the chance to prove to the jury that the State's only direct fact witness had just lied to them. Defense counsel would not only have shown that Shockey was willing to lie under oath but that the prosecution was willing to suborn perjury, knocking down the credibility of the prosecution team in the jury's eyes along with the jury's confidence in Shockey.

It is not only unreasonable to believe that defense counsel would have missed this opportunity for effective cross-examination, but that Rojas, an experienced prosecutor, would have made her case so vulnerable. If she had disclosed the impeachment evidence to the defense, she would not have encouraged Shockey to say that he had no deal with the State. Indeed, Rojas's trial notes show that she had intended to ask Shockey about the bargain she made with him, but the transcript shows she failed to do so. Pet. Ex. 65 (reminding herself to elicit from Shockey that she told him she "could request movement to a different prison"). Realistically, if she had made an appropriate disclosure to defense counsel, she would not have neglected to ask Shockey about the consideration for his testimony.

For all these reasons, it was unreasonable for the state habeas court to find that Rojas had disclosed Shockey's deal to defense counsel.

## III.    If Shockey's deal with prosecutors was disclosed to the defense, then trial counsel was constitutionally ineffective for failing to use it.

### A.  Absent trial counsel's deficient performance, there is a reasonable probability that Mr. Thomas would not have been convicted.

#### 1.    Trial counsel performed deficiently by failing to cross-examine Shockey about his deal with the State when he lied on the stand and said the State had made no promises to him.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. An ineffective assistance of counsel claim has two components: Mr. Thomas must show that counsel's performance was deficient, and that the deficiency prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

To determine the prevailing professional standards, the Supreme Court "refer[s] to the ABA Standards for Criminal Justice as guides," specifically Standard 4-4.1. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (relying on ABA guides, specifically Standard 4-4.1, to find ineffective assistance); *see Williams*, 529 U.S. at 396 (same); *Strickland v. Washington,* 466 U.S. 668, 688 (1984) (referring to ABA Standards as "guides"). The American Bar Association confirms the obvious fact that pursuing ways to impeach prosecution witnesses is a basic duty of defense counsel: "Counsel's investigation should also include evaluation of the prosecution's evidence . . . . consideration of inconsistencies, [and] potential avenues of impeachment of prosecution witnesses." American Bar Association, Criminal Justice Standards for the Defense Function, Standard 4-4.1(c) (4th ed. 2017), *available at* https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/. Counsel is expected to carefully consider "whether and how to conduct cross-examination" and if it is warranted, to make sure it is "vigorous." *Id.* Standards 4-5.2(d) & 4-7.7(b).

The state habeas court found that Rojas disclosed Shockey's deal to defense counsel. Assuming that this finding was reasonable, then Thomas's defense counsel was ineffective for

failing to exploit the supposed disclosure. Shockey was ripe for impeachment after the following colloquy with Rojas:

| | |
|---|---|
| ADA Rojas: | Is it true and fair that I did tell you that I would be honest with a Parole Board or whoever asked me regarding you giving information on a capital murder offense? |
| Shockey: | Correct. |
| ADA Rojas: | And is it true that that's the only thing that I said that I would do for you, and the same for [ADA] Reno? |
| Shockey: | Correct. |

23.RR.154–55. If Thomas's defense counsel had evidence of Shockey's deal with the prosecution in their pockets, they would have been incompetent not to use it during their cross-examination. *Cf. Beltran v. Cockrell*, 294 F.3d 730, 734–35 (5th Cir. 2002) (Clement, J.) (overruling district court's contrary finding in habeas case and holding that petitioner was prejudiced because counsel performed deficiently by failing to impeach witness who identified defendant as the perpetrator with witness's earlier, tentative identification of other man).

> **2.    There is a reasonable probability that the result of the trial would have been different had trial counsel correctly cross-examined Shockey.**

In its findings of fact, the state habeas court suggests that defense counsel cut short cross-examination of Shockey because he sensed that he had already lost the confidence of the jury: "My recollection is that by the time Ms. Rojas reviewed Shockey's criminal history with him in front of the jury and the jury had the opportunity to judge Shockey's demeanor, the jury gave little, if any, weight to his testimony. I believe Mr. Brittain sensed the same and cut his cross short for that reason." Ex. 3 ¶ 53. Not only is this statement speculative and unsupported by specific observable facts drawn from the court's recollection, but it fails to explain why competent defense counsel would omit giving the lie to Shockey.

Shockey was the State's only fact witness in a case built on just three pieces of evidence: DNA samples taken from a small strip of tape, one fingerprint, and the confession Shockey supposedly witnessed. Questioning Shockey about a motive for his testimony, a motive that he lied about, would not only show that Shockey was an interested witness, but would show that Shockey had lied to the jury. It is incredible that competent defense counsel would allow such a major witness for the State to lie unchallenged. Failing to cross-examine Shockey about his deal thus fell short of the constitutional minimum expected of counsel in a death penalty case.

Assuming still that defense counsel was equipped by the prosecution with knowledge of Shockey's deal, Mr. Thomas was prejudiced by his counsel's failure to use it on cross-examination. "To establish Strickland prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694)).

Had defense counsel performed competently and proved to the jury that Shockey had lied to them, there is a reasonable probability that the outcome of the trial would have been different. The State's case rested on just three pieces of evidence, one of which was a confession that Shockey told the jury he witnessed. In a case with so little evidence and so little factual detail about events more than three decades before the trial, the testimony of a fact witness who could tell the jury that the defendant had confessed to the crime must have affected their deliberations. Cross-examining Shockey about his bargain would have done more than other evidence about his self-interest in helping the State: it would have shown the jury that Shockey was capable of perjury and that the prosecution was capable of suborning perjury in pursuit of a conviction.  For these reasons and the reasons Shockey's testimony was material adduced in Sections II.A.4 and III.A.3, there is a reasonable probability that failure to cross-examine Shockey changed the outcome of the trial.

**B.  Good cause exists for a *Rhines* stay so that this claim may be exhausted in state court.**

This alternative claim has not been presented to the state court. Should the Court find it necessary to reach this alternative argument, Mr. Thomas will request that the Court stay and hold these proceedings in abeyance so that he may exhaust it in state court. *See Rhines*, 544 U.S. at 278. Good cause exists for Mr. Thomas not having brought this alternative claim in state court because the affidavits given by trial counsel to habeas counsel explained that there had been no disclosure. *See id.* at 277 (requiring good cause). Only after the state habeas court used its own previously inscrutable experience to find that there had been a disclosure did it become appropriate to argue that there had been ineffective assistance of counsel in cross-examining Shockey.

If the State argues that a *Rhines* stay is unnecessary because this claim would be procedurally barred, Mr. Thomas is prepared to answer that argument in his reply.

**IV.  The State's presentation of false and misleading evidence that the DNA evidence connected to Mr. Thomas had to be from sperm independently violated *Napue*.**

The legal standard for this *Napue* claim is the same as the previous *Napue* claim. To prevail on a *Napue* claim, Mr. Thomas must show

(1) the State presented false or misleading evidence;

(2) the State knew or should have known the evidence was false or misleading; and

(3) the evidence was material in that "the false testimony could in any reasonable likelihood have affected the judgment of the jury."

*Napue*, 306 U.S. 264, at 269–71. *See Barham,* 595 F.2d at 243 n.17; *United States v. Sanfilippo*, 564 F.2d 176, 178–79 (5th Cir. 1977). When evaluating the State's knowledge, courts in the Fifth Circuit consider the entire "'prosecution team' which includes both investigative and prosecutorial personnel." *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (federal officer part of prosecution team); *see also  Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977) (state police

officer part of prosecution team); *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

### A. Texas violated Napue by presenting false evidence about the certainty that the DNA matching Mr. Thomas was from sperm.

The State's assertion that the DNA on the medical tape was from sperms cells proved to be critical support for its theory that Mr. Thomas assaulted the victim sexually, which was critical to the outcome. Prosecutors spent much of closing on this theme, going so far as to claim that "fresh" sperm found on Mrs. McKinney matched to Mr. Thomas.

The State needed to characterize the material on the tape as *sperm cell* DNA rather than DNA from skin cells to incriminate Mr. Thomas, because skin-cell DNA was consistent with the work Mr. Thomas had sometimes done in Mrs. McKinney's home. If the cells were not from sperm, then their presence on the tape would have had less value to the prosecution.

But these conclusive statements about sperm cells turned out to be false. It is undisputed that no DNA found on Mrs. McKinney matched to Mr. Thomas. 24.RR.73–76. And the source of the DNA on the tape was uncertain. The tape was sampled three relevant times—once in 1999, once in 2010, and once in 2014. Throughout the trial, the State's witnesses misleadingly testified that because the 1999 and 2010 DNA evidence was isolated in a "sperm cell fraction," any male DNA was from sperm, so the DNA evidence had to be, at least in part, from Mr. Thomas's sperm. But the presence of Mrs. McKinney's DNA in the sperm cell fraction gave the lie to the effectiveness of the differentiation. These false statements violated Mr. Thomas's due process rights.

### 1.   The State knowingly elicited false testimony about the certainty that the source of Mr. Thomas's DNA on the tape was from sperm.

i.   **The sperm cell fractions contained non-sperm DNA—the State's witnesses' testimony otherwise was knowingly false.**

As to the first element, the State's witnesses knowingly gave false testimony that, because the profiles from the 1999 and 2010 DNA evidence were from a "sperm cell fraction," any male DNA profile could only be from sperm.

***Trial Testimony.*** In answer to questioning by the prosecution, former DPS employee Gary Molina explained the term "sperm cell fraction," and explained that it resulted from a process "to separate the sperm cells from those epithelial [skin] cells":

> Q: When you see the term "sperm cell fraction," what does that mean?
>
> A: Sure. When we have a semen stain, we're able—because of the way that spermatozoa are built, ***we're able to take it through a technique that we can separate the sperm cells from any non-sperm cells***, namely, epithelial or skin cells. And the reason we can do that is because sperm cells tend to be hardier and harder to break apart than regular skin cells. ***So we take it through a process, and we're able to separate the sperm cells from those epithelial cells***. So you'll hear the term "sperm cell fraction" and "epithelial cell fraction."

23.RR.52–53 (emph. added).

He then testified that, in the cover letter for the profile he uploaded to CODIS in 1999, "it specifically state[d] the DNA profile being developed [is] from that sperm fraction of the tape." 23.RR.79, 31.RR.58.

The State's next witness to discuss the DNA was Kimberly Clement, a forensic scientist at the DPS Crime Lab. 23.RR.181. Clement also testified that differential extractions effectively separate skin cells from semen:

> By reviewing the case file, I was made aware that semen had been identified on this cutting. So knowing that semen is there, we use a different type of extraction called a differential extraction, and that ***extraction does good job of separating out a male component from a female component or, actually, a sperm cell fraction from other cells that may be present on the stain***. Sperm has a very strong membrane; it's very difficult to break open to get the DNA. So we can use an extraction procedure that would first break open all the easy cells, the epithelial cells or other cells, and then would save those sperm cells with the stronger membrane for a

separate extraction. So then we would be able to make two different samples from that extraction.

23.RR.206 (emphasis added).

Clement performed the 2010 extraction. She testified that, after her extraction, "the victim [Mrs. McKinney]" and a single "unknown male individual cannot be excluded as contributors to the profile" "from the sperm cell fraction." 23.RR.206–07. She then testified that "Steven Alan Thomas cannot be excluded as a contributor to the profile." 23.RR.220–21. ADA Rojas then asked three questions to elicit misleading testimony that the profile was from the sperm cell fraction, which meant that Mr. Thomas's profile was from sperm:

> Q: Okay. And so breaking that down, this profile that you found that was uploaded in 2010 was a DNA profile from a sperm cell fraction. Is that correct?
>
> A: Yes.
>
> Q: And can you remind us what is a sperm cell fraction?
>
> A: So again, a differential extraction was performed to obtain two fractions, a non-sperm cell fraction and a sperm cell fraction.
>
> Q: Okay. So we have a non-sperm cell fraction, which is the epithelial cells; then we have a specific sperm cell fraction. Is that correct?
>
> A: Yes.

23.RR.221. And ADA Rojas took care to explain away the appearance of Mrs. McKinney's DNA by eliciting testimony from Ms. Clement that "at least a portion of the profile that I obtained would have been from sperm cells." 23.RR.224–25.

In closing argument, prosecutors specifically cited the sperm cell fraction analysis as showing that the DNA match was to sperm:

> Nineteen years go by, and Gary Molina is able to—finally, the science has caught up—to extract that sperm and get him, that unknown profile.

. . .

- 57 -

And it's not until 19 years later that we get his unknown profile, his calling card. We've had it all along. And thank God it never left DPS. Thank God. It's been there this whole time, with the substance designed to give life, he took Mildred to her grave, his sperm. ***It's not an epithelial cell.*** It's not random cells left somewhere in the kitchen or in the living room or in the dining room. We are all in her bedroom. It's semen, ***a sperm cell fraction.***

25.RR.46–47 (emphasis added).

> ***The trial evidence was false and the trial team knew or should have known it was false.***

The trial evidence was incorrect—and the prosecution team knew or should have known that it was incorrect. *See Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case . . . ."). Despite the DPS witnesses' testimony, in evidence submitted at the state habeas level, DPS DNA Section Head Allison Heard explained that:

> I agree one cannot assume that the source of the DNA is from sperm cells if a DNA profile is in the sperm cell fraction.

St. Ex. 6 ¶ 76; *see also* St. Ex. ¶¶ 43, 70.[9]

This sperm-source assumption is even more tenuous because the evidence shows that the 1999 and 2010 sperm cell fraction analyses did not separate sperm from epithelial cells. It was undisputed at trial that Mrs. McKinney's non-sperm DNA appeared in the sperm cell fractions of both the 1999 and 2010 differential extractions. 23.RR.220 (2010 extraction); 23.RR.243 (1999 extraction).

Again, this was something that the State's investigators knew. Ms. Heard acknowledged that the presence of Mrs. McKinney's DNA in the sperm cell fraction could be consistent with the

---

[9]       Heard went on to state that, "depending on the serology test results of the stain, the strength of the profile (how much contribution) can be an indication of DNA source. If there truly was not complete separation during the differential DNA extraction and there was a third contributor (therefore the three sources being blood, semen and saliva) then I would anticipate the sperm cell fraction to be closer to a mixture of 3 individuals at approximately equal levels." St. Ex. 6 ¶¶ 76–77. But this statement doesn't account for the low number of sperm observed on the tape. *See* Pet. Ex. 146 ¶ 19.

differential extractions' "inability to obtain a clean separation due to [sic] number of epithelial or blood cells." St. Ex. 6 ¶¶ 35, 43, 70, 76. Heard also agreed that it "is commonly known that adhesives" like the medical "tape" "can impact the DNA analysis process." *Id.* at ¶ 48. Thus, Dr. Ford explains that he would therefore expect that the "sperm cell fraction" would include Mr. Thomas's non-sperm DNA:

> 22. In addressing the possibility that Mr. Thomas contributed non-sperm cells, Ms. Heard states that she would expect to see Mr. Thomas's DNA profile in the non-sperm fraction and not in the sperm fraction (paragraph 90). We know that Mrs. McKinney contributed non-sperm cells, but her profile did not show up in the non-sperm fractions in DPS's testing. As Ms. Heard points out, it is likely that inhibition and/or degradation caused Mrs. McKinney's non-sperm DNA to appear in the sperm fraction. I would expect Mr. Thomas's non-sperm DNA to be in the same fraction as Mrs. McKinney's, which is what we see.

Pet. Ex. 146; *see also* Pet. Ex. 78 at ¶¶ 53–55 (emph. added). Thus, the trial testimony from prosecution team members that generating a profile from sperm cell fraction necessarily meant that the genetic material was from sperm was false and misled the jury.

### ii. The State's witnesses also misleadingly testified that Mr. Thomas's DNA was the only male DNA present on the medical tape, when the medical tape contained DNA from multiple males.

*Trial Testimony.* The State's witnesses also misleadingly testified that Mr. Thomas's DNA was the only male DNA present on parts of the medical tape. See *United States v. Ballard*, 423 F.2d 127, 133–34 (5th Cir. 1970) ("In *Napue*, it was established that the State had deliberately participated in misleading the jury . . . ."). Testifying about the 2010 sample, Ms. Clement referred to "an unknown male profile" which generated the DNA; ultimately, Mr. Thomas could not be excluded from that profile. 23.RR.206–08, 221–25.

 Similarly, testifying about the 1999 sample from the medical tape, Ms. Clement explained: "I'm able to assign single-source statistics of a profile that would have been generated from one

individual"; again, she testified that Mr. Thomas could not be excluded from that profile. 23.RR.240–46.

### *The trial evidence was false and the trial team knew or should have known it was false.*

But the "more sensitive" Cellmark test of the 2014 sample of the medical tape revealed that it was "a mixture of *at least* two males." 24.RR.50–51 (emph. added), 64, 67–68, 72–73, 79–80. Mr. Thomas could not be excluded as the major contributor. *Id.* But there was at least one more male contributor. *Id.*

And, in its analysis of the medical tape, Cellmark did not use the chemical used to break open sperm cells, so Mr. Thomas's post-conviction DNA expert and Cellmark's DNA analyst agree that "it is unclear whether their testing captured DNA from sperm cells":

> Cellmark used a standard extraction procedure without DTT to extract DNA from these samples. DTT is the chemical which is used in the second extraction of a differential extraction in order to break open the sperm cells. Cellmark will sometimes perform a standard extraction supplemented with DTT to produce a single extract that contains DNA from both sperm cells and non-sperm cells, however, it does not look like they did that on Item 3. As such it is unclear whether their testing captured DNA from sperm cells.

Pet. Ex. 78 ¶37. Pet. Ex. 146 ¶¶17-19; St. Ex. 4 ¶¶ 22-24 (Cellmark's DNA analyst affidavit).

Because Cellmark's test did not separate sperm from skin/saliva cells, Thomas's status as the major contributor supports the inference that his genetic material was *not* sperm. Cellmark did not add the critical reagent that reacts effectively with sperm cells, DTT. *See* 31.RR.123-128; Pet. Ex.146 ¶¶ 17–19; Pet. Ex. 78 ¶ 57; St. Ex. 6 ¶ 78; St. Ex. 4 ¶ 23. Thus, Dr. Ford explains, "the simplest explanation would be that the DNA profile of the major contributor came from non-sperm cells . . . this result offers support that Mr. Thomas's DNA on the tape came from source other than sperm," Pet. Ex. 146, and is consistent with his established innocent presence at some point in the house rather than a possible non-innocent presence in the house.

Additional post-conviction evidence provides three more reasons that the 2014 Cellmark test undermines the State's findings that the 1999 and 2010 medical tape samples had only two contributors.

1. Post-conviction re-analysis of data from the 1999 sample reveals a third contributor because it shows an amount of DNA not attributable to Mr. Thomas or Mrs. McKinney and which exceeds the cutoff for stutter, so it must be interpreted as a true allele from another DNA contributor. Pet. Ex. 78 ¶¶ 59-60; Pet. Ex. 146 ¶ 15.

2. Since 2010, it has become widely known that interpretations of DNA mixtures from three or more persons ("complex mixtures") cannot be based on the validation studies used for two-person mixtures; without validation studies based on similarly-complex mixtures, interpretations of complex DNA mixtures are scientifically unsound. In 2010, the Scientific Working Group on DNA Analysis Methods ("SWGDAM") issued guidelines recommending that labs validate their complex mixture interpretation procedures, and since then an unequivocal consensus has built that methods for interpreting complex mixtures must be based on validation using studies of mixtures of more than two individuals. *See* Ex. 7, 2010 SWGDAM Interpretation Guidelines.[10] But, here, DPS investigators evidently assumed that the 1999 and 2010 samples were mixtures of only two contributors. *See* 23.RR.206–08, 221–25. They interpreted these samples based on validation studies for two-person mixtures. In light of the more sensitive 2014 Cellmark test, which shows that the mixture was complex, these interpretations are unsound. *See Escobar v. Texas*, 143 S. Ct. 557 (2023) (vacating and remanding CCA's denial of state habeas petition based on Texas's confession of error, which was itself based in part on the fact that Escobar had shown that the DNA lab had interpreted a complex mixture based on a validation study for a two-person mixture). Indeed, even DPS's Clement provided an affidavit in which she impliedly admitted that the procedure DPS employed was no longer valid and accepted, and she recommended the "data reported with CPI statistics be re-interpreted with today's standards . . . ." St. Ex. 5.

3. Scientific studies demonstrate that analysts often underestimate the number of contributors to a sample. One peer reviewed author found that for three-person mixtures where there was no allelic dropout—i.e., where all alleles were detected—there was a significant risk of mischaracterizing the mixture by underestimating the number of contributors. Ex. 8, Paoletti et al., Empirical Analysis of the STR Profiles Resulting from Conceptual Mixtures, J. FORENSIC SCI. (2005). Another scientific study found

---

[10]     It took several years for labs to implement the guidelines and recognize the need to perform validations specifically for complex mixtures. Since 2010, several other guidelines and authoritative documents have been published, cementing the unequivocal scientific consensus that methods for interpreting complex mixtures must be based on a lab's internal validation studies of mixtures of more than two individuals. *See* SWGDAM 2016 Validation Guidelines for DNA Analysis Methods; SWGDAM 2017 Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories; Ex. 11, 2018 ASB Standard for Validation Studies of DNA Mixtures, and Development and Verification of a Laboratory's Mixture Interpretation Protocol; and Ex. 12, 2019 ASB Standard for Forensic DNA Interpretation and Comparison Protocols.

that when half of the alleles are lost from degradation in a three-person mixture, there is a 20 to 30 percent mischaracterization rate of underestimating the number of contributors. Ex. 9, Haned et al., Estimating the Number of Contributors to Forensic DNA Mixtures: Does Maximum Likelihood Perform Better than Maximum Allele Count, J. FORENSIC SCI. (2011) Indeed, on this issue, a September 2016 report by the President's Council of Advisors On Science and Technology ("PCAST") observed: "It is often impossible to tell with certainty which alleles are present in the mixture or how many separate individuals contributed to the mixture, let alone accurately to infer the DNA profile of each individual." Ex. 10, PCAST Report at 76. Contrary to Ms. Clement's testimony that "within our field, we don't truly have error rates," 24.RR.21, these studies show that interpretations of complex DNA mixtures have error rates, and they are high.

The State's prosecution team was aware of the Cellmark test, aware that it was "more sensitive," 24.RR.50–51, aware that it, like the other tests here, did not separate sperm from skin/saliva cells, St. Ex. 4 ¶¶ 22-24 and St. Ex. 6 ¶ 78, and aware that it identified at least two male contributors, 24.RR.50–51. But as described below, they continued to describe Mr. Thomas's DNA as from sperm or semen.

> ### 2.   These misrepresentations about Mr. Thomas's DNA had a reasonable likelihood of affecting the trial outcome.

Finally, without the false evidence on Mr. Thomas's DNA, there is a "reasonable likelihood" that the verdict would have been different. The prosecutors knew this: they emphasized over and over that the DNA had to be from sperm cells because there was an obvious innocent explanation for the presence of Mr. Thomas's non-sperm DNA. While Mr. Thomas's sperm on a piece of medical tape could also be consistent with his innocence, it would not contradict the prosecution's story about rape. Much of the closing argument revolved around the point that Mr. Thomas's DNA was from sperm, as prosecutors referred 18 times to "semen" or "sperm." Prosecutor McCloud mentioned the evidence in the initial closing argument:

> The science is there. He has been confirmed four times. ***And we're not talking about epithelial cells***, which you know are skin cells, or saliva. ***No, that's not what's there. It's his semen. It is his semen.*** And if there is any more graphic or obvious way to be involved in a crime, I don't know what it is. You should believe that evidence. You should believe it beyond a reasonable doubt.

25.RR.22 (emph. addd).  And then prosecutor Rojas started the final closing argument with the

point:

> You can't have it both ways. You can't have it and stand up here in front of you
> intelligent people and say 'DNA is great for exclusion, not so much for inclusion.'
> 'Not so much' when it points to him, **to his sperm, to his semen**, the things that
> come out of his body.

25.RR.43 (emph. added). She emphasized the point throughout her final argument. 25.RR.46–48.

If Mr. Thomas's DNA were from epithelial cells, it would have been more reasonable for a jury to

believe that he left the DNA during his work as a pest control technician. Therefore any doubt

about the source of the DNA is material, and the prosecution witnesses' misrepresentations about

the strength of the evidence that the DNA was from sperm are material.  These misrepresentations

violated Thomas's due process rights under *Napue*.

### B.    Although the *Napue* claim is exhausted, it was not adjudicated on the merits in state habeas court and it is therefore unrestricted by 28 U.S.C. § 2254(d).

Under 28 U.S.C. § 2254(b)(1), federal habeas petitioners must fully exhaust remedies

available in state court before proceeding in federal court. To satisfy this requirement, a petitioner

must "fairly present[ ]" the substance of his claim to the highest state court. *Morris v. Dretke,* 379

F.3d 199, 204 (5th Cir. 2004). Here, Mr. Thomas has done so, but the state habeas courts did not

adjudicate it on the merits. Therefore, it is not restricted by 28 U.S.C. § 2254(d).

On March 22, 2020, the state habeas court designated additional issues for development at

an evidentiary hearing, including:

- Whether DNA evidence or testimony presented at trial was false or misleading.

- If the DNA evidence or testimony presented at trial was false or misleading,
whether there is a reasonable likelihood that the false or misleading testimony
affected the culpability verdict.

- If the DNA evidence or testimony presented at trial was false or misleading, whether there is a reasonable likelihood that the false or misleading testimony affected the sentencing verdict.

- Whether relevant scientific evidence is currently available regarding the DNA evidence that was not available at the time of trial because the evidence was not ascertainable through the exercise of reasonable diligence before or during trial.

5 SHR 2025.

The state habeas court held an evidentiary hearing on June 14, 2021. 6 SHR. The State and Mr. Thomas both presented evidence on the misleading DNA evidence, in particular, the certainty that the source of Mr. Thomas's DNA was from sperm left at the time of the crime. *See* St. Ex. 6, Pet. Ex. 78, Pet. Ex. 146. And Mr. Thomas proposed findings of fact on whether the DNA evidence materially misled the jurors into believing that there was no possibility that the DNA attributed to Mr. Thomas was not from sperm. *See* Ex. 2 ¶¶ 123, 113–15. But, while the state habeas trial court found that Mr. Thomas "has not met his burden to demonstrate that the DNA evidence was false or misleading," Ex. 3 ¶ 241, the state habeas trial court failed to address the issue of the certainty that the source of Mr. Thomas's DNA was from sperm left at the time of the crime, and it failed to consider cumulative error related to the DNA evidence. *See id.* In his objections to the state habeas trial court's findings, Mr. Thomas pointed out that the court "failed to address the misleading DNA evidence, that the source of Mr. Thomas's DNA was from sperm left at the time of the crime" and that "DNA had to be from sperm rather than epithelial cells." Ex. 5 at 20–21. But the CCA did not address the DNA evidence at all, only the arguments about DNA made in closing. *See* Ex. 6 at 6.

So, although the *Napue* claim is exhausted, it was not adjudicated on the merits in state habeas court and it is therefore unrestricted by 28 U.S.C. § 2254(d).

**V.      Trial counsel was constitutionally ineffective for failing to retain a DNA expert to investigate and identify the flaws in the States' DNA evidence.**

As discussed above, the Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. An ineffective assistance of counsel claim has two components: Mr. Thomas must show that counsel's performance was deficient, and that the deficiency prejudiced him. *See Strickland*, 466 U.S. at 687. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

**A.  Absent trial counsel's failure to retain a DNA expert to assess the State's DNA evidence, there is a reasonable probability that Mr. Thomas would not have been convicted.**

**1.      Failure to retain a DNA expert to critically examine the State's DNA evidence fell below an objective standard of reasonableness.**

As previously discussed with respect to the Shockey testimony, the professional norms for the defense of any criminal case impose on counsel the duty to investigate and evaluate the State's evidence. *See Wiggins*, 539 U.S. at 524; American Bar Assoc., *Criminal Justice Standards for the Defense Function, Standard 4-4.1(c), available at* https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/. "Defense counsel's investigation of the merits of the criminal charges should include efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others, *as well as independent investigation*. *Id.* (emph. added). Additionally, defense counsel's "investigation should also include evaluation of the prosecution's evidence (including possible re-testing or *re-evaluation of physical, forensic, and expert evidence*) and consideration of inconsistencies [and] potential avenues of impeachment of prosecution witnesses . . . ." *Id.* (emph. added). More specifically, in a capital case, defense counsel:

should make a prompt request to the relevant government agencies for any physical evidence or expert reports relevant to the offense or sentencing, as well as the underlying materials. ***With the assistance of appropriate experts, counsel should then aggressively re-examine all of the government's forensic evidence***, and conduct appropriate analyses of all other available forensic evidence.

American Bar Assoc., *American Bar Association Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1020 (2003) (emph. added) (commentary on Guideline 10.7—Investigation). That is, defense counsel

must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own. Yet investigating a homicide is uniquely complex and often involves evidence of many different types. ***Analyzing and interpreting such evidence is impossible without consulting experts*** – whether pathologists, serologists, microanalysts, ***DNA analysts***, ballistics specialist, translators, or others.

*Id.* at 955 (emph. added) (commentary on Guideline 4.1—The Defense Team and Supporting Services).

While trial counsel requested the State's DNA evidence and some limited re-testing of the State's DNA evidence, their failure to retain an expert to review the results of the DNA testing was deficient. DNA science is indisputably technical. As the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases make clear, trial counsel should "aggressively re-examine all of the government's forensic evidence" with the "assistance of appropriate experts." Thus, as the ABA Guidelines recognize, retaining a DNA expert to interpret and assess the DNA results was necessary to evaluate the prosecution's evidence. But here, trial counsel did not retain a DNA expert and therefore could not competently assess the State's forensic evidence, including the opinions of the State's DNA expert witnesses.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 528 (citation and quotations omitted). "In assessing the reasonableness of an attorney's investigation," "a court must consider not only the quantum of evidence already known

to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Here, because the known DNA evidence was both complicated and one leg of the prosecution's three-legged stool, a reasonable defense attorney would have sought to investigate it and undermine it with the assistance of a DNA expert.

2.    <strong>Trial counsel's deficient performance prejudiced Thomas.</strong>

From the beginning, it was apparent that DNA would be central to the State's case against Mr. Thomas. It was only the State's DNA evidence that made Mr. Thomas a suspect in the first place, 32 years after the murder. There were no eyewitnesses. By the time of trial, the State had only three pieces of evidence against Mr. Thomas: a thumb print; Shockey's testimony; and the State's DNA evidence and the testimony of its experts about that evidence. Without retaining an expert to review the DNA evidence, Mr. Thomas's opportunity to undermine the DNA evidence was left to the non-technical and non-scientific understanding and arguments of trial counsel.

In state habeas proceedings, Dr. Ford explained how a defense DNA expert could have assisted the attorneys in investigating the gaps in the DNA:

> 67. If I had been retained as a DNA consultant to assist defense counsel in preparing for trial and been provided with the discovery materials that were provided to me to prepare this declaration, I would have provided the defense attorney with discovery request language to obtain the missing materials. I would have advised the attorney that in order to be competent he would minimally need to obtain the following materials before proceeding to trial: (i) full case file from FSA including photographs of microscopy, photographs of items of evidence (particularly the tape cuttings) and records of DNA extraction and quantification; (ii) full case file from LabCorp including bench-notes regarding testing of samples, photographs of CTT gels (or equivalent raw data), standard operating procedures, interpretation guidelines, and validation studies undertaken with regard to CTT testing; (iii) materials missing from DPS's casefile including missing bench-notes, electronic data files, standard operating procedures (including stutter filters) and any validation studies they conducted regarding differential extraction of compromised samples; and (iv) Cellmark's standard operating procedures and any validation studies they had conducted regarding Y-STR testing of semen samples extracted with and without DTT.

Pet. Ex. 78.

The failure to investigate and assess the State's forensic is deficient by itself, but it also carried over to trial counsel's ability to competently present Mr. Thomas's defense to the jury. Without the assistance of a DNA expert, trial counsel was unable to identify weaknesses in the State's forensic evidence to be brought out during cross-examination of the State's DNA expert witnesses. And the jury never heard criticism of the State's DNA evidence from an expert with qualifications equal or superior to the State's experts.

Specifically, trial counsel never developed or presented to the jury the criticisms of the State's DNA evidence presented in the state habeas petition and here. As explained above, the DNA expert retained by state habeas counsel, Dr. Simon Ford, ably summarized the deficiencies in the State's expert testimony, showing how the State's experts erred by concluding that DNA that matched Mr. Thomas came from sperm also recovered at the crime scene. *See supra,* Section IV.A.1. Ford explained that the State's evidence did not establish that the DNA profile recovered from the tape that matched Mr. Thomas was from sperm. Rather, "the simplest explanation would be that the DNA profile of the major contributor came from non-sperm cells . . . this result offers support that Mr. Thomas's DNA on the tape came from source other than sperm." Pet. Ex. 146. He further explained the basis for his conclusion on Cellmark's failure to use the critical reagent that reacts effectively with sperm cells, DTT.

> Viewing Cellmark's Y-STR testing of the tape samples in a vacuum and assuming that there are some sperm cells on the sample, the simplest explanation would be that the DNA profile of the major contributor came from non-sperm cells, because these are the types of cells that would burst efficiently with the extraction procedure that was used, and the DNA profile of the minor contributor or contributors may have arisen from the occasional sperm cell that burst prematurely. As such, this result offers support that Mr. Thomas's DNA on the tape came from source other than sperm.

*See* Pet. Ex.146 ¶¶ 17–19. Had he or another DNA expert been retained by trial counsel, he could have presented these same observations and conclusions to the jury. *See* Pet. Ex. 78 ¶68. But these

are observations and conclusions that trial counsel could not even have developed—and, indeed, did not develop—without the assistance of a DNA expert.

Had the criticisms of the State's DNA evidence been known to trial counsel and raised at trial, there is a reasonable probability that the result at trial would have been different. Given the paucity of the State's evidence, undermining one of the three-legs of the State's stool would have likely changed the outcome. Had the Shockey testimony been undermined as described above, along with the DNA evidence, the State would have been left with a single thumbprint, the presence of which was explained by Mr. Thomas's previous pest-control service at the victim's home. And of course, at trial, Mr. Thomas needed only to create reasonable doubt in the mind of one juror.

### B. Good cause exists for a Rhines stay so that this claim may be exhausted in state court.

This alternative claim has not been presented to the state court. Should the Court find it necessary to reach this argument, Mr. Thomas will request that the Court stay and hold these proceedings in abeyance so that he may exhaust it in state court. *See Rhines*, 544 U.S. at 278.

If the State argues that a *Rhines* stay is unnecessary because this claim would be procedurally barred, Mr. Thomas is prepared to answer that argument in his reply. For example, Mr. Thomas is prepared to demonstrate that his state habeas counsel was ineffective for failing to bring this claim. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding . . . counsel in that proceeding was ineffective.").

**VI.     Mr. Thomas was deprived of his constitutional right to effective assistance of counsel at the punishment phase of his trial.**

Mr. Thomas's trial counsel failed to investigate red flags that he had experienced childhood abuse, a deficiency that the Supreme Court routinely finds violates defendants' Sixth Amendment right to trial counsel. The state habeas court's conclusions that Mr. Thomas had not shown deficiency and prejudice is an unreasonable application of clearly established law and an unreasonable determination given the evidence.

**A. Trial counsel's deficient performance in presenting mitigating evidence prejudiced Mr. Thomas and violated his Sixth Amendment right to effective assistance of counsel.**

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Courts review claims of ineffective assistance of counsel under the two-prong test of *Strickland*: (1) that counsel's performance was deficient, that is, "counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment," and (2) that such deficient performance prejudiced the petitioner, that is, counsel's deficient performance "deprive[d] the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 667. Both prongs are met here because Mr. Thomas's trial counsel failed to investigate and present evidence that he had experienced childhood abuse.

**1.     Trial counsel acted deficiently by failing to investigate and present red flags of child abuse.**

*Trial counsel must conduct a thorough mitigation investigation, pursuing any "red flags."* "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

Prevailing professional norms require capital lawyers to conduct a thorough mitigation investigation. *See Wiggins*, 539 U.S. at 524. "[C]ounsel should consider presenting ... [the defendant's] medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences." *Id.* (citing *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* as source of professional norms); *see* American Bar Assoc., *ABA Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. at 1022 (commentary on Guideline 10.7—Investigation).

When a "petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence . . . [and] counsel attempt to justify their limited investigation as reflecting a tactical judgment," the deference owed to such a strategic judgment turns on "the adequacy of the investigations supporting those judgments." *Wiggins*, 539 U.S. at 521. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (citation and quotations omitted). "In assessing the reasonableness of an attorney's investigation," "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

Conducting interviews and consulting experts is not constitutionally sufficient if counsel fails to pursue leads from the available evidence. Thus, for example, in *Rompilla v. Beard*, the Supreme Court found that, even though trial counsel had interviewed the defendant and some members of his family, and reviewed reports by three mental health experts, trial counsel was ineffective because they "ignored . . . red flags" in the available evidence and did not further investigate them. 545 U.S. 374, 381, 391 n.8 (2005).

***The defense team's initial investigation turned up red flags of child abuse, which they
failed to investigate.*** Mr. Thomas was represented by William "Steve" Brittain and Allan
Williams. CR.6, 14–15. Counsel retained mitigation specialist Gerry Byington. Pet. Ex. 105 at
394.

Mr. Byington was working on at least twelve other capital cases at the same time. *See* Pet.
Ex. 57; Pet. Ex. 92; Pet. Ex. 96; Pet. Ex. 97; Pet. Ex. 98;Pet. Ex. 99. He worked fewer than 160
hours on the case. Pet. Ex. 41.[11] In this work, Mr. Byington visited Mr. Thomas just twice, each
visit for two hours, likely each including an hour of travel time, so that the total time was itself just
two hours. *Id.* In post-conviction, Michael Wiseman, a capital trial and post-conviction attorney
with 40 years of experience reviewed the case and provided an opinion on counsel's performance.
Pet. Ex. 85. He states that in the 27 years that he has reviewed capital convictions, he has never
seen a case in which the appointed mitigation specialist visited the client for only two hours. *Id.*
¶ 18.

Counsel also retained a psychiatrist, Dr. Leonard Weiss, to evaluate Mr. Thomas. Pet. Ex.
45. Dr. Weiss spent an hour reviewing records, and five hours interviewing Mr. Thomas. Pet. Ex.
44. In a report to counsel titled "Mitigation of Steven Thomas," Dr. Weiss identified that Steven
had experienced a "[1] A childhood filled with abuse: physical as well as emotional [2] and drug
abuse and dependency which affected his brain to a profound extent and contributed to his
violation behavior. [3] He was also a victim of untreated mental illness." Pet. Ex. 46 at 1.

Dr. Weiss explained the following:

- Mr. Thomas had a physically and emotionally abusive mother and father. *Id.* Mr.
  Thomas was severely beaten at home with a strap, belt, or flyswatter for hours on
  end, often daily. *Id.* Mr. Thomas was compared to his older brother, which caused
  further beatings. *Id.* at 2.

---

[11]     Counsel also retained a fact investigator, who worked the case for only one day. Pet. Ex. 42a.

- Mr. Thomas got drunk for the first time at 12, and used marijuana daily from the time he was 18. Mr. Thomas also abused cocaine, methamphetamine, alcohol, and Valium. *Id.* at 2–3. The degree, duration, quantity and quality of drug and alcohol abuse predisposed Mr. Thomas's brain to paranoia and violent behavior. *Id.*

- Mr. Thomas suffered from an untreated mental illness, specifically ADHD and possible bipolar disorder. *Id.*

Given what counsel "actually discovered" through the expert, the "scope of their investigation was unreasonable." *Wiggins*, 539 U.S. at 525.

**But trial counsel did not investigate these flags or convey them to the jury**. *Cf.* 28.RR.1–159*, generally*. Mr. Thomas's post-conviction state habeas counsel interviewed many family members who had not been interviewed, or even contacted, by Mr. Thomas's trial team, including:

- Deborah Crane, Bruce Thomas's first wife, who lived with the family just after she and Bruce had finished high school. *See* Pet. Ex. 30 ¶ 31.

- Shawn Crane, Mr. Thomas's nephew. *See* Pet. Ex. 28 ¶ 31.

Even for the witnesses interviewed by counsel and the defense team, like Steven's brother Bruce Thomas, the trial investigation was cursory. Bruce explained that "[b]efore Steven's trial, I spoke once or twice in person with the mitigation specialist on the case, Gerry Byington. Gerry and I met up at my parents' house to talk. My mother tried to put her nose into everything, and I think she and my father were around during my interview with Gerry." *See* Pet. Ex. 114 ¶ 44.  "For the punishment phase, Steven's trial attorneys did not tell me they planned to have me testify. I was actually in Oklahoma when my daughter called me and told me I was scheduled to testify the next day. I had to drive through the night to get back in time. I did not know what questions they were going to ask me when I got on the stand." *Id.* ¶ 45.

Trial counsel's failure to investigate these red flags was deficient performance based on incorrect information and not a reasonable strategy. In a post-conviction affidavit, trial counsel swore that they chose not to investigate and present evidence about Rita's abuse of Mr. Thomas

because they believed (1) the family would contradict the expert's report, and no one else would testify to it, and (2) Bruce was successful:

- In interviews, "Bruce Thomas stated that the Defendant was disciplined but in no way was the victim of child abuse." St. Ex. 40 ¶ 8.

- Dr. Weiss's "source of the frequency and nature of the beatings was the Defendant," and "the Court may have ruled that this was hearsay and inadmissible at trial." *Id.* ¶ 9.

- "Factors we considered in formulating a theory of the defense . . . Efficacy of presenting an abusive unfortunate childhood in combination with the potential state response: 'abuse excuse' and the apparent success of a sibling raised by the same parents in the same home. This sibling denying that the abuse and neglect took place." *Id.* ¶ 13.

- "We anticipated the state could call family members as witnesses, who could contradict the horrific mistreatment of the Defendant as a child." *Id.*

This affidavit only underlines trial counsel's incompetence. Bruce Thomas's post-conviction affidavit shows defense counsel to have entirely misunderstood the facts. Bruce's testimony about the nature and frequency of his mother's physical punishment would have been consistent with the expert report: his mother used a "switch" or "a belt" and "left welts to get her message across." Pet. Ex. 114 ¶¶ 21, 46.[12] "No more than a couple of weeks would pass before a whipping at my house . . . if a child refused to do something they were asked, he got beaten." *Id.* ¶¶ 22–23, 46. Ms. Crane and Shawn Crane would also have been willing to testify to the abuse. *See* Pet. Ex. 28 ¶ 31; Pet. Ex. 30 ¶ 31.

If trial counsel were concerned that Bruce's "apparent success" would contradict this narrative, scratching the surface of that "success" would have eradicated the concern. Every

---

[12]    Dr. Jess Ghannam, Professor in the School of Medicine at the University of California, San Francisco, and former Chief of Medical Psychology at UCSF-Mount Zion Medical Center, explains that, "It is not surprising, psychologically, that both Bruce and Mr. Thomas do not define their mother's treatment of them as abusive." Pet. Ex. 106 ¶ 22 (Dr. Ghannam's expert report). "Characterizing Rita's treatment of her children as abusive is threatening to both of her sons because they must then engage with the feelings of fear they had to survive. *Id.* In abusive families, it is a common coping mechanism to project an image of an idealized family. *Id.* ¶ 21.

witness interviewed in post-conviction could have testified to Rita treating Steven worse than Bruce. And it would have been easy to elicit testimony that Bruce in fact had not been that successful: married and divorced six times, bankrupt five times, and addicted to cocaine and gambling. *E.g.*, Pet. Ex. 32 at ¶¶ 12, 15, 17, 18.

Counsel's failure to discover this evidence is not supported by a "reasonable professional judgment"; indeed, here, as in *Wiggins*, "counsel discovered no evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless." *Wiggins*, 539 U.S. at 51, 521. Instead, "having acquired only rudimentary knowledge" of Steven's history, trial counsel filled in the blanks with assumptions, "making a fully informed decision with respect to sentencing strategy impossible." *See id.* at 524, 527–28.

Moreover, here, as in *Andrus*, "due to counsel's failure to investigate compelling mitigating evidence, what little counsel did present backfired by bolstering the State's aggravation case," which, along with counsel's "overlooking" significant mitigation evidence, "effected an unconstitutional abnegation of prevailing professional norms." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020). In *Andrus*, the Supreme Court explained that, because the defendant's trial counsel failed to investigate mitigating evidence, much of the "so-called mitigating evidence" "unwittingly aided the State's case in aggravation," confirming "the gaping distance between his performance at trial and objectively reasonable professional judgment." *Id.* at 1883. So too here.

In *Andrus*, defense counsel put on evidence from the defendant's mother that "sketched a portrait of a tranquil upbringing, during which Andrus got himself into trouble despite his family's best efforts," and the defendant "fell into drugs entirely on his own." *Id.* The same thing happened in this case. Defense counsel elicited testimony from Mr. Thomas's brother, Bruce, that their parents were supportive of Mr. Thomas. 28.RR.8, 12–13. The only negative childhood experiences

that Bruce Thomas testified to were about Mr. Thomas's childhood illnesses and injuries. *Id.* at 11. This portrayal of a close, supportive family, with few hardships, let the prosecutors argue to the jury that "[h]aving a wonderful family, a family that loves you despite, is not mitigating; it's aggravating." 29.RR.47–48. "The opportunities that [Mr. Thomas] had are the same as many of us that are sitting in this courtroom today . . . . He could have done anything he wanted for the last 34 years. He chose to be a drug dealer. He chose to be assaultive." 29.RR.16. "Nothing there. None of those choices, is there any mitigation." 29.RR.49. This prosecution strategy could have been predicted, and defense counsel's elicitation of apparently aggravating evidence underlines their deficient representation. *See Andrus*, 140 S. Ct. at 1883; *Sears v. Upton*, 561 U.S. 945, 947 (2010) ("The prosecutor ultimately used the evidence of Sears' purportedly stable and advantaged upbringing against him during the State's closing argument.").

> **2.** **Counsel's deficient performance prejudiced Mr. Thomas because, had the defense team investigated further, extensive evidence of Mr. Thomas's childhood abuse and trauma was readily available.**

Prejudice exists if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether the defendant deserved the death penalty rather than a lesser sentence. *See Wiggins*, 539 U.S. at 536. The reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation." *Andrus*, 140 S. Ct. at 1886 (quoting *Williams*, 529 U.S. at 397–98) (remanding for Texas CCA to apply this rule when deciding the prejudice prong). Because Mr. Thomas's "death sentence required a unanimous jury recommendation, prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [his] 'moral culpability.'" *Id.* (quoting *Wiggins*, 539 U.S. at 537–538, and citing Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(e)(1)).

- 76 -

Here as discussed immediately above, in Section VI.A.1, the defense team presented a sunny view of Mr. Thomas's background that prosecutors used against him in closing. 28.RR.8–13, 29.RR.16, 47–49. But had the defense team investigated further, extensive evidence of Mr. Thomas's childhood abuse and trauma was readily available.

Had the defense team investigated further, additional witnesses would have confirmed that Mr. Thomas experienced childhood abuse. While Steven Thomas's mother, Rita Thomas, tried to project the appearance of a normal middle-class family, *e.g.,* Pet. Ex. 28 ¶ 15, Mr. Thomas's family was driven by violence, abuse, and addiction that left him traumatized.

Mr. Thomas was born in 1958 to Rita Graham Thomas and William "Bill" Thomas. In a sworn declaration, Mr. Thomas's older brother, Bruce, stated that Rita often physically punished him and Steven, especially Steven:

> As far as discipline in our house, my mother was the disciplinarian. She would whoop our asses. I would rather get a beating from my father than a whooping from my mother. When my mother was mad at Steven or me, she would demand that we go outside and pick out a switch for her to use against us. If I came back with a dinky flower as a switch, my mother would go pick one out herself. She also used a belt to whip us. She left welts on us to get her message across. One time, my mother even used a coat hanger, and beat us until we nearly bled.

> Steven got whipped by my mother more than me, for whatever reason. No more than a couple of weeks would pass before a whipping at my house. When my father disciplined Steven or me, he also used a belt.

> My mother's whole family was the same way in terms of discipline . . . . When they whooped you, they beat you nearly half to death. That was the kind of upbringing I was used to. I realized later that not all families were like my family . . . . In my family, if a child refused to do something they were asked, he got beaten.

Pet. Ex. 114 ¶¶ 21–23. He stated that he would have "gladly told Steven's defense team everything I have stated in this declaration and would have testified to the same if I had been asked on the witness stand." *Id.* ¶ 46.

While both Bruce and Mr. Thomas experienced physical punishment from their parents, Bruce had a substantially different childhood. Pet. Ex. 106 ¶ 27. In the first five years of his life, Rita formed a close bond with Bruce when she cared for him at her parents' house while she was divorced from Bill. *Id.* Mr. Bruce was a better academic and athlete, and received support and praise from his teachers, coaches, and teammates, protective factors Mr. Thomas did not have. *Id.*

Deborah Crane, Bruce's first wife, who lived with the family just after she and Bruce had finished high school, remembered Rita's violence. She stated that "Rita had an absolutely terrible temper and she frequently lashed out at Bill, Bruce, and Steven over the smallest things. . . . During arguments, she would move forward, screaming, then rear her arm back and slap her husband and her sons full force across the face so your head would get knocked to the side" Pet. Ex. 30 ¶ 7.

Ms. Crane explained that Steven was an especially frequent target: "there seemed to be something about Steven that Rita resented or hated." *Id.* ¶¶ 7, 10; Pet. Ex. 27 at 14–15 (Crawford Report). She "belittled and abused" Mr. Thomas more than anyone else in the family. Pet. Ex. 30 at ¶ 7. "When Rita got really angry at Steven, which was often, she slapped him across the face." *Id.* ¶ 8. "When Rita hit Steven, he had to just stand in front of his mother and take the humiliating beatings." *Id.* ¶ 9.

Bruce and Deborah's son, Shawn, born when Steven was an adolescent, also remembered the abuse: "Rita loved to slap people, especially Steven. These slaps would be full force blows across the face." Pet. Ex. 28 ¶ 10. He explained, "Rita's abuse was physical, psychological, and emotional," *Id.* ¶ 11. Her primary target was Mr. Thomas: "Most of my memories of physical violence in the household are of Rita hitting Steven. Rita hit Steven on a regular basis, and Steven just stood there and took the hits." *Id.* ¶ 12. Steven's son, Blake Thomas, also remembered Rita's violence: "It did not take much to set her off and when her temper got going, it was terrifying to

- 78 -

be around her. . . . Not only did she yell and scream, when her temper really exploded, she would slap people as well." *Id.* ¶ 10.

The violence affected Mr. Thomas. Ms. Crane remembered that Mr. Thomas would "claw[] at his own face" and dig "his fingernails into the sides of his face at his temples" while Rita beat, berated, and screamed at him. Pet. Ex. 30 ¶ 8. "[T]he way Rita treated Steven was damaging him and leaving him with no confidence or self-esteem . . . . She festered his temper by the way she mistreated him . . . . Steven once confessed to me that he hated his mother." *Id.* ¶ 9.

After analyzing the materials here and interviewing Steven and his family members, Dr. Sarah Crawford concluded that

> Steven Thomas experienced ongoing and cumulative trauma from his exposure to repeated and continuous family violence, physical abuse, psychological abuse, emotional abuse, neglect, and family problems related to substance abuse and addiction.
>
> . . . .
>
> Steven began self-medicating by using alcohol at the age of 12, psychotropic medications at 16, marijuana at 17, and cocaine at 18. His untreated cumulative trauma and untreated addiction problems caused Steven to struggle in his daily life and led to repeated encounters with the criminal justice system.

Pet. Ex. 27 at 1–2 (Crawford Dec.); *see also* Pet. Ex. 106 at 1–2 (Ghannam Dec.) (agreeing). Without access to drugs or alcohol, Mr. Thomas has had very few disciplinary issues while incarcerated. Pet. Ex. 27 at 26.

The mitigating evidence Counsel failed to uncover is of the exact sort that has been found, again and again, to be mitigating.

The Supreme Court has held four times that, in a capital case, failure to investigate and present readily available evidence of severe child abuse is not discretionary with the lawyer, not merely cumulative, not a harmlessly overlooked or optional supplement to an otherwise

unobjectionable mitigation case, but is instead prejudicial and rises to the level of a constitutional violation.

- In *Porter v. McCollum,* 558 U.S. 30, 33, 43 (2009), the Court held that "it is unreasonable to discount to irrelevance" the evidence that defendant's father was "violent every weekend," especially "when that kind of history may have particular salience for a jury evaluating" the defendant's relationship with the victim.

- In *Rompilla*, 545 U.S. at 392, the Court found prejudice based on undiscovered mitigating evidence, including that the defendant had been "abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks" and had been "subjected to yelling and verbal abuse."

- In *Wiggins,* 539 U.S. at 535–36 (2003), the Court held that "[g]iven both the nature and the extent of the abuse petitioner suffered," "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."

- And in *Williams*, 529 U.S. at 398, the Court held that "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."

In *Eddings v. Oklahoma*, 455 U.S. 104, 107, 115 (1982) (citation and quotations omitted), the Court similarly held petitioner's evidence that his father had used "actual punishment, or physical violence—hitting with a strap or something like this" and emotional disturbance "is particularly relevant" and thus a judge's failure to consider it was not harmless.

Failure to put on evidence of child abuse is prejudicial even if there is also significant aggravating evidence—for example, in *Williams*, the prosecution proved that the petitioner had been convicted of armed robbery, burglary, grand larceny, arson, and had confessed to two auto thefts and two separate violent assaults on elderly victims. *Williams*, 529 U.S. at 368. The Court still found that the failure to put on evidence of abuse prejudiced the petitioner. *Id.* And the weight of such evidence is especially clear because Mr. Thomas was 20 at the time of the alleged offense. *See Eddings*, 455 U.S. at 115 (holding that because "the defendant was 16 years old at the time of the offense there can be no doubt" of the relevance of child abuse).

- 80 -

The Supreme Court's holdings reflect the reality that jurors likewise find evidence of childhood abuse compelling. *See* Margaret C. Stevenson, Bette K. Bottoms & Shari S. Diamond, *Jurors' Discussions of a Defendant's History of Child Abuse and Alcohol Abuse in Capital Sentencing Deliberations*, 16 Psych., Pub. Pol'y and L. 1, 25 (2010) ("As hypothesized, jurors were more likely to use child abuse directly as a mitigating factor than to use it directly as an aggravating factor."). This is especially so where psychological evidence is available, as would have been available here from Dr. Weiss. *See* John H. Montgomery, J. Richard Ciccone, Stephen P. Garvey & Theodore Eisenberg, *Expert Testimony in Capital Sentencing: Juror Responses*, 33 J. Am. Acad. Psych. L. 509, 509 (2005) ("The jurors in this study were significantly influenced, however, by psychiatric/psychologic testimony in the area of a defendant's mitigating mental abnormality.").

Thus, because reweighing the available mitigation evidence against the evidence in aggravation is "sufficient to undermine confidence in the outcome." Mr. Thomas was prejudiced by his counsel's deficient performance, and his Sixth Amendment rights were violated.

**B. The adjudication on the merits in State court proceedings resulted in a decision that was contrary to and involved an unreasonable application of clearly established federal law.**

Addressing this issue, the Texas Court of Criminal Appeals denied relief "because Applicant has failed to show by a preponderance of the evidence that his trial counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance." Ex. 6 at 3. This ruling "does not conclusively reveal whether it determined that [Thomas] had failed to demonstrate deficient performance under *Strickland*'s first prong, that [Thomas] had failed to demonstrate prejudice under *Strickland*'s second prong, or that [Thomas] had failed to satisfy both prongs of *Strickland*." *Andrus*, 140 S. Ct. at 1886 (analyzing same

language). The CCA does not make any further factual finding, so the courts should look through the CCA's ruling to the state habeas trial court's ruling. *See Ex parte Simpson*, 136 S.W.3d 660, 668 (Tex. Crim. App. 2004) ("There is no provision in article 11.071 that permits either the State or the habeas applicant to submit original evidence directly to this Court."). The state habeas trial court concluded that Mr. Thomas had failed to show deficiency and had failed to show prejudice. Ex. 3 ¶¶ 98–145.

Because this claim was adjudicated on the merits, to obtain relief, Mr. Thomas must show that the state habeas court's adjudication either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Here, 28 U.S.C. § 2254(d) does not bar Mr. Thomas's claim. Looking at the first *Strickland* prong, the state habeas trial court's decision about counsel's deficient performance was both contrary to clearly established Federal law and based on an unreasonable determination of the facts. Looking at the second *Strickland* prong, state habeas trial court's decision about prejudice was also contrary to clearly established Federal law. Mr. Thomas is entitled to relief.

      **1.**    **28 U.S.C. § 2254(d) does not bar this claim because, in its evaluation of deficient performance, the state habeas court relied on an unreasonable determination of the facts, so Mr. Thomas meets the Section 2254(d)(2) exception.**

The state habeas trial judge found trial counsel's affidavit "credible," and found that defense counsel's interviews "provided trial counsel an accurate and complete picture of Applicant's childhood and early years." Ex. 3, ¶¶ 68, 72. This finding was an "unreasonable

determination of the facts in light of the evidence presented in the State court proceeding" because it was based on "a clear factual error." 28 U.S.C. § 2554(d)(2); *Wiggins*, 539 U.S. at 528.

As explained immediately above, in Section A of this claim, the picture trial counsel had of Bruce's memory of Mr. Thomas's childhood was contradicted by the reality uncovered in the post-conviction investigation. That investigation showed that Bruce would not have "contradict[ed] testimony that [Thomas] was mistreated as a child," Ex. 3 ¶ 87, but would have corroborated it. Pet. Ex. 114 ¶¶ 21–23. The state habeas court did not cite Bruce's post-conviction affidavit, either ignoring it or not considering it at all. Thus, the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented.

> **2. Mr. Thomas satisfies 28 U.S.C. § 2254(d)(1) because, in evaluating deficient performance, the state court failed to identify or apply an objective standard; and applying the appropriate standards, trial counsel's performance was deficient.**

A decision is contrary to Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Court's] cases" or if it "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams*, 529 U.S. at 405–06. Here, the state habeas court did both; each is an independent reason that Mr. Thomas is entitled to relief.

> ***The CCA and state habeas trial court failed to apply an objective standard.***

*Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter,* 562 U.S. 86, 110 (2011) (citations omitted). Objective standards of reasonableness are the "professional norms" prevailing at the time of the trial. *See Stricklan*d, 466 U.S. at 688. A habeas court must identify the prevailing professional norms before it decides whether a potential justification for counsel's performance is

objectively reasonable. *Id.* But the state habeas court did not identify any standards for assessing deficient performance.

Mr. Thomas, by contrast, offered evidence of the professional norms at the time of his trial and how his Counsel failed to meet those benchmarks. *See* Ex. 3 at Section III(B). In addition, he submitted a declaration from Michael Wiseman describing the standard of care for capital counsel. Pet. Ex. 85. Neither the CCA nor the state habeas trial court referred to either. This is a second reason that Mr. Thomas avoids the relitigation bar.

### *The CCA and state habeas trial court arrived at a different result than Rompilla.*

Instead, the courts found Mr. Thomas failed to prove that counsel was deficient without applying "an objective standard of reasonableness." *See, e.g.*, Ex. 6 at 3; State Findings at 19, ¶ 114. The state habeas trial court stated that Mr. Thomas's case was not like cases in which relief had been granted, but did not perform a reasoned analysis, ignoring *Strickland*. Ex. 3 at 17–19. Rather than identifying objective standards of reasonableness, the trial court embraced an outcome determinative mishmash reminiscent of the subjectivity of Justice Potter Stewart's test for obscenity: "I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

If the state courts had appropriately weighed Counsel's performance using the prevailing professional norms, they would have found the investigation unreasonable. The prevailing norms require capital lawyers to conduct a thorough mitigation investigation. *See Wiggins*, 539 U.S. at 524 ("[T]opics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.") (citing *ABA Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*). This obligation exists independently

and does not depend on the client's or his family's reporting. *See Rompilla*, 545 U.S. at 377 (holding that counsel must investigate even when "a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available"). Additionally, simply conducting interviews of people who knew the defendant and consulting experts is not constitutionally sufficient if counsel overlooks available evidence and fails to thoroughly explore circumstances that would lead to discovery of relevant mitigating circumstances. *Id.* (while trial counsel conducted interviews of the defendant's family and acquaintances and employed three mental health professionals, they were ineffective for failing to obtain available records and pursue red flags revealing brain dysfunction).

But the state habeas courts did not address trial counsel's failure to investigate red flags of childhood abuse and neglect, mental health issues, and brain dysfunction. The Findings violate Supreme Court jurisprudence by excusing counsel's failure to pursue these leads saying that they interviewed some witnesses and hired experts. *Compar*e Ex. 3 at 18, ¶ 106, *with Rompilla*, 545 U.S. at 381. Talking to some witnesses and hiring experts does not absolve counsel. The post-conviction record is also clear that there are many witnesses trial counsel never interviewed, numerous leads pointed out by defense experts that were never investigated, and significant amounts of collateral life-history records that were never obtained. Trial counsel thus could not have performed a thorough mitigation investigation on which to base strategic decisions, given the lack of investigation into these significant avenues of mitigating evidence. In light of the legal standards and the post-conviction record, the excuses raised in post-conviction on which the State habeas courts relied are unreasonable. For instance, the state habeas trial court concluded that trial counsel performed an "extensive mitigation investigation," *see* Ex. 3 at 18, ¶ 106, despite never fully investigating the red flags as reported by Dr. Weiss and Dr. Yount and never speaking to

many witnesses discovered during the post-conviction investigation who corroborated Mr. Thomas's life history of trauma. This is a third independent reason that the Mr. Thomas avoids the relitigation bar.

### 3. Mr. Thomas satisfies 28 U.S.C. § 2254(d)(1) because the state habeas court failed to apply the proper prejudice inquiry.

The state habeas trial court's decision that Mr. Thomas was not prejudiced involves an unreasonable application of clearly established federal law.

A reviewing court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98 (citation omitted). If a state court fails to do so, it fails "to apply the correct prejudice inquiry." *Sears*, 561 U.S. at 956. Evidence that a defendant experienced beatings as a child is relevant mitigating evidence, and "it is unreasonable to discount to irrelevance the evidence of [the defendant's] abusive childhood, especially when that kind of history may have particular salience for a jury evaluating [the defendant's] behavior in his relationship with [the victim.]" *Porter*, 558 U.S. at 43 (reversing denial of writ of habeas corpus under Section 2254(d) and reasoning that the state court's evaluation of prejudice prong violated law).

But that is exactly what the trial court did here. Although the trial court mentioned "the totality of the evidence," the trial court short-circuited the prejudice analysis. Ex. 3 ¶ 145. In its analysis, the state habeas court did not address any of the mitigating evidence of childhood beatings and how that evidence would have changed the evidentiary picture at Mr. Thomas's sentencing trial. *See id.* ¶¶ 145, 115–45. Instead, the habeas court detailed only the "significant aggravating evidence" to conclude there was no prejudice. *See id*. This reasoning "discount[s] to irrelevance" the mitigating evidence, contrary to *Porter*. *See Williams*, 529 U.S. at 368 (holding that, even

though the prosecution proved that the petitioner had been convicted of armed robbery, burglary, grand larceny, arson, and had confessed to two auto thefts and two separate violent assaults on elderly victim, the defense's failure to put on evidence of childhood abuse prejudiced the defendant). This is a fourth independent reason that Mr. Thomas avoids the relitigation bar.

For all of these reasons, Section 2254(d) is satisfied as to Mr. Thomas's claim for ineffective assistance of counsel on mitigation.

## VII.   Mr. Thomas was convicted and sentenced to death without due process of law because the State lost the majority of the physical evidence collected from the crime scene during the thirty-four years that elapsed between the victim's death and his trial.

Mr. Thomas found himself accused of a crime three decades after its commission—and in the intervening years, the State lost much of the most probative evidence. The State's failure to preserve crucial physical evidence collected from the crime scene deprived Mr. Thomas of his right to present evidence in his defense and violated the State's obligation to preserve material evidence. The State lost

- fingernail clippings from the victim,

- a strip of bedsheet,

- the bedside alarm clock,

- six hairs recovered from the victim's body,

- a glove found under the victim's head,

- Mrs. McKinney's nightgown,

and various other items from the crime scene that could have contained forensic evidence of the identity of the murderer. 20.RR.171–75. Indeed, at trial, Gary Molina, a forensic specialist who worked on the case in the 1990s, testified that he had reason to believe that the nightgown, glove, and strip of bedsheet all contained semen. 23.RR.56–57. Specifically, he affirmed that he wanted to examine these items because previous reports and notes in the casefile suggested that

they may contain semen. *Id.* Thus, he told the court he requested them from the Department of Public Safety, only to be told that they could no longer be found. *Id.*

A "fundamental requirement of due process is the opportunity to be heard." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (citation and quotation omitted). The need for a vigorous defense against the State's case is heightened where the State seeks the death penalty: the "qualitative difference[] between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

The missing evidence could thus have played a critical role. Re-examining the alarm clock might have led Mr. Thomas's lawyers to find additional indications that the fingerprint was placed during pest control. And the fingernail clippings, hair, and nightgown might have helped police identify the true perpetrator.

The loss of physical evidence compromised the reliability of Mr. Thomas's trial because the remaining physical evidence was nearly all that the State had to link him to the murder. Aside from the testimony of Shockey, a serial jailhouse snitch who perjured himself at Mr. Thomas's trial, the State's case rested only on physical evidence: a 30-year fingerprint recovered from the now-missing bedside alarm clock and DNA from medical tape. The heart of the State's case was therefore circumstantial, forensic evidence that at most placed Mr. Thomas at the crime scene before the murder.

The testimony of Mr. Thomas's brother (put on by the State) showed that he had visited the victim's house to spray for bugs, and Mr. Thomas's own statements to law enforcement established that he sometimes rummaged for drugs in his customers' medicine cabinets. The defense thus had an equally plausible theory for why Mr. Thomas's DNA was on the medical tape and his fingerprint was on the bedside alarm clock: he had been in the victim's bedroom to spray

for insects, and he had been in her medicine cabinet feeling around for pills where DNA from his skin cells adhered to the sticky tape.

Thomas was excluded as a DNA match from semen found in the victim's throat; the presence of the same unidentified assailant's DNA or other biological identifiers on the lost evidence would have pointed away from the guilt of Mr. Thomas to the unknown perpetrator of the crime. As it was, Thomas's fingerprint and DNA were found on just two of the remaining pieces of crime scene evidence, but their presence was fully consistent with the defense theory that he had only visited the victim's house to apply pesticide on an earlier day. The surviving forensic evidence was simply too little to let Mr. Thomas present a defense in a capital case for a crime that occurred three decades before he was ever suspected of committing it. The State had no evidence placing Thomas at the victim's home on the day of the murder; it had no direct evidence (such as eyewitness testimony) about where he was on the day of the crime. Simply put, the State never solved the murder of Mildred McKinney; their theory of the case fails to explain her fetishistic murder. For instance, the State did not identify the man who orally raped Mrs. McKinney; they had no hypothetical motive for why a healthy young man, with no history of sexual assault or sexual deviancy, would commit a bizarre, intricate rape-murder of an elderly female; and they had no timeline for the crime, no account of the series of events that left behind a strange crime scene with furniture stacked on top of the victim.

In terms of Mr. Thomas's ability to present a defense, he was handicapped by his own criminal history and the fact that he had no way of remembering where he was or what he was doing on a specific day over thirty years in the past. None of Thomas's prior crimes committed in the decades that elapsed between the death of McKinney and his trial were sex crimes; none

resembled the bizarre sexual deviancy of Mrs. McKinney's murder.[13] Still, the State surely would have made hay of his prior convictions had Mr. Thomas testified in his own defense. No competent criminal defense attorney would have recommended that he take the stand. And even if Mr. Thomas could have prudently testified, he could have offered little more than a bare denial due to inability to remember what he was doing on a random day more than three decades ago.

In sum, Mr. Thomas depended on physical evidence to contest the State's charges. The loss of most of the evidence collected by the State therefore unconstitutionally compromised his ability to offer evidence in his defense under the heightened standard of reliability applicable to a capital case.

## VIII.   Mr. Thomas was convicted and sentenced to death without due process of law because his jury was misinformed about how failing to answer penalty phase questions would determine whether he lived or died.

A jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). In this case, the jurors were affirmatively misled about their role in the sentencing process. Texas mandates courts instruct juries in terms that lead them to believe that failure to reach agreement on any question will cause a mistrial rather than an automatic life sentence. The corollary is that conscientious jurors with doubts about whether death is an appropriate punishment are led to think that the only way to spare the defendant the death penalty is to assemble a coalition of ten jurors to answer one of the aggravation questions in the negative or the mitigation question in the affirmative. This is not the case, but Texas connives to confuse juries, misleading them about their role in the sentencing process in violation of defendants' constitutional rights under the Fourteenth and Eighth Amendments.

---

[13]     The weight of empirical evidence, acknowledged by the Supreme Court, proves that when "convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault. *McKune v. Lile*, 536 U.S. 24, 33 (2002); *accord Smith v. Doe*, 538 U.S. 84, 103 (2003). In other words, Thomas does not fit the criminologically proven profile of a sex criminal.

Because Thomas's alleged crime occurred in 1980, the court applied an older version of the Texas capital sentencing statute. Tex. Code Crim. Proc. art. 37.0711. The trial court posed these four questions to the jury:

> 1) Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant, Steven Alan Thomas, that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased, Mildred McKinney, or another would result?
> 2) Do you find from the evidence beyond a reasonable doubt that the Defendant, Steven Alan Thomas, actually caused the death of the deceased or intended to kill the deceased or another or anticipated that a human life would be taken?
> 3) Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Steven Alan Thomas, would commit criminal acts of violence that would constitute a continuing threat to society?
> 4) Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the defendant, Steven Alan Thomas, that there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed?

CR.202–05.

The defendant cannot be sentenced to death unless the jurors answer "Yes" to each of the first three questions and "No" to the final question. Tex. Code Crim. Proc. art. 37.0711 § 3(g). The jurors are instructed to independently answer each question, meaning that know they can answer "Yes" to the aggravation questions but "No" to the final question. *Id.* They are further told that a majority of ten jurors is enough to enter an answer, either "Yes" or "No," to any question. *Id.*

The above voting system is not intuitive. It entails that it is possible for a majority of ten jurors to answer the aggravating questions "Yes" but for there to be no majority on the jury able to answer the final mitigation question either way. Intuitively, the legal result of this voting pattern would be a sentence of death as there is no finding of mitigating circumstances to "counterbalance" the finding of aggravating circumstances. But this is not the case—a failure to answer the mitigation question either way results in a life sentence for the defendant. *Id.* § 2(g).

- 91 -

Additionally, with these instructions, a juror can falsely but reasonably believe that a failure to answer *any* of the questions would result in a mistrial, requiring the enormous time and expense of another capital murder trial. Fear of a mistrial after weeks of trial will weigh heavily on a juror who has reservations about voting with his or her fellows. In this context, the model juror is loath to be the cause of a mistrial.

Fear of juror confusion is not hypothetical but has been empirically demonstrated. When researchers interviewed Texas capital jurors, they found that 73% of them falsely believed that all jurymen had to agree to answer the mitigation question in favor of the defendant. Williams J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIM. L. BULL. 51, 68 (2003). Even worse, 68% of them wrongly thought that death was *required* if they decided that the defendant posed a future danger. *Id.* at 72–73.

Through this counterintuitive system, jurors are unconstitutionally misled about the power they hold in the machine of death. Creating misimpressions and then failing to dispel them, Texas specifically prohibits the court or the attorneys from informing the jurors of the true consequence of a failure to agree on any of the penalty questions: "The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues." *Id.* § 3(i). Thus, jurors are unconstitutionally made to believe that (1) their failure to reach a sufficient majority on the mitigation question can result in a death sentence and (2) their failure to reach a sufficient majority on any of the questions will result in a costly mistrial of the entire case, both the guilt and punishment phases.

## Conclusion

For the foregoing reasons, Steven Alan Thomas respectfully petitions this Court to grant him habeas relief from his unconstitutional conviction and sentence. Relief is not barred under 28 U.S.C. § 2254(b) or (d) for the reasons described above. For any claim adjudged to be procedurally

defaulted, cause and prejudice exist to excuse the procedural default of any claim. Alternatively, a miscarriage of justice would produced absent review of any claim, either because it would result in the imprisonment of a person who is actually innocent or because it would result in the execution of a person who is constitutionally ineligible for execution.

## Statement of Timeliness

Mr. Thomas's petition is timely in accordance with 28 U.S.C. § 2244(d)(1)(A).

## Prayer for Relief

WHEREFORE, for these reasons, Mr. Thomas seeks:

1. Leave to amend his Petition as other facts may become known;

2. Leave to brief any procedural bars the State may raise under AEDPA or other statutes;

3. Leave to complete any discovery not completed in state court;

4. An evidentiary hearing on his compliance with AEDPA;

5. An evidentiary hearing on any defenses the State may raise;

6. An evidentiary hearing on the merits on his claims;

7. Relief from his conviction in this case;

8. Relief from his sentence in this case;

9. Such other relief as equity and justice may require.

Dated: August 24, 2023                           Respectfully submitted,

                                                 /s/ James E. Zucker
                                                 James E. Zucker
                                                 State Bar No. 24060876
                                                 Katherine S. Dannenmaier
                                                 State Bar No. 24125093
                                                 YETTER COLEMAN LLP
                                                 811 Main Street, Suite 4100
                                                 Houston, Texas 77002
                                                 Telephone: (713) 632-8000
                                                 Facsimile: (713) 632-8002
                                                 jzucker@yettercoleman.com
                                                 kdannenmaier@yettercoleman.com

                                                 **ATTORNEYS FOR PLAINTIFF**
                                                 **STEVEN ALAN THOMAS**

### CERTIFICATE OF SERVICE

I certify that on August 24, 2023, a copy of the foregoing pleading was electronically served on counsel for Respondent, Ellen Stewart-Klein, ellen.stewart-klein@oag.texas.gov.

                                                 /s/ James E. Zucker
                                                 James E. Zucker

**VERIFICATION**

I, James E. Zucker, attorney for Applicant Steven A. Thomas in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this application are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 24, 2023.

_____
James E. Zucker