**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **STEVEN ALAN THOMAS,**<br>**TDCJ No. 999597,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**ERIC GUERRERO, Director,**<br>**Texas Department of Criminal Justice,**<br>**Correctional Institutions Division,**<br><br>**Respondent.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil No. 1:23-cv-01005-RP**<br><br>*** DEATH PENALTY CASE *** |

**MEMORANDUM OPINION AND ORDER**

Petitioner Steven Alan Thomas initiated this federal habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge the constitutionality of his 2014 capital murder conviction and sentence of death. Currently before the Court is Thomas's Petition for Writ of Habeas Corpus (ECF No. 1), as well as Respondent Eric Guerrero's Answer (ECF No. 19) and Thomas's Reply (ECF No. 23) thereto. Having carefully considered the record and pleadings submitted by both parties, the Court concludes Thomas is not entitled to federal habeas corpus relief.[1]

## I. Background

### A. The Offense

Seventy-three-year-old Mildred McKinney was brutally beaten, sexually assaulted, and strangled to death in her Williamson County home in November 1980. The full extent of her

[1] Pursuant to an order from this Court, Respondent electronically filed a copy of all the relevant state court records from Thomas's trial, appellate, and state habeas corpus proceedings. For reference, the Clerk's Record and Reporter's Record from Thomas's trial are found on the Court's electronic docket at ECF Nos. 9-1 through 9-39 (cited in parenthesis throughout). The record of Thomas's direct appeal proceeding can be found at ECF Nos. 9-40 through 9-83 (same). And the record of Thomas's state habeas corpus proceeding can be found at ECF Nos. 10 through 18 (same).

gruesome injuries need not be recounted here.[2] In short, McKinney was found almost completely naked on the floor of her bedroom, her hands tied behind her back with a white cloth torn from a pillowcase, a telephone cord, and a pair of pantyhose. A loose ligature made from a blood-stained strip of pillowcase was found around her neck. Near McKinney's body, investigators found an alarm clock, the base of a telephone, and a lamp—all unplugged. They also found a small, sticky piece of ribbon or medical tape tied to her right thumb. McKinney's normally tidy home was in disarray, and numerous valuable items were later found missing from her china cabinet and jewelry box. There were no witnesses to the crime.

Although authorities developed numerous suspects over the years, McKinney's murder remained unsolved for over three decades until advances in DNA technology eventually led police to Thomas. Using this technology, scientists with the Texas Department of Public Safety Crime Lab (DPS Lab) were initially able to develop an unknown DNA profile from sperm cells found on the sticky ribbon or tape (Item 3) that was removed from McKinney's thumb. This profile was then loaded into CODIS[3] in October 1999. Several years later, using newer technology, the DPS Lab retested Item 3 and developed an even more complete DNA profile which was again loaded into CODIS in June 2010.

In March 2012, Thomas pled guilty to unrelated federal drug trafficking charges and was sentenced to 60 months of imprisonment. As a result of this conviction, a sample of his DNA was taken and uploaded into CODIS. Shortly thereafter, the FBI identified Thomas as a possible match for the DNA found on Item 3 and notified local authorities. In October 2012, a grand jury indicted

[2] The Texas Court of Criminal Appeals (TCCA) provided a lengthy and detailed summarization of all of the evidence presented at Thomas's trial in their opinion affirming Thomas's conviction on direct appeal. *Thomas v. State*, No. 77,052, 2018 WL 739093, at *1-8 (Tex. Crim. App. Feb. 7, 2018).

[3] Testimony established that CODIS is a state, local, and national DNA database administered by the Federal Bureau of Investigation (FBI).

Thomas with capital murder for intentionally causing McKinney's death while in the course of committing or attempting to commit burglary, robbery, and forcible rape. (ECF No. 9-1 at 13) (Indictment).

Thomas's trial commenced in October 2014. At trial, the State presented evidence that: (1) Thomas had worked in Austin for his brother's pest control company at the time of McKinney's murder and that she was possibly one of their clients, (2) Thomas's right thumbprint matched a latent print lifted from the alarm clock found on McKinney's bed, (3) Thomas could not be scientifically excluded as a contributor to the DNA profile developed from Item 3, and (4) jailhouse informant Steven Shockey overheard Thomas mentioning a similar offense—and his intention to place the blame on a dead friend—while they were both incarcerated at the Williamson County Jail. After hearing testimony and arguments for six days, a jury found Thomas guilty of capital murder as charged in the indictment. (ECF No. 9-2 at 91-95) (Judgment).

## B. The Punishment Phase

The punishment phase of Thomas's trial began October 28, 2014, and lasted four days. (ECF Nos. 9-30 through 9-33). During that time, the jury heard testimony from twenty-three prosecution witnesses and seven witnesses presented on behalf of the defense. That testimony is briefly summarized below.

### 1. Evidence Presented by the State

The State's punishment-phase case consisted of testimony chronicling Thomas's drug addiction, criminal activities, and violent behavior after his high school years until the time he was arrested for the instant offense. The first four witnesses were people who knew Thomas well—his ex-wife, their son, his ex-wife's new husband, and a close high school friend.

Thomas's high school friend, Russell Trimble, was first to testify. (ECF No. 9-30 at 14-62). According to Trimble, Thomas was a typical high school student, but started using marijuana late in high school. After high school, his drug use extended to cocaine, speed, and prescription pills. Trimble described one night in 1980 when Thomas showed up at his apartment "very, very high" with a full-size kitchen trash bag full of loose prescription pills. Thomas wanted to stash the pills at Trimble's home, which he had stolen from other people's homes while working as an exterminator for his brother's business. Trimble knew Thomas had often sold marijuana and cocaine.

On another occasion, Trimble recalled that Thomas "put his hands on" his girlfriend, Cindy, at a party at the Thomas family home, and that Trimble and his wife had to bring Cindy back to their apartment to protect her. Thomas later called Trimble and threatened to burn the apartment down because Trimble had "taken his girlfriend away." Although he never witnessed it, Trimble was aware that Thomas had abused Cindy on other occasions. He did witness an encounter in 1980 when Thomas beat up an older man after claiming the man tried to grab something out of the back of his truck. Thomas told Trimble that he "put him down."

Thomas's ex-wife, Cindy Rich, was next to testify. (ECF No. 9-30 at 63-92). When they started dating in high school, Thomas was good-looking and kind, but things changed as time went on. Thomas began to belittle her, and she was frightened of him. She always had bruises on her arms from his fingers. She was aware that Thomas sold drugs and stole prescription pills from people's homes. They both did a lot of drugs, which continued after they got married in 1981. Once, when he was two or three years old, their son, Blake, placed a piece of chalk in his nose to imitate Thomas using cocaine. After that, Cindy knew she had to get Blake away from that situation and she left Thomas.

Cindy testified that Thomas abused her both during and after their marriage ended. On one occasion, Thomas pushed her against a wall. On another, Thomas pushed his way into her apartment, yanked jewelry off of her neck, held her against the wall, and threw things around the kitchen in the presence of their young son. Thomas also left a threatening message on her answering machining that "a hammer was going to come down on her parents' head." She later obtained a protective order against Thomas, which only angered him further. Thomas would harass Cindy while she was driving to work or to Blake's school, throw things at her car, and once pulled up next to her and made a throat-slashing gesture with his hand.

Cindy's second husband, Kirk Rich, confirmed Thomas's behavior toward Cindy after the divorce. (ECF No. 9-30 at 92-114). Kirk had several confrontations with Thomas over the years, and always worried about Blake when he was with his father. On one occasion, Kirk discovered that his tires had been slashed after an encounter with Thomas. He went to Thomas's house to confront him, but Thomas did not answer so he went home. He also recalled when Thomas broke into his apartment, tore the necklace off of Cindy's neck, and ripped the phone out of the wall. At a later child support hearing, Thomas threatened Kirk in court.

Thomas's son, Blake, testified that he became aware of his father's drug use at an early age, particularly cocaine. (ECF No. 9-30 at 116-35). Once, when he was seven, Blake became frightened because he could not wake Thomas, and Kirk had to come get him. Another time, when Blake was in high school, he witnessed his father put a knife to another man's throat and threaten to kill him if his girlfriend at the time, who was using cocaine with the man, died from an overdose. Blake also testified that Thomas, high on cocaine, once told him to make a choice: "I'll either kill Kirk, or throw a Molotov cocktail in your mom's car while your sister is in there."

Following these witnesses, the State then presented a string of witnesses to demonstrate Thomas's unlawful and violent behavior over the years:

- In 1978, a police officer conducted a traffic stop of Thomas's vehicle and found 250 grams of marijuana and a bottle of Demerol in Cindy's name. (ECF No. 9-30 at 131-51). Thomas was charged with third-degree felony possession, but the case was ultimately dismissed.

- In 1981 or 1982, while on a hunting trip with his brother and some friends, Thomas pulled out a pistol and loudly berated his brother about his poor driving. *Id.* at 152-58.

- In 1992, Thomas admitted to killing a person to Gary Hengst while they attended an alcohol treatment program together. *Id.* at 183-94. Hengst also recalled that Thomas's truck had around five bullet holes in it. When asked, Thomas explained that it was from a shootout with a drug dealer.

- Also in 1992, Thomas got into an argument with Tyrone Claibourne while playing golf near Inks Lake. (ECF No. 9-31 at 7-31). Thomas approached Claibourne and his teenage son with a golf club in hand and then hit Claibourne in the knee with it. Claibourne collapsed, and Thomas took a full swing at Claibourne's head, caving in his skull. Claibourne was hospitalized for ten days and required reconstructive surgery on his skull. He had facial spasms for around three years and is now paralyzed on his left side.

- In 1993, Thomas was pulled over for driving while intoxicated (DWI) and arrested after failing the field sobriety test. (ECF No. 9-30 at 159-71). Police searched his vehicle and found multiple weapons: a loaded .357 magnum Ruger, two loaded .22 pistols, a loaded .22 Ruger rifle, two illegal double-edged knives, two long carving knives, and assorted ammunition scattered all over the vehicle. Police also found a metal box filled with marijuana and bag full of assorted pills. Thomas was charged with DWI, possession of marijuana, and unlawfully carrying a weapon.

- Also in 1993, Thomas was detained for traffic violations and searched. (ECF No. 9-31 at 46-69). The detaining officer found a crack pipe and marijuana on Thomas and a piece of crack rock in his mouth. When she searched his car, the officer found numerous weapons: a .410 shotgun, three loaded pistols within the driver's reach, two loaded .22 rifles with the butts sticking up for easy access, a gym bag full of ammunition and magazines, an illegal switchblade, and an illegal bayonet. Thomas was later charged with unlawfully carrying a weapon and possession of a controlled substance and received community service for the first charge and six years of probation for the second.

- Again in 1993, Thomas's neighbor, Jeff Bingham, woke up in the middle of the night and witnessed Thomas "blast" his truck with a shotgun. *Id.* at 70-85. At the

time, the truck was parked in front of his house, right in front of his child's bedroom window. Bingham had never spoken to Thomas and did not know why Thomas shot his truck. Thomas eventually pled guilty to criminal mischief, a Class A misdemeanor, and received community supervision for six years.

- In 1997, Janet Neururer met Thomas at an alcohol support group and they began dating. (ECF No. 9-30 at 195-212). On one occasion, Thomas pushed Neururer against the wall and twisted her arm during an argument. She called 911 and he was arrested for assault. He later received six months of deferred adjudication for family violence assault. On a different occasion, Thomas attempted to suffocate her while they were having sex but later acted as if nothing had happened. Additionally, Neururer testified that Thomas once shot several baby goats who had lost their mother because he thought they would die anyway.

- In 2001, Thomas admitted to Austin police detective Manuel Fuentes that he had supplied cocaine and prostitutes to John Loewenthal, a wealthy acquaintance of Thomas whose death Fuentes was investigating. (ECF No. 9-31 at 87-101). Loewenthal's death was ultimately ruled a suicide.

- In 2009, police received a complaint that Thomas was selling and using marijuana from a house he shared with his girlfriend, Joyce Clayton, and her son, Michael. *Id*. at 102-14. Joyce gave police permission to search the home, where they found: a shotgun, a .50 caliber rifle, a digital scale, packaging baggies, a checkbook issued to Thomas, and half a pound of marijuana. Thomas was eventually charged with unlawful possession of a firearm by a felon.

- In 2010, Thomas got into a verbal altercation with Joyce's son, Michael. *Id*. at 116-48. Thomas shoved Michael, then "took him to the ground and began choking him and banging his head up against the floor." Thomas then tried to drag Michael out of the house by his feet. Michael later got dizzy and passed out, and police and paramedics were called. Thomas admitted to choking Michael, but said it wasn't too hard because "he knows what it's like to choke the life out of someone and he didn't do that."

- Also in 2010, Thomas was arrested crossing the Mexican border with about fifty kilograms of marijuana hidden in the gas tank of a rental truck. *Id*. at 244-71. Thomas informed Criselda Pendleton, a Task Force Officer with the Drug Enforcement Agency, that he had done numerous such runs for a large drug trafficking organization and was paid around $5,000 per trip. At first, Thomas indicated a willingness to cooperate with Pendleton in exchange for help with some pending state charges, but Thomas later reneged and was indicted on four counts of federal drug trafficking. Thomas pled guilty to possession with intent to distribute and was sentenced to sixty months in the federal penitentiary. It was there that Thomas's DNA was taken and loaded into CODIS.

Lastly, the State presented the testimony of James Sloan, a Texas Department of Criminal Justice (TDCJ) State Classification Committee Member. (ECF No. 9-31 at 149-206). Sloan testified that a person convicted of capital murder and sentenced to life imprisonment under 1980 law would be placed in a G3 custody level for a minimum of ten years. In TDCJ, G1 is the least restrictive custody level, while G5 is the most restrictive level for aggressive or assaultive offenders. An inmate at a G3 level would be placed at a maximum security facility, would have a cellmate, and would be allowed to work and have access to other inmates of the same security level. The inmate would also be allowed contact visits, recreation, and access to vocational and educational activities. After ten years, such an inmate could become a less-restrictive G2 classification, which would allow him more access to different parts of the facility.

2. Evidence Presented by the Defense

In response, the defense presented several of Thomas's friends and family members to testify about the positive aspects of Thomas's background and character.

Thomas's brother, Bruce Thomas, testified that Thomas "came into the world fighting for his life" because he had pyloric stenosis when he was born. (ECF No. 9-32 at 6-33). Thomas was small for his age and was picked on a lot as a child, but he was scrappy and "a fighter from day one." Later, Thomas developed a problem with drugs and alcohol, although he sought treatment for them and worked hard to maintain his sobriety. His mother and father supported him the whole way. Bruce explained that his family and friends all have a very close relationship, including Thomas. This includes his two young daughters, Misty and Sarah, as well as Thomas's son, Blake. It also included the Dickson family, who were close family friends. On several occasions, Thomas even visited the elder Dickson, who suffered from Alzheimer's, in the nursing home and brought him lunch.

David Dickson testified that his family had been friends with the Thomas family for almost fifty years. *Id*. at 34-44. The two families traveled together and threw parties together, and Thomas was always a gracious host. When he was in town, Thomas would always go visit his parents and help Dickson's mother, who suffered from polio. Later, Thomas visited Dickson's father in a memory care facility and took him to visit Thomas's parents. On one occasion, Thomas notified Dickson that his father's home was dangerously cold. Dickson believes his father would not be around now if Thomas had not taken the time to visit him.

Ryan Shook testified that he met Thomas in the seventh grade and they became best friends shortly thereafter. *Id*. at 45-58. Shook lost his parents in a murder-suicide in 1973, after which he spent most of his time with Thomas and his family. Shook stated that Thomas was there for him every day after that, and felt that Thomas protected him emotionally while they were in school. Thomas had a strong work ethic and took on part-time jobs early in high school. They later drifted apart after high school but still kept in touch on occasion.

Thomas's niece, Sarah Thomas, testified that she always had a wonderful relationship with Thomas and his son, Blake. *Id*. at 60-70. Thomas was the "fun uncle" but also like a second father to her, as he was always someone she could go to for help. Despite the things he has done, Sarah would still go visit Thomas in the penitentiary if he were given a life sentence. Suzanne Reyna, Thomas's former sister-in-law, also would visit Thomas if he were given a life sentence. Her daughter, Misty, loved her uncle, as he would babysit or spend time with her on a regular basis, particularly when she was young. Thomas always called on her birthday and kept in contact even after her divorce from Thomas's brother in 1981.

Finally, the defense present the testimony of two experts to show that Thomas suffered from chronic diseases and would not be a danger to society if imprisoned for life. The first was

Frank AuBuchon, a former classification expert with TDCJ, who agreed with James Sloan that an inmate convicted of capital murder and sentenced to life imprisonment would likely start in general population at a G3 custody level. *Id.* at 84-111. Aubuchon stated that the prison classification process is essentially a risk assessment and that the best predictor of an inmate's behavior is his prior institutional behavior. Short of that, you can make a prediction based on the inmate's age, the offense, and the length of his sentence. Older inmates tend to be less aggressive, and the prison system is designed to wear you down over time.

Aubuchon testified that an inmate convicted of capital murder, if sentenced to life, would be imprisoned at a maximum security facility with concrete walls, two perimeter fences, barbed wire, motion detectors, armed guard towers, and twenty-four hour patrol. Life in these facilities is "a hellish experience," tedious and dull, with no control over your day-to-day decisions. *Id.* at 97. Inmates are subjected to daily pat-downs and strip searches and are always being told what to do. Aubuchon admits, however, that the system is not perfect and that sometimes people get hurt in prison, including those who work within the prison system.

The second expert to testify was Dr. Steven Yount, a family practice doctor board certified in family medicine. *Id.* at 115-46. Dr. Yount conducted laboratory testing and a physical examination of Thomas in June 2014 while Thomas was awaiting trial in the instant case. He found that Thomas suffered from "out of control" hypertension and diabetes, as well as an enlarged prostate. According to Dr. Yount, hypertension has no cure and can cause damage to the heart, retinas, kidneys, and brain. He also referred to a study suggesting a fifty-eight percent statistical probability that, just from the diabetes alone, an older diabetic like Thomas would be deceased in ten years. Thomas also suffers from abnormally low testosterone, which lowers his risk of aggression while greatly increasing his risk of mortality, particularly from cardiovascular disease.

3. The State's Rebuttal

In rebuttal, the State offered victim-impact testimony from the victim's grandson, Robert Stapleton, who was twelve-years-old when his grandmother was murdered. (ECF No. 9-32 at 151-56). Stapleton testified that his grandmother's death had a long and lasting effect on his entire family. The murder had both an emotional and physical impact on his parents, both of whom died before the crime had been solved.

Following this testimony, on October 31, 2014, the jury was instructed on the punishment special issues and heard closing argument by counsel. (ECF No. 9-33 at 4-50). After closing arguments, the jury deliberated and returned its verdict, finding unanimously (1) beyond a reasonable doubt that Thomas acted deliberately and with the reasonable expectation that the death of Mildred McKinney would result, (2) beyond a reasonable doubt that Thomas actually caused McKinney's death, intended to kill her, or anticipated that a human life would be taken, (3) beyond a reasonable doubt there was a probability that Thomas would commit criminal acts of violence that would constitute a continuing threat to society, and (4) taking into consideration all of the evidence, including the circumstances of the offense, Thomas's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. (ECF Nos. 9-2 at 87-90; 9-33 at 51-52). The trial court accordingly sentenced Thomas to death. (ECF No. 9-33 at 52-53).

## C. **Post-conviction Proceedings**

Thomas appealed his conviction and sentence, raising seventeen points of error in his direct appeal brief. (ECF No. 9-40). In an unpublished opinion delivered February 7, 2018, the TCCA rejected Thomas's allegations and affirmed his conviction and sentence. *Thomas*, 2018 WL 739093.

While Thomas's direct appeal was pending, the trial court appointed the Office of Capital and Forensic Writs (OCFW) to represent Thomas in pursuing state habeas corpus relief. (ECF No. 9-2 at 96). The OCFW filed a lengthy state habeas application on Thomas's behalf raising a total of nine multi-faceted claims for relief supported by sixty exhibits. (ECF Nos. 10-8 at 56-165, 10-9 at 1-67, and 10-10 at 1-67). Following the State's opposition and an evidentiary hearing, the trial court issued findings of fact and conclusions of law recommending that relief be denied. (ECF No. 12-9 at 206-250). In an order dated August 24, 2022, the TCCA denied Thomas state habeas corpus relief based on the trial court's findings and conclusions and the court's own independent review of the record. *Ex parte Thomas*, No. 86,576-01, 2022 WL 3642125, at *2 (Tex. Crim. App. 2022) (per curiam).

One year following the denial of state habeas relief, Thomas filed the instant federal habeas corpus petition in this Court raising eight claims for relief supported by thirteen exhibits. (ECF No. 1). Thereafter, Respondent filed an answer to the petition (ECF No. 19) to which Thomas replied (ECF No. 23). Both parties have also supplemented their arguments with additional authority that the Court has taken into consideration. (ECF Nos. 26, 27, 29, 30, 34, 36 and 38). The case is now ripe for adjudication.

## II. <u>Claims for Relief</u>

As raised in Thomas's federal petition (ECF No. 1), the following eight allegations are now before the Court:

(1) The prosecution knowingly elicited false testimony from jailhouse informant Steven Shockey that he had received no consideration for his testimony;

(2) The prosecution withheld favorable evidence of a deal with Shockey;

(3) If Shockey's deal with the prosecution was disclosed to the defense, then trial counsel were constitutionally ineffective for failing to use it;

(4) The prosecution knowingly presented false and misleading evidence concerning the DNA evidence connected to Thomas;

(5) Trial counsel was constitutionally ineffective for failing to retain a DNA expert to investigate and identify the flaws in the State's DNA evidence;

(6) Trial counsel rendered ineffective assistance at the punishment phase of trial by failing to investigate and present evidence of childhood abuse and trauma;

(7) The loss of the majority of the physical evidence collected from the crime scene thirty-four years prior to trial violated Thomas's due process rights; and

(8) Thomas's due process rights were violated because the jury was misinformed about how failing to answer penalty-phase questions would determine his sentence.

## III. Standard of Review

When reviewing claims that were "adjudicated on the merits in State court," federal courts must apply the deferential standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d). AEDPA "sharply limits" collateral review of federal habeas claims raised by state prisoners. *Klein v. Martin*, 607 U.S. 213, 220 (2026) (per curiam). Under this heightened standard, a federal habeas petitioner may not obtain relief on any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication was either: (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Id.* This intentionally difficult standard stops just short of imposing "a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

For purposes of § 2254(d)(1), a state court decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if it resolves a case differently than the Supreme Court has on a set of materially 'indistinguishable' facts." *Senn v. Lumpkin*, 116 F.4th 334, 339 (5th Cir. 2024) (citation omitted). On the other hand, a state court decision is an "unreasonable application of" clearly established federal law when "no fairminded jurist would agree" with the ruling. *Andrew v. White*, 604 U.S. 86, 92 (2025) (quoting *Richter*, 562 U.S. at 101). This requires a petitioner to "show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam). Instead, a petitioner must show that the state court's "determination was *unreasonable*—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007) (emphasis added).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion itself. *Richter*, 562 U.S. at 102. So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief. *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (finding federal habeas relief unavailable unless the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.") (citation omitted).

Lastly, § 2254(d)(2) of AEDPA affords significant deference to a state court's ultimate determination of the facts. *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015). Similar to review under § 2254(d)(1), state court factual determinations may not be characterized as unreasonable

"merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination." *Id.* (citation modified). In other words, a petitioner does not overcome the § 2254(d)(2) standard unless "*every* fairminded jurist would agree" that the state court's decision was based on an unreasonable determination of the facts. *Brown v. Davenport*, 596 U.S. 118, 136 (2022).

## IV. Merits Analysis

### A. Steven Shockey's False Testimony (Claim 1)

In *Napue v. Illinois*, the Supreme Court held that a criminal defendant is denied due process when the State knowingly uses perjured testimony or allows false testimony to go uncorrected at trial. 360 U.S. 264 (1959); *see also Giglio v. United States*, 405 U.S. 150 (1972). A petitioner seeking to obtain relief on such a claim must show that (1) the testimony was false, (2) the prosecution knew that the testimony was false, and (3) the testimony was material. *United States v. Dvorin*, 817 F.3d 438, 451-52 (5th Cir. 2016); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

In his first claim for relief, Thomas argues that the prosecution violated *Napue* by eliciting false testimony from jailhouse informant Steven Shockey that he had received no consideration for his testimony. (ECF No. 1 at 23-41). Thomas raised this allegation during his state habeas corpus proceedings which the TCCA ultimately rejected. *Ex parte Thomas*, 2022 WL 3642125, at *1. For the reasons discussed below, the state court's adjudication was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Federal habeas corpus relief is therefore unwarranted.

1. <u>Relevant Background</u>

Shockey testified for the State on the second-to-last day of the guilt/innocence phase of trial. (ECF No. 9-27 at 144-57). According to Shockey, he and Thomas became acquainted while they were both incarcerated in the Williamson County Jail prior to Thomas's trial in the instant case. *Id*. at 148-50. Shockey testified that, over the course of several weeks, he heard "little outbursts and mumbles" from Thomas about "being high on cocaine, approaching a house, burglarizing it or, you know, going into the house, the wee hours of the morning; something about restraining the occupant or the person, having to restrain her before she got out of the bed, [and] taking some money and some jewelry." *Id*. at 152. At one point, Thomas told Shockey that, "he was going to put it off on a man named Glen Scongins, and he's dead." *Id*. at 155.[4]

At the time of Thomas's trial, Shockey was serving a fifteen-year-sentence as a result of a May 2013 conviction for aggravated assault with a deadly weapon. *Id*. at 145, 148. He also had three previous convictions for forgery, two previous convictions for theft, and two previous convictions for possession of methamphetamine. *Id*. at 145-47. Shockey testified that, a month after his aggravated assault conviction, he met with Detective John Foster of the Williamson County Sheriff's Department regarding the instant case. *Id*. at 145, 148. Although Shockey was seeking a reduction in his sentence in exchange for the information he had on Thomas, Detective Foster made clear that he could not do anything to reduce or change the sentence that Shockey had already received. *Id*. at 153-54.

---

[4] Detective Craig Ferguson of the Williamson County Sheriff's Department later testified that he was unable to locate a "Glen Scongins," but discovered that Thomas was acquainted with a person named Glen Sconci who had died several years earlier. *Id.* at 166-69. Detective Ferguson also confirmed that Shockey and Thomas had indeed been incarcerated together at the Williamson County Jail and had access to the same common areas. *Id*. at 169-70.

Shockey then testified about two meetings he had with Assistant District Attorneys Lytza Rojas and Josh Reno prior to Thomas's October 2014 trial. *Id.* at 154-55. The following exchange occurred:

> Rojas: Okay. Do you recall meeting with Mr. Reno and I there in TDCJ a couple of months ago?
>
> Shockey: Yes.
>
> Rojas: And do you recall me telling you that I also could not do anything for you regarding the aggravated nature of the offense that you pled guilty to?
>
> Shockey: Yes.
>
> Rojas: And that I couldn't promise you and **would not promise you anything** in exchange for the testimony and the things that you told John Foster you heard?
>
> Shockey: Correct.
>
> Rojas: Is it true and fair that I did tell you that I would be honest with a Parole Board or whoever asked me regarding you giving information on a capital murder offense?
>
> Shockey: Correct.
>
> Rojas: And is it true that that's the **only thing** that I said that I would do for you, and the same for Mr. Reno?
>
> Shockey: Correct.

*Id.* (emphasis added).

2. <u>The State Court's Adjudication</u>

During his state habeas proceedings, Thomas introduced considerable evidence that the prosecution offered Shockey more than just a promise to inform the parole board of his involvement in the trial in exchange for his testimony. (ECF No. 12-9 at 209-12). In several phone calls made from the Williamson County Jail both before and after his testimony at Thomas's trial, Shockey discussed the prosecutors' additional promise to seek a unit transfer from TDCJ that

would place him closer to his elderly mother who lived in Austin. *Id.* This second promise was also referenced in letters Shockey wrote to Detective Ferguson and ADA Rojas, as well as in communications between Ferguson, Rojas, and TDCJ Classification Chairman Kelly Enloe. *Id.* In particular, in a letter to Enloe, Rojas stated:

> In exchange for his testimony, I informed Mr. Shockey that I would reach out to TDCJ and the Parole Board to make it known that he assisted the State and provided truthful testimony. I also told Mr. Shockey that I would request he be placed in a unit that would allow his elderly mother the chance to visit with a little more ease. While Mr. Shockey was informed that I have no authority to make changes or affect classification in the TDCJ units, I told him that I would make a request . . . I am currently writing to request that inmate Steven Richard Shockey be considered for placement at either the Hughs [sic] Unit or the Goree Unit.

(ECF No. 13-8 at 5-6). Enloe later responded that Shockey was "being reassigned to a unit closer to his family." *Id.* at 11.

In an affidavit submitted to the state habeas trial court, ADA Rojas confirmed her offers to Shockey as follows:

> 53. I recall telling Shockey that if we could verify the information he shared, and if he then testified truthfully in court, I would write a letter on his behalf to the Board of Pardons and Paroles, and I would tell whoever asked, that he cooperated with the State in the prosecution of Thomas.
>
> 54. I recall Shockey telling us that his mother was sick and that he wanted to relocate to a prison that was closer to her. I told Shockey that I was aware that [TDCJ] had the ability to transfer prisoners. I told him that in addition to talking to the Board of Pardons and Paroles, I would pass on his request to TDCJ. I told him that I, however, had no authority or power to order a transfer for a prisoner or the granting of parole.

(ECF No. 18-8 at 16-17).

Based on the above evidence, the state habeas trial court ultimately determined that Shockey's testimony was indeed false because he stated the only promise the prosecution gave to him was that they would inform TDCJ and the Board of Pardons and Parole about his participation in the trial. (ECF No. 12-9 at 211). Nevertheless, the trial court concluded that Shockey's

testimony was not material to the jury's verdict because (1) the defense had already developed other impeachment evidence, (2) the State corroborated many of the facts to which Shockey testified, and (3) the conviction was supported by other evidence. *Id.* at 214-16. The TCCA later denied Thomas habeas corpus relief based, in part, on the findings and conclusions of the trial court. *Ex parte Thomas*, 2022 WL 3642125, at *1-2 (denying relief because Thomas "has not proven by a preponderance of the evidence that the false testimony contributed to his conviction or punishment.") (citations omitted).

3. Analysis Under AEDPA

Because Thomas's *Napue* claim was "adjudicated on the merits in State court," this Court must apply AEDPA's deferential standard of review when determining whether federal habeas corpus relief is warranted. 28 U.S.C. § 2254(d). That is, Thomas must show that the state habeas decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.*; *Uvukansi v. Guerrero*, 126 F.4th 382, 387 (5th Cir. 2025). Relevant here, materiality is a mixed question of law and fact reviewed under § 2254(d)(1). *Uvukansi*, 126 F.4th at 387; *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

In adjudicating the merits of Thomas's *Napue* claim, the state court agreed with Thomas that Shockey had testified falsely and without correction. The court only denied state habeas relief because it determined that Thomas failed to demonstrate that Shockey's testimony was material. Facing AEDPA's strict relitigation bar, Thomas raises several arguments attempting to

demonstrate that the state court's determination on materiality was either "contrary to" or an "unreasonable application of" clearly established federal law.[5] None are persuasive.

(a) <u>The "contrary to" clause of § 2254(d)(1)</u>

A state court's decision is contrary to clearly established precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts facts that are materially indistinguishable from a decision of the Supreme Court yet reaches a different result." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Wooten v. Lumpkin*, 113 F.4th 560, 568 (5th Cir. 2024). To prevail, a defendant must point to "Supreme Court precedent that is 'opposite to' or 'materially indistinguishable' from this case." *Russell v. Denmark*, 68 F.4th 252, 265 (5th Cir. 2023) (quoting *Williams*, 529 U.S. at 413). This is such a high bar that "in most AEDPA cases, the 'contrary to' prong does not apply." *Id.*

*i. improper standard*

Thomas first contends that § 2254(d)(1) does not restrict relief because the state court used the wrong standard for *Napue* materiality. Specifically, citing the TCCA's one-sentence denial of his *Napue* claim, Thomas contends the state court incorrectly required him to prove "by a *preponderance of evidence* that the false testimony contributed to his conviction or punishment." (ECF No. 1 at 35). According to Thomas, this requirement is far higher than the "reasonable likelihood" standard set forth by the Supreme Court in *Napue*.

This Court agrees that a "preponderance of the evidence" is not the correct standard for *Napue* materiality. Under *Napue*, false testimony is material only if there is "any reasonable likelihood" that it "could . . . have affected the judgment of the jury." *Uvukansi*, 126 F.4th at 390

[5] Thomas also argues that the state court's materiality determination was "an unreasonable determination of the facts" under § 2254(d)(2). (ECF No. 1 at 37-41). Because materiality is a mixed question of law and fact, however, Thomas's arguments will be addressed under the umbrella of § 2254(d)(1).

(quoting *Giglio*, 405 U.S. at 154). However, simply because the TCCA's one-sentence denial referenced the preponderance standard does not necessarily imply that it applied the incorrect legal standard in adjudicating Thomas's allegation. That is because federal review in this case centers on *two* opinions—the trial court's recommendation providing a detailed analysis of Thomas's *Napue* claim, and the TCCA's ultimate denial of relief.

When evaluating a claim under AEDPA, a federal court must "train its attention" on the "last related state-court decision" that provides a "relevant rationale" to a particular claim. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). A federal court should focus "on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and . . . give appropriate deference to that decision." *Sheppard v. Davis*, 967 F.3d 458, 467 (5th Cir. 2020) (citing *Wilson*, 584 U.S. at 125). When a state court's denial of habeas is not explained, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wooten*, 113 F.4th at 566 (citing *Wilson*, 584 U.S. at 125).

Here, the TCCA disposed of Thomas's *Napue* claim without explanation, stating only that it denied relief because Thomas "has not proven by a preponderance of the evidence that the false testimony contributed to his conviction or punishment." *Ex parte Thomas*, 2022 WL 3642125, at *1-2 (citation omitted). Later in the opinion, the court stated that it was denying relief on all of Thomas's allegations "[b]ased on the trial judge's findings and conclusions and our independent review of the record." *Id.* at *2. For these reasons, this Court will "look through" the TCCA's unexplained decision to the last state court decision that does provide a relevant rationale—the state habeas trial court's lengthy order recommending the denial of habeas relief. (ECF No. 12-9).

In this order, the state habeas trial court meticulously set forth the evidence demonstrating that Shockey's testimony was false and that the State knew the testimony was false. *Id.* at 208-14. Considering this finding, the court then stated that "the issue is whether Shockey's testimony was material to the jury's verdict and it was reasonably likely to influence the judgment of the jury." *Id.* at 214-15 (citations omitted). Following this statement of the standard, the court went on to explain why Shockey's false testimony was not material, a conclusion that was ultimately adopted by the TCCA. *Id.* at 215-16; *Ex parte Thomas*, 2022 WL 3642125, at *2. Thus, it is clear that both the trial court and the TCCA applied the correct reasonable-likelihood standard when rejecting Thomas's *Napue* allegation.

The fact that the TCCA recited the preponderance standard when ultimately denying relief does not alter this conclusion. Texas courts have long held that "[a]n applicant for a post-conviction writ of habeas corpus bears the burden of proving his claim by a preponderance of the evidence." *Diamond v. State*, 613 S.W.3d 536, 545-46 (Tex. Crim. App. 2020); *Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995). Such a standard is simply a general burden of proof that is applied to post-conviction claims in Texas and does not, in this context, reflect the TCCA's adoption of a different standard for materiality. In similar contexts, both the Supreme Court and the Fifth Circuit have found that it is not improper for a state court to apply a general preponderance of evidence standard to a petitioner's factual contentions. *See Holland v. Jackson*, 542 U.S. 649, 654 (2004) (finding a similar statement to be "reasonably read as addressing the general burden of proof in postconviction proceedings with regard to factual contentions."); *Uvukansi*, 126 F.4th at 390 (finding it "proper for the [state court] to refer to a need for a preponderance evidence, as habeas applicants bear the burden of proving a constitutional violation to qualify for relief.").

Thus, contrary to Thomas's assertion, the TCCA did not impose a standard higher than the Supreme Court's "reasonable likelihood" standard for *Napue* materiality.

*ii. improper burden-shifting*

Thomas next contends that § 2254(d)(1) does not preclude relief because the state court wrongly placed the burden of proof on him instead of the State. Because the State is the beneficiary of Shockey's false testimony, Thomas argues, it is the State who bears the burden of proving beyond a reasonable doubt that the testimony was not material, consistent with the harmless error test from *Chapman v. California*, 386 U.S. 18 (1967). As support, Thomas cites the recent Supreme Court case *Glossip v. Oklahoma*, which clarified that the materiality standard in *Napue* effectively requires "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 604 U.S. 226, 246 (2025) (citing *United States v. Bagley*, 473 U.S. 667, 680, n. 9 (1985)).

True, both the state habeas trial court and the TCCA in this case placed the burden of proving materiality on Thomas. *See* ECF No. 12-9 at 216 ("Given this record [Thomas] has not met his burden to demonstrate that [] Shockey's false testimony was material sufficient to provide relief."); *Ex parte Thomas*, 2022 WL 3642125, at *1-2 (adopting the trial judge's conclusions and denying relief on Thomas's *Napue* claim because Thomas "has not proven" materiality). However, both of these determinations predated *Glossip* by several years. And just prior the release of the *Glossip* opinion in 2025, the Fifth Circuit observed that "[n]o majority of the Supreme Court has indicated that *Napue*'s materiality standard is the same as *Chapman*'s harmless error standard." *Uvukansi*, 126 F.4th at 390 (citing *Ventura v. Att'y Gen. of Fla.*, 419 F.3d 1269, 1279 n.4 (11th Cir. 2005)).

Consequently, at the time of the TCCA's order in August 2022, the law was at best ambiguous as to who bore the burden of establishing materiality in the *Napue* context.[6] *Id*. at 391 (finding "[t]he practice of other circuits suggests the Supreme Court [had] not clearly placed the burden of proof on the State."). Due to this lack of clarity, Thomas cannot establish that the TCCA's ruling was contrary to "*clearly established* Federal law." 28 U.S.C. § 2254(d)(1) (emphasis added); *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (finding a state court decision is not "contrary to . . . clearly established Federal law" when Supreme Court precedent "is, at best, ambiguous.").

*iii. materially indistinguishable facts*

Thomas next argues that the TCCA's decision was contrary to[7] clearly established Supreme Court precedent because it was decided on a set of facts that are "materially indistinguishable" from the Supreme Court's opinion in *Napue*. In *Napue*, the State's principal witness testified falsely that he was not promised anything in exchange for his testimony. 360 U.S. at 265-67. In fact, the prosecutor had promised to recommend a sentence reduction in exchange for the witness's testimony. *Id*. at 266. Because of the passage of time and the unavailability of other witnesses, the Supreme Court described the witness's testimony as "extremely important," noting the evidence against Napue "consisted largely" of the witness's testimony. *Id*. Had the jury been apprised of the true facts, the Court surmised, "it might well have concluded that [the witness] had fabricated testimony in order to curry the favor of the . . . the State[.]" *Id*. at 270.

---

[6] While Thomas argues that a footnote in *Bagley* established that the burden belongs to the State, this portion of the opinion was joined by only two Justices, and thus of no precedential value. *See Bagley*, 473 U.S. at 679 n.9 (opinion of Blackmun, J.); *Uvukansi*, 126 F.4th at 390.

[7] Thomas mistakenly raised the "materially indistinguishable" argument in an attempt to satisfy the "unreasonable application" clause of § 2254(d)(1). (ECF No. 1 at 36-37). But such an argument falls within the "contrary to" clause of § 2254(d)(1), *see Williams*, 529 U.S. at 406, a fact Thomas appears to recognize in his subsequent motion for partial summary judgment. (ECF No. 34 at 18-19). It will be addressed as such.

In contrast, the jury in Thomas's trial had already been informed that Shockey had attempted to curry favor with the State in exchange for his testimony. While the jury was not aware of the State's promise to seek a unit transfer for Shockey to be closer to his elderly mother, it was aware of Shockey's unsuccessful attempt to obtain a sentence reduction from the State, as well as the State's promise to inform the parole board of his involvement in the trial in exchange for his testimony. *See* Section IV(A)(1), *supra*. Thus, the jury was well-aware of the possibility that Shockey, a lifelong criminal and drug addict, had fabricated his testimony in order to please the State.

More importantly, unlike the State's witness in *Napue*, Shockey's testimony was not critical to the State's case against Thomas. To the contrary, Shockey's testimony merely corroborated scientific evidence that already placed Thomas at the scene—namely, his DNA on the sticky ribbon found on the victim's thumb and his thumbprint on the alarm clock found on the victim's bed. Given that Shockey's testimony was not the sole—or even the primary—evidence connecting Thomas to the crime, the facts from *Napue* are clearly distinguishable from the facts of this case. As such, the TCCA's judgment was not "contrary to . . . clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1).

Again, the Supreme Court's recent grant of habeas relief in *Glossip v. Oklahoma* does not alter this result. 604 U.S. at 226. In *Glossip*, the false testimony given by the State's witness was material because that witness's testimony "was the *only* direct evidence of Glossip's guilt of capital murder," and therefore "the jury's assessment of [the witness's] credibility was necessarily determinative[.]" 604 U.S. at 248 (emphasis added). In other words, "the jury could convict Glossip only if it believed [the witness]." *Id.*

Conversely, Shockey's testimony in this case did little more than corroborate the direct evidence establishing Thomas's presence on the night of the offense. The jury could have convicted Thomas "even if it discredited [Shockey]'s testimony; indeed, it could convict and sentence [Thomas] to death if [Shockey] had not testified at all." *See Joubert v. Guerrero*, 2025 WL 2643182, at *8 (5th Cir. 2025) (unpublished) (discussing *Glossip* in a similar context). Because the facts in *Glossip* are clearly distinguishable from the instant case, it does not help Thomas overcome the "high bar" set by the "contrary to" clause of § 2254(d)(1). *Russell*, 68 F.4th at 265.

(b) The "unreasonable application of" clause of § 2254(d)(1)

In addition to the above arguments, Thomas also contends that the state court's determination on materiality was an "unreasonable application of" clearly established federal law. A state court decision is unreasonable if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. But to obtain relief, Thomas must show "far more than that the state court's decision was merely wrong or even clear error." *Shinn*, 592 U.S. at 118. Instead, he must establish "that the state court blundered so badly that every fairminded jurist would disagree with the decision." *Klein*, 607 U.S. at 220-21 (quotations omitted); *White*, 604 U.S. at 92 (finding a state court decision is unreasonable when "no fairminded jurist would agree" with the ruling).

Here, the state habeas trial court set forth the correct standard for evaluating materiality—the "reasonable likelihood" standard—before concluding that Shockey's false testimony was not material to the jury's verdict. (ECF No. 12-9 at 214-16). The court essentially based this determination on three factors: (1) there was other evidence impeaching Shockey's credibility,

(2) the State corroborated many of the facts to which Shockey testified, and (3) Shockey's testimony was not critical to the State's case. *Id.* The TCCA later denied Thomas habeas corpus relief based, in part, on these findings and conclusions. *Ex parte Thomas*, 2022 WL 3642125, at *1-2.

Thomas fails to establish that the state court "blundered so badly that every fairminded jurist would disagree with the decision." *Klein*, 607 U.S. at 220-21. Take, for instance, the state court's acknowledgment of other evidence impeaching Shockey's credibility. The state court determined that Shockey's false testimony was not material because the jury already heard testimony about Shockey's prior arrests and sentences, Shockey's desire to have his most recent sentence reduced or otherwise mitigated, and that the State promised Shockey they would inform the parole board of his involvement in the trial in exchange for his testimony. In essence, the state court determined that evidence of Shockey's deal to move closer to his mother was immaterial given the cumulative weight of other testimony establishing his motive to cooperate with the State and calling into question his credibility as a witness. Such a decision was clearly reasonable, as undisclosed cumulative evidence is not material when, as here, "it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Lewis*, 157 F.4th 415, 427 (5th Cir. 2025) (citing *United States v. Brumfield*, 89 F.4th 506, 514-15 (5th Cir. 2023)).

Thomas attempts to rebut the notion that Shockey's undisclosed deal was cumulative impeachment evidence by offering the unremarkable observation that "not all benefits received by a State's witness are created equal." (ECF No. 23 at 24). To Thomas, the State's promise to put in a good word with the parole board was the equivalent of a "plastic participation trophy" while their promise to move Shockey closer to his mother was tantamount to "an eighteen-carat gold

medal." The Court disagrees, as the promise of a more preferential incarceration does not outweigh a promise to help obtain a witness's release. As the state habeas trial court observed, "[a]s to motivation to lie, the motivation to receive a transfer to a unit closer to his ailing mother pales in comparison to the motivation to receive parole and obtain release." (ECF No. 12-9 at 216). While Thomas may disagree, certainly not all fairminded jurists would. *See Wooten*, 113 F.4th at 568 (finding AEDPA deference precludes relief "[i]f fair-minded jurists could disagree about whether the state court's decision was correct[.]").

Similarly, fairminded jurists would likely agree with the state court's determination that Shockey's testimony was not critical to the State's case. Again, unlike *Napue*, Shockey's testimony was not the sole or even primary evidence connecting Thomas to the crime—that distinction belongs to the DNA evidence found on the sticky ribbon attached to the victim's thumb and to Thomas's fingerprint found on the victim's alarm clock. Despite Thomas's attempt to bolster the importance of Shockey's testimony, it simply corroborated the scientific evidence that already placed Thomas at the scene. Thus, to the extent the jury would have possibly distrusted Shockey's testimony even more had they heard about his deal to relocate, it would not ultimately have mattered because they already had the DNA and fingerprint evidence on which to rely.[8]

Thomas again disagrees, arguing that the prosecutors themselves believed that Shockey's testimony was important. He cites letters written by both ADA Rojas and Detective Ferguson to TDCJ on Shockey's behalf indicating their belief that Shockey's testimony was "extremely useful"

---

[8] Thomas makes much of the fact that the State's case against Thomas was entirely circumstantial. (ECF No. 1 at 33). Given that the Supreme Court has made clear that circumstantial evidence alone can sustain a conviction, this argument is unpersuasive. *See e.g., Ruan v. United States*, 597 U.S. 450, 467 (2022) ("The Government, of course, can prove [the disputed element] through circumstantial evidence."); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (emphasizing that the Court has "never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required"); *Holland v. United States*, 348 U.S. 121, 140 (1954) ("Circumstantial evidence in this respect is intrinsically no different from testimonial evidence.").

to their case. (ECF No. 1 at 31-32, 38). But the prosecution's arguments to the jury tell a different story. As noted by the state habeas trial court, the prosecution did not mention Shockey or his expected testimony during opening statements, focusing instead on the DNA testimony to come. (ECF No. 12-9 at 215). And while the first piece of evidence that the prosecution mentioned in closing was Shockey's testimony, it took only nineteen lines of the record and concluded with, "and y'all can do what you will with what Steven Shockey told you. It's just a piece of evidence that connects this defendant." (ECF No. 9-29 at 17). ADA Rojas did not mention Shockey in her final summation. *Id*. at 43-50. Thus, even assuming the prosecution's subjective belief in the importance of Shockey's testimony was relevant to the materiality analysis, the record on the issue is, at best, ambiguous.

All this is not to say that Shockey's testimony lacked any value for the State, or that evidence of Shockey's entire deal with the State would not have been helpful to the defense. Certainly, the State would not have put Shockey on the stand if his testimony lacked all value, and evidence of false testimony can be material even if it "goes only to the credibility of the witness[.]" *Glossip*, 604 U.S. at 248 (citing *Napue*, 360 U.S. at 269). But while such evidence can be material, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Joubert*, 2025 WL 2643182, at *6 (citing *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)).

This Court must ultimately determine if there is "any reasonable likelihood" that Shockey's false testimony "could have affected the judgment of the jury." *Napue*, 360 U.S. at 271. That is, could it "have made a material difference" if the State had corrected Shockey's false testimony at trial? *Glossip*, 604 U.S. at 253. Given that Thomas's conviction rested almost entirely on the

DNA and fingerprint evidence placing him at the scene of the murder and not on Shockey's already questionable testimony, the answer to these questions is most likely no.

4. <u>Conclusion</u>

Thomas presented significant evidence demonstrating that the prosecutor elicited, and then failed to correct, testimony from Shockey that she knew to be false concerning promises made to Shockey in exchange for his testimony. Such actions, whether accidental or intentional, have no place in a fair and equitable criminal justice system. The only question is whether these actions could have affected the judgment of the jury. *Giglio*, 405 U.S. at 154.

After thorough analysis, the state court found that they did not. Although the prosecution's case against Thomas mostly relied on just three pieces of evidence—Shockey's testimony, an alarm clock with Thomas's fingerprint, and a single piece of ribbon found on the victim's body that contained Thomas's sperm DNA—the state court determined that Shockey's false testimony was immaterial because Shockey's credibility was sufficiently impeached by other evidence and his testimony was ultimately not critical to establishing Thomas's guilt. Given this determination, principles of "comity, finality, and federalism" prevent this Court from disrupting the state court judgment unless "egregious" circumstances exist. *Uvukansi*, 126 F.4th at 392.

This is not such an extreme case. As discussed at length above, the state court's decision was neither "contrary to" nor "an unreasonable application of" clearly established Supreme Court precedent. Thomas has identified no Supreme Court precedent that is "opposite to" or "materially indistinguishable" from this case. *Russell*, 68 F.4th at 265 (quoting *Williams*, 529 U.S. at 413). Nor has he shown that, in light of Supreme Court precedent, the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Uvukansi*, 126 F.4th at 391 (citing *Richter*, 562 U.S.

at 103). While it is possible that fairminded jurists could disagree about whether Shockey's false testimony was material, that is not enough to warrant federal habeas corpus relief under AEDPA. *See Klein*, 607 U.S. at 220-21 (precluding federal habeas relief unless "every fairminded jurist would disagree with the decision."). Such relief is therefore denied.

**B. <u>Withheld Evidence</u> (Claim 2)**

In a related allegation, Thomas contends the prosecution withheld evidence of Shockey's deal with the State in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. To establish a *Brady* violation, Thomas must demonstrate that (1) the prosecution suppressed evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

The TCCA rejected Thomas's *Brady* allegation during his state habeas corpus proceedings. *Ex parte Thomas*, 2022 WL 3642125, at *1. As with his previous *Napue* claim, the state court found, in part, that the allegedly suppressed evidence was not material. To warrant federal habeas relief, Thomas must show that the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).[9] He fails to make this showing.

---

[9] Thomas argues that AEDPA's relitigation bar does not apply because the state court's findings were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" pursuant to 28 U.S.C. § 2254(d)(2). (ECF No. 1 at 51-55). "Because *Brady* claims involve mixed questions of law and fact," however, the Fifth Circuit has held that "§ 2254(d)(1), instead of subpart (d)(2), is applied." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018). Thomas's arguments will therefore be addressed under § 2254(d)(1).

1. <u>The State Court's Adjudication</u>

The Court has already discussed the gist of Shockey's testimony and the circumstances surrounding his deal with the prosecution when addressing Thomas's first *Napue* claim. *See* Sections IV(A)(1) and (2), *supra*. In short, Shockey testified that, in exchange for his testimony, the only promise made by the prosecution was the promise to inform the parole board of his cooperation in this case. *Id*. This testimony was false, as the prosecution also promised Shockey that they would seek a unit transfer from TDCJ so that he could be closer to his elderly mother. *Id*.

During his state habeas corpus proceedings, Thomas argued that the State's failure to disclose the full extent of its promises to Shockey violated his due process rights under *Brady*.[10] In considering whether such evidence was suppressed by the State, the state habeas trial court noted that neither the trial court records nor the notes of the lead prosecutor for the State, ADA Rojas, reflect that her agreement with Shockey regarding a unit transfer was disclosed to defense counsel. (ECF No. 12-9 at 212-14). Similarly, defense counsel had no recollection of being informed of such potentially useful impeachment evidence. (ECF No. 13-8 at 210-11).

Despite there being no record of a disclosure, ADA Rojas stated her "belief" that the information was provided to the defense team because it was her "standard operating procedure" to do so. (ECF No. 18-8 at 12). Based on this affidavit and his personal experience with ADA Rojas's "practices, procedures, and veracity," the state habeas trial court concluded that Thomas failed to demonstrate that the State suppressed the nature of its agreement with Shockey. (ECF No. 12-9 at 213-14). Alongside Thomas's *Napue* claim, the trial court then conducted its

---

[10] Thomas also argued that the State failed to disclose the fact that Shockey had come forward in a separate capital case alleging the defendant in that case, also incarcerated with Shockey at the Williamson County Jail, had confessed to him as well. *See Ex parte Thomas*, 2022 WL 3642125, at *1. This allegation was not raised in Thomas's federal habeas petition and is therefore not before this Court.

materiality analysis, concluding that Shockey's false testimony was not material to the jury's verdict because (1) the defense had already developed other impeachment evidence, (2) the State corroborated many of the facts to which Shockey testified, and (3) the conviction was supported by other evidence. *Id*. at 214-16.

The TCCA later denied Thomas habeas corpus relief based, in part, on the findings and conclusions of the trial court. *Ex parte Thomas*, 2022 WL 3642125, at *1-2. Specifically, the court determined that Thomas "has not met his burden to show that (1) the State failed to disclose evidence; (2) the withheld evidence was favorable; and (3) the evidence was material." *Id*.

2. <u>Analysis Under AEDPA</u>

Thomas contends that the state court's rejection of his *Brady* allegation was unreasonable. To establish a *Brady* violation, Thomas must demonstrate all three prongs of the *Brady* analysis—suppression, favorable evidence, and materiality. *Grace v. Hooper*, 123 F.4th 800, 805 (5th Cir. 2024) (citing *United States v. Glenn*, 935 F.3d 313, 319 (5th Cir. 2019)). In its opinion denying state habeas corpus relief, the TCCA determined that Thomas failed to establish any of these prongs. *Ex parte Thomas*, 2022 WL 3642125, at *1. Thus, to be entitled to federal habeas relief, Thomas must show that the state court's decision as to each prong was unreasonable. *See* 28 U.S.C. § 2254(d)(1).

(a) <u>Suppression</u>

First, the suppression prong. Thomas argues that the state court's suppression determination was unreasonable because it credited Rojas's affidavit over the record and affidavit from trial counsel. Noting that Rojas never denied suppressing Shockey's deal nor affirmatively stated that she disclosed it, but rather equivocally stated her "belief" that she would have disclosed the information given her past practices, Thomas contends it was improper for the state court to

treat her affidavit as probative of whether or not Shockey's deal was disclosed to the defense. This is all the more true, Thomas asserts, given that the record is devoid of any evidence of disclosure and defense counsel affirmatively denied receiving such useful impeachment information.

Thomas's concerns about the state court's suppression determination are justified. The trial court gave credence to Rojas's conjecture that she *probably* disclosed evidence of Shockey's deal without a shred of evidence in the record establishing that she *actually* did. This, in the face of credible evidence from defense counsel that such evidence was not disclosed but would have been helpful to impeaching Shockey's credibility if it had. Perhaps more troubling, the trial court admittedly credited Rojas with disclosure based almost exclusively on his own preconceived notion of her veracity after working on "hundreds" of other cases together.[11] (ECF No. 12-9 at 213). While trial courts are allowed to rely on personal recollection to resolve issues on state habeas review, *see* Tex. Code Crim. Proc. art. 11.071 § 9(a), the trial court here went a step further—he evaluated Rojas's credibility based solely on a favorable opinion of her honesty that was formed long before proceedings in this case even began. Such an admitted predisposition, absent any tangible evidence in the record supporting Rojas's assertion, renders the trial court's disclosure determination questionable, at best.

That being said, the trial court's determination on the suppression prong was not necessarily unreasonable under existing law. To start, state courts have "substantial leeway" in deciding whether the *Brady* disclosure requirement has been satisfied. *Reeder v. Vannoy*, 978 F.3d 272, 279 (5th Cir. 2020) (per curiam) (quoting *Cobb v. Thaler*, 682 F.3d 364, 379 (5th Cir. 2012)). But more importantly, a state court decision is unreasonable under AEDPA only if "the state court

[11] The trial court stated that the "totality of the record" also supported his determination despite previously finding that no such *Brady* disclosure was reflected in the district clerk's record or Rojas's trial notes. (ECF No. 12-9 at 212-13).

was *so* wrong that the error was 'well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Holberg v. Guerrero*, 187 F.4th 262, 276 (5th Cir. 2026) (citations omitted). Stated differently, Thomas must establish that "every fairminded jurist would disagree with the decision" in order to obtain relief. *Klein*, 607 U.S. at 220-21 (quotations omitted); *Holberg*, 187 F.4th at 276 (reiterating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.") (citation omitted).

This Court is unsure whether surmounting such a difficult burden is even possible, much less that Thomas has done so in this case. While the Court finds the state court's disclosure determination unsettling, it likely is not "beyond the realm of possibility that a fairminded jurist could agree with the state court." *Langley*, 926 F.3d at 156 (quotation and citation omitted). Ultimately, however, such a determination is unnecessary given the reasonableness of the state court's decision on the third *Brady* prong finding the allegedly suppressed information to be immaterial to Thomas's defense. Thus, the Court will adjudicate Thomas's *Brady* allegation on materiality alone. *See United States v. Kuyoro*, 175 F.4th 630, 639 (5th Cir. 2026) ("Because we find no suppression, we need not address the favorability and materiality prongs.").

(b) Materiality

Under the third prong of *Brady*, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Strickler v. Greene*, 527 U.S. 263, 289 (1999). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. This inquiry accounts for the cumulative effect of the withheld evidence against everything the jury already had. *Kyles v. Whitley*, 514 U.S. 419, 434-37 (1995).

Here, resolution of the *Brady* materiality prong echoes the previous resolution of Thomas's *Napue* claim.[12] *See* Section IV(A), *supra*. That is, evidence of Shockey's deal with the State to move closer to his mother would not have made a difference at Thomas's trial given that Shockey's credibility was already adequately impeached by his prior criminal history and his attempts, whether successful or not, to have his most recent sentence reduced or otherwise mitigated. The jury that convicted Thomas had substantial reasons to doubt Shockey's credibility—he was a lifelong criminal and convicted felon trying to curry favor with the State in exchange for testifying against Thomas. The fact that he was also promised a prison transfer for this testimony would do little to further impeach Shockey's already questionable credibility. It is therefore immaterial for *Brady* purposes. *See Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005) ("If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality.").

Likewise, evidence of Shockey's prison-transfer deal would not have resulted in a different outcome had it been disclosed to counsel because Shockey's testimony was ultimately not critical to the State's case against Thomas. The State's case relied primarily on the fact that Thomas's sperm DNA was found on the sticky ribbon attached to the victim's thumb and his fingerprint found on an alarm clock near the victim's body. At best, Shockey's testimony simply corroborated the scientific evidence establishing Thomas's presence on the night of the offense. Because the jury could have convicted Thomas even it fully discredited Shockey's testimony, the evidence of Shockey's deal with the State is immaterial. *See Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir.

---

[12] The Court notes that "different standards of materiality apply" to *Brady* and *Napue* claims. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993). The materiality standard for *Brady* claims asks whether there is a *reasonable probability* that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different. See Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Conversely, the standard for *Napue* materiality is "considerably less onerous," asking whether there is *any reasonable likelihood* that the false testimony could have *affected* the jury's verdict. *Whitley*, 992 F.2d at 497 (citations omitted); *see also Dennes v. Davis*, 797 F. App'x 835, 846 (5th Cir. 2020) (unpublished) (stating that, for petitioners, *Napue* has a "more lenient standard to establish prejudice").

2010) (finding the materiality of *Brady* evidence "depends almost entirely on the value of the evidence relative to the other evidence mustered by the state"); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (same).

3. Conclusion

In sum, the state court determined that relief was not warranted on Thomas's *Brady* claim for the same reason that relief was unwarranted under the less-stringent materiality prong of *Napue*—there is no reasonable probability that the result of Thomas's trial would have been different had evidence of Shockey's entire deal with the State been disclosed to the defense. Although fairminded jurists could certainly disagree with this determination, Thomas has not established that *every* fairminded jurist would. Thus, due to the substantial deference afforded to state court determinations under AEDPA, relief is denied. *See Klein*, 607 U.S. at 220-21 (precluding federal habeas relief unless "every fairminded jurist would disagree with the decision.").

**C. False DNA Testimony (Claim 4)**

Thomas next contends that the State presented false and misleading testimony from its experts about the certainty that the DNA found on the medical tape (Item 3) that matched Thomas's DNA was from sperm. According to Thomas, the experts: (1) falsely testified that, because the DNA profiles found on Item 3 were from a "sperm cell fraction," any male DNA profile could only be from sperm, and (2) misleadingly testified that Thomas's DNA was the only male DNA present on parts of Item 3.

Thomas concedes that this allegation was fully exhausted during his state habeas corpus proceedings but argues nonetheless that AEDPA's deferential standard should not apply in this Court because the state court did not adjudicate the claim on the merits. Respondent disagrees,

arguing that the TCCA may not have specifically discussed Thomas's allegation but still adjudicated the claim in its opinion denying state habeas corpus relief. As discussed below, Respondent is correct—Thomas must overcome AEDPA to be entitled to habeas relief in federal court. He does not.

1. <u>Relevant Background</u>

On direct appeal, the TCCA described in great detail the evidence concerning the investigation into McKinney's murder in 1980. *Thomas*, 2018 WL 739093 at *1-3. While DNA testing did not yet exist, investigators had collected hairs, clothing, ligatures, bedding, and other evidence from the crime scene, including vaginal swabs from the victim's body, and submitted them to the DPS Lab for forensic testing. *Id*. at *4. While numerous suspects were developed over the years, advances in DNA technology eventually led investigators to Thomas. *Id*.

The State presented its DNA evidence at Thomas's trial primarily through the testimony of three DNA analysts: (1) Gary Molina with the DPS Lab testified in detail about the testing he conducted in 1996 and 1999, (2) Kimberly Clement with the DPS Lab testified about the testing she conducted using newer technology in 2010, and (3) Barbara Leal with Cellmark Forensics testified about the testing she conducted in 2014 prior to Thomas's trial. The TCCA accurately summarized their testimonies as follows:

> Gary John Molina was the CODIS program manager at the DPS Lab. When Molina examined Item 3 (cuttings from the sticky ribbon removed from McKinney's thumb), he found that it contained sperm cells. Molina extracted the biological material from Item 3 and sent the resulting extraction (Item 3A) to a private lab for testing, along with McKinney's bloody nightgown and known DNA samples from [other suspects]. Eventually, Molina developed a DNA profile from the sperm cell fraction from Item 3, which he uploaded to CODIS in 1999.
>
> * * *
>
> DPS Forensic Scientist Kimberly Clement was assigned to this case in 2009. Clement testified that the DNA profile that Molina had uploaded to CODIS in 1999 had only nine loci or locations, while ten loci were required to upload an unknown

profile into the national CODIS database. Therefore, in 2010, Clement extracted a new DNA profile from Item 3 and extracted a known profile from McKinney's bloody nightgown. Item 3 contained both sperm cells and blood or saliva. Clement, who was using STR[13] analysis, reported: "The DNA profile from the sperm cell fraction of Item 3 is consistent with a mixture. Assuming the victim is the source of Item 8—which would be the nightclothes'—[t]he victim and an unknown male individual cannot be excluded as contributors to the profile." Clement then uploaded the unknown male profile into the national CODIS database.

In 2012, Clement received a report from the FBI identifying [Thomas] as a potential match to the Item 3 profile. The DNA Lab notified [Detective] Foster of the possible DNA match. He obtained a search warrant for [Thomas]'s DNA and [eventually obtained four buccal swabs from Thomas].

* * *

Clement stated in a July 20, 2012 report:

> The DNA profile from the sperm cell fraction of the ribbon (Agency Item 3) is consistent with a mixture. Assuming Mildred McKinney is the source of the stain from the night clothes (Agency Item 8), Mildred McKinney cannot be excluded as a contributor to the profile. [Thomas] cannot be excluded as a contributor to the profile. The probability of selecting an unrelated person at random who could be a contributor to this profile is approximately 1 in 96.90 million for Caucasians, 1 in 6.925 billion for Blacks, and 1 in 155.3 million for Hispanics. The approximate world population is 6.8 billion. [].

In 2014, Clement sent some materials associated with this case to Cellmark Forensics, a private DNA lab, for testing. Clement also re-analyzed the cutting that Molina had taken from Item 3 and determined that [Thomas] could not be excluded as the contributor of the major component in this mixture at the loci listed. She concluded that the "probability of selecting an unrelated person at random who could be the source of the major component in this profile is approximately 1 in 10.88 trillion for Caucasians, 1 in 204.7 trillion for Blacks, and 1 in 174.2 trillion for Hispanics." Additional testing excluded [other suspects] as contributing to the DNA profile developed from Item 3.

* * *

13 The record shows that STR stands for Short Tandem Repeat. This is a type of DNA analysis that allows technicians to "run samples very rapidly" and offers the potential to obtain a full DNA profile from a spot of blood barely visible to the naked eye.

> Barbara Leal, a DNA analyst at Cellmark Forensics, testified that she analyzed Y–STR profiles of the vaginal, oral, throat, and anal samples from McKinney.[14] Leal could not obtain a Y–STR profile from the vaginal samples. She obtained a partial Y–STR profile from the throat slide, indicating the presence of a male's DNA in McKinney's throat. [Thomas and several other suspects] were all excluded as contributors of that male DNA. Leal found a single male DNA profile for the anal sample, but the result was insufficient to make any further determinations.
>
> Leal processed two sets of cuttings from Item 3 and compared them to the known DNA samples. On the first set, she found a Y–STR profile that was a mixture of two or more males. Leal stated "with a reasonable degree of scientific certainty" that [Thomas] and [his brother William] could not be excluded as contributors to the major component of that mixture. That major profile was seen, Leal testified, "1 time in 6714, Caucasians; it was also seen 1 time in 5871, African Americans; and it was seen zero times in 3504, Hispanics." . . . For the second set of cuttings, the Y–STR profile again indicated a mixture of at least two males. [Thomas and his brother] could not be excluded from the major component of that mixture.

*Thomas*, 2018 WL 739093, at *4-7.

2. <u>The State Court's Adjudication</u>

Thomas did not initially allege his claim concerning false or misleading DNA testimony either on direct appeal or in his application for state habeas corpus relief. But after receiving briefing from both parties during Thomas's state habeas proceedings, the state habeas trial court determined that additional controverted fact issues existed and designated the following additional issues for development at an evidentiary hearing:

- Whether DNA evidence or testimony presented at trial was false or misleading.
- If the DNA evidence or testimony presented at trial was false or misleading, whether there is a reasonable likelihood that the false or misleading testimony affected the culpability verdict.
- If the DNA evidence or testimony presented at trial was false or misleading, whether there is a reasonable likelihood that the false or misleading testimony affected the sentencing verdict.

[14] Y–STR testing is STR testing that is specific to the Y-chromosome. This profile is passed down through the paternal lineage in a family and all blood-related males in the same lineage should have the same Y–STR profile.

- Whether relevant scientific evidence is currently available regarding the DNA evidence that was not available at the time of trial because the evidence was not ascertainable through the exercise of reasonable diligence before or during trial.

(ECF No. 12-8 at 361-62).

The state habeas trial court held an evidentiary hearing in June 2021 where both parties presented evidence on several issues, including Thomas's claim that the DNA testimony was misleading. (ECF No. 13-6). Thomas relied heavily on affidavits submitted by Simon Ford, a molecular biologist and consultant in the field of forensic DNA technology, who raised numerous concerns about the methods used to analyze the DNA in Thomas's case. (ECF Nos. 1-13; 13-12 at 361-77). The State responded with an affidavit from their own expert, Allison Heard, who is the DNA Section Supervisor at the DPS Lab. (ECF No. 18-8 at 79-105). The State also provided affidavits from Barbara Leal (now McCarty) and Kimberly Clement, both of whom testified for the State at trial. (ECF No. 18-8 at 24-34, 56-58).

After further briefing and argument from the parties, the state habeas trial court issued detailed findings and conclusions on a number of the concerns raised by Ford, including the assumption that the DNA found on Item 3 that matched Thomas's DNA was from his sperm. (ECF No. 12-9 at 231-48). In particular, the court made the following findings:

207. Ford draws on his previous concerns to argue against the conclusion that DNA consistent with [Thomas] must come from his sperm cells because it shows up in the sperm fraction of the sample.

208. Heard agrees if based on this alone, but notes that, depending on the serology test results of the stain, the strength of the profile (how much contribution exists) can indicate the source of the DNA.

209. Heard states if there truly were not complete separation during differential extraction, and there were a third contributor (thereby existing three sources–blood, semen, and saliva), then she would anticipate the sperm cell fraction to be closer to a mixture of three individuals at approximately equivalent levels.

*Id*. at 240-41. The court then made the following conclusions about Thomas's DNA challenges:

> 237. Gary Molina testified in detail about the testing he did as a DPS analyst in 1996 and 1999. RR23:38-127. Kim Clement testified about the testing she conducted in 2010 using a different cutting and different methods than Molina's testing and submission in 1999. RR23:180-246. Barbara McCarty, then Leal, testified about Cellmark's Y-STR testing before the jury as well. RR24-47-94.
>
> 238. Thus, the jury at trial had DNA evidence conducted by a variety of laboratories, using a variety of methods, all of which inculpated [Thomas] to varying degrees of certainty.
>
> 239. Reviewing the affidavits presented, the record, and the evidence before this Court it is clear that Ford and Heard disagree in the conclusions they draw and the interpretations they make from the available evidence. They also disagree about the utility and efficacy of the various methods employed and their confidence in the results. Likewise, Ford and McCarty similarly disagree. It is not at all clear that this disagreement is rooted in anything other than speculation, possibilities, and potential concerns on the part of Ford.
>
> 240. These disagreements as to interpretation of portions of a particular method or analysis belie the combined force of the multiple inculpatory results.
>
> 241. At the very least, [Thomas] has not met his burden to demonstrate that the DNA evidence was false or misleading or that it would render an immaterial statement before the jury otherwise material.
>
> *Id*. at 245-46.

The TCCA later denied Thomas habeas corpus relief based, in part, on these findings and conclusions. *Ex parte Thomas*, 2022 WL 3642125, at *2. While the TCCA did not address Thomas's allegation specifically, it recognized that "additional matters" aside from the claims raised in Thomas's state habeas application were addressed by the trial court, including a claim challenging the statistics used by the experts to calculate DNA mixture probabilities. *Id*. The court stated that it had "reviewed the record with respect to these allegations" and that it denied relief "[b]ased on the trial judge's findings and conclusions and our independent review of the record[.]" *Id*.

3. The TCCA's Decision Was on the Merits

This Court must apply AEDPA's deferential standard of review when reviewing claims that were "adjudicated on the merits in State court." 28 U.S.C. § 2254(d). Knowing this, Thomas argues that § 2254(d) is inapplicable to the instant claim because the TCCA "did not discuss, much less deny relief, on any stand-alone claim based on misleading DNA testimony or any claim based on the sperm cell fraction issue discussed here." (ECF No. 23 at 45). In other words, Thomas believes he did his part by presenting his claim fully and fairly to the state court, but the TCCA nonetheless erred and overlooked the claim.

Because such a scenario is "unlikely," there is a rebuttable presumption that the state court adjudicated the claims on the merits when it was fully and fairly presented. *Lucio v. Lumpkin*, 987 F.3d 451, 464 (5th Cir. 2021) (citing *Johnson v. Williams*, 568 U.S. 289, 298 (2013)). Thomas can rebut this presumption by offering: (1) evidence the claim was adjudicated using "state-law procedural principles" that are contrary to a merits determination, or (2) evidence that "leads *very clearly* to the conclusion that a federal claim was inadvertently overlooked in state court." *Jimenez v. Guerrero*, 133 F.4th 483, 489 (5th Cir. 2025) (citations omitted). "Pure speculation" alone will not overcome the presumption of merits adjudication. *Id*.

Thomas surmises that the TCCA overlooked his false-testimony claim simply because it was not discussed in the court's opinion. But a state court is not required "to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Id*. (citing *Richter*, 562 U.S. at 100). To the contrary, the presumption applies even when, as here, a state court addressed "some but not all of a defendant's claims." *Id*. (citing *Williams*, 568 U.S. at 298); *see also Dunn v. Reeves*, 594 U.S. 731, 743 (2021) (stating that "state courts need not even discuss separately every single

claim."). Thomas does nothing to rebut the presumption that the state court in this case considered his claim "too insubstantial to merit discussion." *Id.* (citing *Williams*, 568 U.S. at 299).

Furthermore, the state habeas record "very clearly" shows his false-testimony allegation was *not* "inadvertently overlooked in state court." *Id.* at 489. As discussed above, the trial court's lengthy findings and conclusions addressed several of Thomas's allegations challenging the DNA testimony, including his concern that the testimony assumed that the DNA found on Item 3 was from Thomas's sperm. Although the TCCA did not mention each of Thomas's concerns about the DNA testimony, it recognized that the trial court "addressed additional matters" regarding DNA and denied relief based, in part, on the trial court's findings and conclusions. *Ex parte Thomas*, 2022 WL 3642125, at *2.

As there is ample evidence the TCCA was well-aware of the instant allegation, Thomas fails to establish "the exceedingly rare" exception to the presumption that the claim was adjudicated on the merits. *Jimenez*, 133 F.4th at 490-91 (finding that such a showing "is probably impossible in practice."). This Court will therefore review the allegation under the deferential standard set forth by AEDPA.

4. Analysis Under AEDPA

As established previously, a *Napue* violation requires that a witness testified falsely, that the government knew the testimony was false, and that the testimony was material. *Brumfield*, 89 F.4th at 519. False testimony is material when there is "any reasonable likelihood" that it "could . . . have affected the judgment of the jury." *Uvukansi*, 126 F.4th at 390 (quoting *Giglio*, 405 U.S. at 154).

When it comes to forensic science, however, the concept of "false" under the *Napue* rubric "is not so easy to pin down." *Herod v. Guerrero*, 2026 WL 2495303, at *8 (5th Cir. 2026)

(unpublished) (citation omitted). Evidence is generally "false" if it is "specific misleading evidence important to the prosecution's case in chief." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).

Here, there is no question that the State's expert testimony regarding the DNA found on Item 3 was important to the prosecution's case against Thomas, and thus material. The combined testimony established that Thomas could not be scientifically excluded as a contributor to sperm cell DNA found on an item tied to the victim's right thumb, thus providing the only direct evidence supporting the State's theory that Thomas had assaulted the victim sexually and was at least present when she was brutally murdered. As such, the only questions are (1) whether the State's experts testified falsely, and (2) whether the prosecution knew the testimony was false or knowingly allowed it "to go uncorrected when it appear[ed]." *Glossip*, 604 U.S. at 246.

Thomas argues that the State's experts falsely testified about the certainty that the source of the male DNA found on Item 3 was from sperm and misleadingly testified that Thomas's DNA was the only male DNA present on parts of Item 3. To support these assertions, Thomas relies almost exclusively on the affidavits of his state habeas expert, Simon Ford, who disagreed with the methods used by the State's experts and the conclusions they drew on a number of issues. But the fact that Thomas found an expert willing to critique the methods and conclusions of the State's experts does not establish that their testimony was either false or misleading. *See Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000) (holding disagreement between experts was insufficient to overcome state habeas court's factual determination that the prosecution expert's testimony was not false or misleading); *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996) (holding that "the fact that other experts disagreed" was insufficient to show the state's expert testimony to be false or misleading).

Moreover, Thomas presented the state habeas court with no specific evidence showing the prosecution knew (or should have known) that the experts' testimony was false or misleading. *See Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (denying habeas petition because, even assuming, *arguendo*, that certain testimony was false, no proof of prosecutor's knowledge of its falsity) (citations omitted). The Fifth Circuit has suggested that a state "should have known" about the falsity of testimony when "positive information already in the possession of the prosecution established that the testimony was false." *Herod*, 2026 WL 2495303, at *9 (citation omitted). Yet Thomas identifies no such "positive information" from the time of trial establishing that the conclusions of the State's experts were either false or misleading.

Thomas's allegation is essentially an attempt to turn one expert's *ex post facto* criticisms into evidence establishing a *Napue* violation. But that is not enough to show that the testimony of the State's experts was either false or misleading. *See Robertson v. Davis*, 715 F. App'x 387, 393 (5th Cir. 2017) (unpublished) (finding "mere disagreement between experts is insufficient to show that testimony is false or misleading."); *Gimenez v. Ochoa*, 821 F.3d 1136, 1142 (9th Cir. 2016) ("To the extent that this new testimony contradicts the prosecution's expert testimony, it's simply a difference in opinion—not false testimony."). Nor does it establish that the prosecution knew, or should have known, that their experts testified falsely or misleadingly. Consequently, viewing all the evidence under the deferential standard that applies on federal habeas review, Thomas has not shown that the state court's decision was objectively unreasonable or that he is entitled to relief under *Napue*. Federal habeas relief is therefore denied.

**D. <u>Mitigating Evidence</u> (Claim 6)**

In his next allegation, Thomas argues that he was deprived of his right to effective assistance of counsel at the punishment phase of his trial. Specifically, Thomas faults his trial

counsel, Steve Brittain and Allan Williams, for failing to investigate and present evidence that Thomas was physically and emotionally abused as a child. This allegation was raised during Thomas's state habeas proceeding and ultimately rejected by the TCCA. For the reasons discussed below, Thomas fails to demonstrate the state court's rejection of the allegation was either contrary to, or an unreasonable application of, Supreme Court precedent.

1. The *Strickland* Standard

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right "entails that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence." *Hinton v. Alabama*, 571 U.S. 263, 272 (2014). To establish the merits of a claim alleging the ineffective assistance of trial counsel (IATC) under the Sixth Amendment, a petitioner must satisfy the *Strickland* test—i.e., that (1) counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88, 690. This standard is both demanding and deferential. *Shinn*, 592 U.S. at 118; *Strickland*, 466 U.S. at 689.

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-88). This requires the Court to "affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (cleaned up). As such, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise

of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s second prong, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019) (citation omitted). In conducting *Strickland*'s prejudice analysis, a court must "consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam). But the question "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111-12 (emphasis added) (citing *Wong*, 558 U.S. at 27). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id*.

2. <u>The State Court's Adjudication</u>

During his state habeas proceedings, Thomas asserted that his right to constitutionally effective counsel was impeded by counsels' failure to sufficiently investigate his life history and mental health history. To support this assertion, Thomas relied upon the declaration of Dr. Leonard Wiess, a forensic psychiatrist retained by trial counsel to assist them at the punishment phase of Thomas's trial. (ECF No. 11-3 at 72). Dr. Weiss informed trial counsel that Thomas suffered a childhood filled with physical and emotion abuse by his parents, particularly his mother, who herself grew up in a physically and emotionally abusive household. *Id*. Despite the disclosure of these "red flags," Thomas argued, his trial counsel failed to investigate or present any evidence on the matter to the jury. He also provided the affidavits of three family members—his brother, his

brother's ex-wife, and his nephew—who could have testified on his behalf regarding the abusive household in which he was raised. (ECF Nos. 11-2 at 1-11, 25-32; 16-5 at 12-27).

In response, trial counsel submitted an affidavit recounting their mitigation efforts. (ECF No. 20 at 1-10). To assist them at the punishment phase, counsel requested and retained four experts: (1) Dr. Wiess, a forensic psychiatrist, (2) Dr. Stephen Yount, a medical doctor specializing in family medicine, (3) Frank Aubuchon, a criminal justice consultant specializing in the environment and quality of life in the Texas prison system, and (4) Gerald Byington, a licensed mitigation specialist with experience working on death penalty cases. *Id*. Dr. Yount and Aubuchon both testified at trial, while Byington located and interviewed witnesses who could provide favorable information about Thomas, including four of the witnesses who eventually testified for the defense at trial. *See* Section I(B)(2), *supra*.

Counsel also interviewed Thomas's brother, mother, and father in order to obtain an accurate and complete picture of Thomas's childhood and early adult years. (ECF No. 20 at 3). Thomas's brother, Bruce, was also interviewed separately to inquire about the possibility that Thomas was abused or neglected as a child. *Id*. Bruce indicated that while Thomas always had a lot of bruises and injuries while growing up, these were minor and the result of hyperactivity, not abuse. *Id*. According to Bruce, Thomas was "disciplined but in no way the victim of child abuse or neglect." *Id*. This was far different from the picture Bruce later painted in Thomas's post-conviction proceedings, where he spoke of his entire family being "strict disciplinarians" and that Thomas was often on the receiving end of physical abuse. (ECF No. 16-5 at 12-27).

Following the summary of the investigation they undertook, counsel explained the factors they considered in formulating their defensive strategy. (ECF No. 20 at 9-10). Among other things, counsel considered the brutality of the murder, crime scene photos they anticipated would

be admitted, the vulnerability of the victim (an elderly woman living alone killed in her own home), the length of time between the crime and arrest, the anticipated composition of the Williamson County jury pool, and the efficacy of presenting evidence of an abusive childhood (the "abuse excuse") in the face of a sibling denying that such abuse and neglect occurred. *Id*. Counsel then determined that:

> . . . the better strategy would be to present the fact that [Thomas] had chronic diseases that would lead to an early death and dementia. The penitentiary environment would likely hasten both. This approach would also lend itself to a "no" answer to the special issue concerning future dangerousness. We also believed that there would be serious problems both practical and evidentiary in presenting the saga of childhood abuse and neglect as presented in the writ. We anticipated the state could also call family members as witnesses, who could contradict the horrific mistreatment of [Thomas] as a child.
>
> We made an effort with many of our witnesses at the punishment hearing to humanize [Thomas]. To show that his life was not all drugs and fights we brought people who could describe their friend in a positive way.

*Id*.

Based on the above evidence, the state habeas trial court found that counsel "conducted an extensive investigation, interviewed multiple witnesses, used multiple experts, and developed enough mitigation evidence to make strategic choices as to which pieces of evidence were least likely to be rebutted and most likely to be effective." (ECF No. 12-9 at 223). Citing the *Strickland* standard, the court concluded:

> Given this record, [Thomas] has not met his burden to demonstrate that his trial counsels' conduct fell below an objective standard of reasonableness in the manner in which they investigated mitigation evidence. Rather, the evidence before this Court demonstrates [Thomas]'s trial counsel thoroughly investigated and considered mitigation evidence and strategically chose which testimony to present at the punishment phase of the trial.

*Id*. The trial court then recounted the significant aggravating evidence presented by the State at both phases of trial, including evidence that Thomas consistently engaged in drug sales and violent behavior over a period of years. *Id*. at 224-31. Given the totality of this evidence, the court

concluded that Thomas "has not met his burden to demonstrate that, even if his trial counsel had performed deficiently (which they did not), he suffered prejudice therefrom." *Id*. at 231.

As with Thomas's previous claims, the TCCA ultimately denied Thomas habeas corpus relief based, in part, on the findings and conclusions of the trial court. *Ex parte Thomas*, 2022 WL 3642125, at *2. Also citing *Strickland*, the court determined that Thomas "failed to show by a preponderance of the evidence that his trial counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance." *Id*.

3. Analysis Under AEDPA

Thomas contends that the state court's decision was an unreasonable application of *Strickland* and an unreasonable determination of the facts. (ECF No. 1 at 75, 87-92). Because IATC claims are considered mixed questions of law and fact, however, they are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Further, when a state court adjudicates an IATC claim on the merits, as it did in this case, a federal habeas court must review the claim under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *See Woods*, 578 U.S. at 117 (citing *Pinholster*, 563 U.S. at 190); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009).

That means the "pivotal question" before this Court is not "whether defense counsel's performance fell below *Strickland*'s standards," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. That is to say, the question to be asked in this case is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. Under this standard, this Court may grant federal habeas relief only if Thomas demonstrates that *every*

"fairminded jurist" would agree that *every* reasonable lawyer would have made a different decision. *Reeves*, 594 U.S. 731, 739-40 (citing *Richter*, 562 U.S. at 101); *see also Klein*, 607 U.S. at 220-21 (precluding federal habeas relief unless "every fairminded jurist would disagree with the decision."). Thomas does not come close to meeting this difficult standard.

(a) Counsels' performance

It is unquestioned that under prevailing professional norms at the time of Thomas's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (citations omitted). Counsel in death-penalty trials have long been required to either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). When assessing the reasonableness of an investigation, a court must look at "the known evidence" and whether it "would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

That being said, lawyers generally need not go "looking for a needle in a haystack," especially when they have "reason to doubt there is any needle there." *Maryland v. Kulbicki*, 577 U.S. 1, 5 (2015) (per curiam) (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). Nor is counsel required to prepare for "what appear to be remote possibilities." *Richter*, 562 U.S. at 110. Instead, counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 522. Every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. For this reason, there is always a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional

assistance." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689)).

The record in this case supports the state court's conclusion that Thomas's trial counsel "thoroughly investigated and considered mitigation evidence and strategically chose which testimony to present at the punishment phase of trial." (ECF No. 12-9 at 224). Counsel retained four experts to assist them at the punishment phase, including Dr. Wiess, a forensic psychiatrist. After conducting an evaluation of Thomas, Dr. Weiss informed counsel that Thomas had been the victim of physically and emotionally abusive parents as a child. However, the only source of the frequency and nature of the abuse was Thomas himself. (ECF No. 20 at 4). To get a clearer picture of Thomas's childhood, counsel interviewed Thomas's older brother, Bruce, about the possibility that Thomas had been abused or neglected as a child. Bruce affirmatively denied that Thomas was in any way the victim of child abuse or neglect. *Id*. at 3.

Given their investigation, as well as their concerns about the efficacy of presenting an abusive childhood as mitigation, counsel chose a different strategy—to humanize Thomas and present witnesses to describe him in a positive way. *Id*. at 9-10. Through the thorough investigation of mitigation specialist Gerald Byington, counsel were able to present five such witnesses, all family or close friends. Counsel also chose to present evidence demonstrating that Thomas would not be a future danger if sentenced to life imprisonment given that he suffered from chronic diseases that would likely lead to dementia or an early death, particularly in the harsh environment of a maximum-security prison. *Id*. at 10. This was done through the testimony of the other two experts retained by counsel—Dr. Yount, a family medicine doctor, and Frank Aubuchon, a criminal justice consultant.

Thomas has not shown that counsels' investigation or choice of strategy fell below "an objective standard of reasonableness." *Rhoades*, 852 F.3d at 431-32. Quite the opposite, given counsels' concerns about presenting childhood abuse as mitigating evidence, along with the fact that the only evidence of abuse came from Thomas himself and was adamantly refuted by his older brother, counsels' chosen strategy appears imminently reasonable under the circumstances. Trial counsel have broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (indicating counsel has "wide latitude in deciding how best to represent a client") (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003)). And a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).

Counsels' decision in this case to forego further investigation into Thomas's allegations of abuse and to focus instead on Thomas's good attributes and negating the future danger special issue certainly did not "permeate[] the entire trial with obvious unfairness." *Id.* at 752-53. The fact that Thomas has now found witnesses in post-conviction to substantiate his abuse allegations does not change this determination, as the evidence known to counsel at the time of trial would not lead a "reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

On federal habeas review, this Court is mindful that "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009). Because there is a more than "reasonable

argument that counsel satisfied *Strickland*'s deferential standard," Thomas's allegation fails. *Richter*, 562 U.S at 105.

(b) Prejudice

Even assuming counsel were deficient in not investigating further, the question of whether counsels' deficient performance prejudiced Thomas still remains. *Andrus*, 590 U.S. at 821-22 (citing *Strickland*, 466 U.S. at 692).

For mitigation-investigation claims such as this, a federal habeas court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Trevino v. Davis*, 861 F.3d 545, 549 (5th Cir. 2017) (citing *Wiggins*, 539 U.S. at 534). *Strickland* places the burden on the defendant to show a "reasonable probability" that, but for counsels' deficient investigation, the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27 (citing *Strickland*, 466 U.S. at 694). But "[t]he likelihood of a different result must be substantial, not just conceivable." *Brown v. Thaler*, 684 F.3d 482, 491 (5th Cir. 2012) (citing *Richter*, 562 U.S. at 112). In cases where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish *Strickland* prejudice. *Busby v. Davis*, 925 F.3d 699, 726 (5th Cir. 2019) (citing *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)).

As discussed by the TCCA on direct appeal, the assault, rape, and murder of seventy-three-year-old Mildred McKinney was exceptionally violent and brutal:[15]

> Medical Examiner Roberto Bayardo performed McKinney's autopsy. He testified that the only clothing remaining on her body was the left sleeve of a torn

[15] While, by their nature, all capital murder cases involve terrible circumstances, Supreme Court precedent plainly anticipates that the severity of the crime is a relevant factor in *Strickland* prejudice. *See Smith v. Spisak*, 558 U.S. 139, 154-55 (2010); *Strickland*, 466 U.S. at 699; *see also Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence."); *Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) (unpublished) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime.").

> and bloody pink nightgown. McKinney's hands were tied behind her back with a white cloth torn from a pillowcase, a yellow telephone cord, and a pair of pantyhose. The pantyhose and telephone cord had also been tied to her lower leg and opposite ankle. Bayardo additionally discovered two portions of a sticky pink ribbon ("Item 3") tied to McKinney's right thumb. He carefully removed the ribbon and placed it in an envelope. Also, a white string of the type commonly attached to a closet light was tied around both of McKinney's thumbs. Around McKinney's neck, Bayardo found a loose ligature made of a blood-stained strip of pillowcase.
>
> McKinney had suffered extensive bruising and other injuries to her head, face, and neck. She had also suffered bruising from the many ligatures securing her limbs. Her hands were so swollen, bruised, and bloody that Bayardo deduced that her assailant must have stepped on them. McKinney's chest was also bruised, there was extensive bruising of the outside of her sexual organ, and there was a deep tear to the back of her vagina. Bayardo concluded that some object about the size and shape of a baseball bat had caused this vaginal tear. He said that, **out of the 15,000 autopsies he had performed over the course of his career, this was the worst injury he had ever seen.** Bayardo further found injuries to McKinney's anus and rectum suggesting that an object of similar size had been inserted into her anus. Bayardo also found a lubricant-type material smeared around the opening of McKinney's vagina and anus. He testified that he found "fresh sperms" in McKinney's vagina.
>
> Bayardo stated that bleeding around McKinney's lungs, the fracture of her hyoid bone, and the pattern of bruising on her neck showed that she had been manually strangled. Bruising in the back of McKinney's throat was consistent with an object being pushed into her mouth. Based on the amount of bruising and bleeding he observed, Bayardo surmised that McKinney was alive when the injuries to her vagina and anus occurred. He concluded that strangulation "associated with" forcible rape caused McKinney's death, which he estimated occurred between 3:00 and 5:00 o'clock in the morning.

*Thomas v. State*, 2018 WL 739093, at *2 (emphasis added).

At the punishment phase, the jury then heard evidence of Thomas's longtime drug addiction, criminal activity, and violent behavior over the course of several decades. *See* Background, Section I(B)(1), *supra*. Among other things, the jury heard testimony establishing that Thomas: (1) harassed and physically abused the women in his life, (2) put a knife to a man's throat over a drug dispute, (3) caved in a man's skull with a golf club over a dispute at a golf course, (4) shot up his neighbor's truck with a shotgun, (5) choked his girlfriend's son until he

passed out, and (6) had committed multiple criminal offenses, including running drugs for an international drug trafficking organization. *Id.*

Considering the brutal nature of the crime and the overwhelming evidence establishing his future dangerousness, Thomas fails to establish the result of his sentencing would have been different had counsel further investigated Thomas's assertion that he was physically beaten and emotionally abused as a child. *See Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State"). Thomas therefore fails to demonstrate he was prejudiced by counsels' allegedly deficient mitigation investigation.

4. Conclusion

In summary, Thomas contends that counsel deficiently investigated "red flags" that their own expert uncovered concerning physical and emotional abuse inflicted on Thomas as a child by his parents and grandparents. But "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Although it is possible, in hindsight, to speculate that counsel could have investigated more, hired different experts, or presented more witnesses, this Court is "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)) (internal quotation marks omitted).

The objective evidence present in the record demonstrates that counsel conducted a broad investigation into Thomas's background and chose their strategy after consulting with several different types of experts, family members, and friends. Thomas provides no evidence to the contrary. Instead, he offers evidence establishing that Thomas's mother was a strict disciplinarian with a terrible temper who would hit or lash out at others, including Thomas and his brother, Bruce, over the smallest things. (ECF No. 1 at 81-84). But such evidence does not come close to outweighing the substantial evidence presented by the State at both the guilt-innocence and punishment phases of trial regarding the brutal murder of Mildred McKinney and Thomas's history of violence.

As a result, Thomas falls short of establishing either prong of the *Strickland* inquiry. The state court found the same, concluding that Thomas failed to show "that his trial counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that the result of the proceedings would have been different but for counsel's deficient performance." *Ex parte Thomas*, 2022 WL 3642125, at *1. This decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods*, 578 U.S. at 117. Federal habeas corpus relief is therefore denied.

**E. <u>Lost Evidence</u> (Claim 7)**

In Claim 7, Thomas contends his due process rights were violated by the State's failure to preserve crucial physical evidence. Citing the loss of certain evidence[16] that occurred during the thirty-four-year period between McKinney's death and his trial, Thomas argues that his right to

---

[16] The evidence allegedly lost includes a fingernail clipping from the victim, a strip of her bed sheet, the bedside alarm clock with Thomas's fingerprint, six hairs removed from the victim's body, a glove found under the victim's head, and the victim's nightgown. (ECF No. 1 at 92).

present evidence in his defense was compromised. Thomas raised a similar argument during his state habeas proceedings which the TCCA ultimately rejected. This decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.[17]

The Supreme Court has held that the State violates a defendant's due process rights if: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *California v. Trombetta,* 467 U.S. 479, 489 (1984). If the exculpatory value of the evidence is undetermined, but may be "potentially useful" to the defense, then a defendant must show that the government acted with bad faith in destroying the evidence. *Arizona v. Youngblood,* 488 U.S. 51, 58 (1994). Thus, the failure to preserve potentially useful evidence "does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" *Illinois v. Fisher,* 540 U.S. 544, 547-48 (2004) (per curiam). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *United States v. Wadi*, 153 F.4th 465, 478 (5th Cir. 2025) (citation omitted).

Thomas offers nothing to suggest that the exculpatory value of the missing evidence was apparent to the State before the evidence was lost. While he speculates that the evidence *might have* played a critical role in his defense, it just as easily could have inculpated him even further for McKinney's murder. As such, Thomas must establish that the State acted in bad faith in failing to preserve the potentially exculpatory missing evidence. *Fisher*, 540 U.S. at 547-48; *Youngblood*,

---

[17] Respondent contends this allegation was never presented to the state courts despite the fact that a nearly identical allegation was brought during Thomas's state habeas proceedings. (ECF No. 10-10 at 23-27). While Thomas's state habeas claim focused more on the passage of time between the crime and trial, the allegation still revolves around the loss of evidence and Thomas's inability to test these items and present favorable results to the jury. For this reason, the Court believes Thomas's allegation has been sufficiently exhausted for AEDPA purposes. To the extent it is not, however, the Court notes the allegation would be unexhausted and procedurally barred from federal habeas review for the reasons discussed in Section V below.

488 U.S. at 58. Again, Thomas does not even attempt to make this showing.[18] Because Thomas offers only conclusory assertions that the State compromised his ability to present evidence in his defense, federal habeas relief is unavailable. *See Armstrong v. Ashley*, 60 F.4th 262, 273 (5th Cir. 2023) (finding conclusory assertion of bad faith insufficient to establish a constitutional violation under *Youngblood*); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (finding conclusory allegations "fail to show that the state, in bad faith, destroyed any evidence with knowledge of its exculpatory value.").

### F. <u>Juror Confusion</u> (Claim 8)

Under Texas law, capital jurors at the punishment phase of trial are instructed that they can answer "Yes" to the future-dangerousness special issue and "No" to the mitigation special issue only if all twelve of them agree to do so. *See* Tex. Code Crim. Proc. art. 37.0711, §§ 3(d), (f).[19] They are also instructed that they can give the opposite answers only if ten or more of them agree to do so. *Id*. If the jury fails to agree on an answer to either special issue, the trial court is required to sentence a defendant to life imprisonment. *Id*. at § 3(g). However, the statute prohibits the trial court and the parties from informing jurors of the effect of their failure to agree on an issue. *Id*. at § 3(i).

Citing *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994), Thomas argues that he was denied due process because his jury was affirmatively misled about their role in the sentencing process. He submits that Texas's "12-10 rule," along with the sentencing statute's prohibition on informing the

---

[18] At best, Thomas hints that the loss of evidence was the result of negligence on the part of the State. Mere negligence, however, does not constitute evidence of bad faith. *Youngblood*, 488 U.S. at 58 (finding the failure to refrigerate clothing or test semen samples was at worst negligence and not demonstrative of bad faith); *accord United States v. Diaz*, 844 F. App'x 734, 735 (5th Cir. 2021) (unpublished) (no evidence of bad faith where prosecution negligently lost or destroyed an audio recording of a discussion between appellant and his co-conspirator that allegedly reflected that Diaz did not knowingly participate in the charged conspiracy).

[19] The jury was instructed under an older version of the Texas capital sentencing statute because the instant murder occurred in 1980.

jury of the true consequences of their failure to agree on any of the special issues, generates confusion among jurors and leads them to speculate about the effect of a non-unanimous verdict. The TCCA disagreed with this argument during Thomas's state habeas proceedings, ultimately concluding that Thomas failed to "persuade us to revisit our previous decisions rejecting such claims." *Ex parte Thomas*, 2022 WL 3642125, at *2. This decision was imminently reasonable.

To start, this issue has been foreclosed for some time by the Supreme Court's decision in *Jones v. United States*, 527 U.S. 373, 381-82 (1999). In *Jones*, the Court explicitly rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process." *Id*. The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process. *Id*. Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." *Id.*

Likewise, the Fifth Circuit has also rejected this claim, finding that a failure to instruct the jury as to the consequences of deadlock "in no way affirmatively misleads the jury about its role in the sentencing process." *Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011) (citing *Jones*, 527 U.S. at 381-82). Even apart from *Jones*, the court held that the 12-10 rule "passes constitutional muster." *Id*. at 670 (citing *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir. 2000)). For this reason, the Fifth Circuit has repeatedly denied similar claims. *See, e.g., Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016); *Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Druery v. Thaler,* 647 F.3d 535, 542-43 (5th Cir. 2011). Thomas's claim is therefore foreclosed by clearly established federal law.

Regardless, relief on Thomas's claim is barred by the anti-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, federal courts are generally barred from applying "new" constitutional rules of criminal procedure retroactively on collateral review. *Edwards v. Vannoy*, 593 U.S. 255, 272 (2021) ("New procedural rules do not apply retroactively on federal collateral review."). A new rule for *Teague* purposes is one which was not "dictated by precedent existing at the time the defendant's conviction became final." *Felder v. Johnson*, 180 F.3d 206, 210 (5th Cir. 1999) (citing *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997)). The only exception to the *Teague* non-retroactivity doctrine is reserved for rules that would place certain primary conduct beyond the government's power to proscribe. *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997); *see also Edwards*, 593 U.S. at 272 (eliminating the "watershed exception" to the *Teague* doctrine).

Here, Thomas's conviction and sentence became final for *Teague* purposes in February 2018, when the TCCA affirmed his conviction and sentence. *Thomas*, 2018 WL 739093. Thomas has pointed to no precedent since that time mandating the new rule he now proposes. Nor does this new rule fall within the lone exception to the *Teague* doctrine. Consequently, *Teague* bars relief on Thomas's allegation and precludes this Court from recognizing the new legal theory underlying his claim. *See Blue v. Thaler*, 665 F.3d 647, 670 (5th Cir. 2011) (holding that challenge to Texas's penalty-phase instructions violates *Teague*); *Druery,* 647 F.3d at 544-45 (same).

## V. <u>Procedural Default</u>

In his last remaining claims for relief (Claims 3 and 5), Thomas alleges that he received ineffective assistance from his trial counsel due to their failure: (1) to cross-examine Steven Shockey about his deal with the State, and (2) to retain a DNA expert to identify the flaws in the State's case. Thomas concedes that these allegations have not been presented to the TCCA for

review either on direct appeal or during his state habeas proceedings. Federal habeas relief is therefore precluded on these unexhausted allegations because they are considered procedurally defaulted.

**A. <u>The Exhaustion Requirement</u>**

AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A) (stating that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). This requirement promotes federal-state comity, affording States "an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights[.]" *Shinn*, 596 U.S. at 378 (citing *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)). Exceptions exist only where there is no available state corrective process or circumstances render such process ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1)(B).

To satisfy the exhaustion requirement, a petitioner must fairly present his legal claim to the highest state court in a "procedurally proper manner." *Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015). The federal claim must be the "substantial equivalent" of the claim brought before the state court. *Young v. Davis*, 835 F.3d 520, 525 (5th Cir. 2016); *see also Lucio*, 987 F.3d at 464 ("a state prisoner who does not fairly present a claim to a state habeas court—specifying both the legal and factual basis for the claim—may not raise that claim in a subsequent federal proceeding"). A federal habeas petitioner shall not be deemed to have exhausted the remedies available in the state courts "if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

To exhaust a claim in Texas, a petitioner must present the substance of his claim to the TCCA—the state's highest court of criminal jurisdiction—in either a petition for discretionary

review or an application for writ of habeas corpus under Article 11.071 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 11.071 § 4; *Busby v. Dretke*, 359 F.3d 708, 723 (5th Cir. 2004) ("Habeas petitioners must exhaust state remedies by pursuing their claims through one complete cycle of either state direct appeal or post-conviction collateral proceedings."). Thomas admits to doing neither in the instant case. (ECF No. 1 at 59, 74). As a result, his allegations (Claims 3 and 5) are unexhausted under 28 U.S.C. § 2254(b). *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001).

**B. <u>The Procedural Default Doctrine</u>**

To promote compliance with the exhaustion requirement, federal courts must apply an important corollary—the doctrine of procedural default. *Shinn*, 596 U.S. at 378; *Dretke v. Haley*, 541 U.S. 386, 392 (2004). In this context, a procedural default occurs when a prisoner "fails to exhaust available state remedies, and the state court to which the prisoner would have to present his claims in order to exhaust them would find the claims procedurally barred[.]" *Norman v. Stephens*, 817 F.3d 226, 231 n.1 (5th Cir. 2016) (citation omitted). In other words, an unexhausted claim is procedurally defaulted for federal habeas purposes if the claim would now be procedurally barred in state court. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Here, Thomas is unable to return to state court to present his unexhausted claims because doing so would be barred by Texas' abuse of the writ doctrine codified in Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure.[20] *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir.

---

[20] Article 11.071, Section 5(a) provides that a state court may not consider the merits of, or grant relief on, claims presented in a successive state habeas application unless the legal or factual issues were unavailable at the time the previous application was filed or, but for a violation of the Constitution, no rational juror could have found the applicant guilty or voted in favor of a death sentence.

1998). The Fifth Circuit has consistently held that Texas' abuse of the writ doctrine is an "independent and adequate" state procedural bar foreclosing federal habeas review of unexhausted claims. *See Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010) (holding a petitioner's claims were procedurally defaulted because if the petitioner returned to state court, the court would not consider the merits under Article 11.071, § 5(a)); *Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010); *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001). Thomas's unexhausted claims are therefore procedurally defaulted in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).

Consequently, Thomas is precluded from federal habeas review of these claims unless he can show cause for the default and resulting prejudice, or demonstrate that the Court's failure to consider his claims will result in a "fundamental miscarriage of justice." *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008) (citing *Coleman*, 501 U.S. at 750-51). Thomas makes three such arguments: (1) cause and prejudice should excuse the default of Claim 3 because the claim was not available to his state habeas counsel before his state application was adjudicated, (2) ineffective representation by his state habeas counsel establishes cause and prejudice for Claims 3 and 5, and (3) the miscarriage-of-justice exception applies to Claim 5. The Court will discuss each of these arguments in turn.

**C. <u>The Cause-and-Prejudice Exception</u> (Claim 3)**

To show cause, Thomas "must show that some objective factor external to the defense impeded counsel's efforts to comply with the [relevant] procedural rule." *United States v. Vargas-Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (citing *Davila v. Davis*, 582 U.S. 521, 528 (2017)). In that review, it "is well established that a failure to raise a claim in an earlier habeas petition may not be excused for cause if the claim was reasonably available at the time of the first petition." *Prible*

*v. Lumpkin*, 43 F.4th 501, 514 (5th Cir. 2022) (quotation omitted). As to prejudice, Thomas must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 518 (citations omitted). The Court need not consider prejudice if Thomas fails to show cause, and vice versa. *Id.*

Thomas asserts that his IATC claim concerning trial counsels' failure to impeach Steven Shockey with evidence of his deal with the State (Claim 3) was not reasonably available at the time of his state habeas proceedings. (ECF No. 23 at 38-39). According to Thomas, his state habeas counsel conducted a diligent investigation and obtained the affidavits of his trial counsel, Allan Williams and Steve Brittain. Both attested that they had no recollection of the prosecution disclosing Shockey's deal with the State to be moved closer to his mother. (ECF No. 13-8 at 210-11). Because of these affidavits, Thomas contends, state habeas counsel had no basis for an IATC claim and no motivation to weaken the related *Brady* claim by pleading a *Strickland* claim in the alternative. It was only after the state habeas trial court found that the deal with Shockey was disclosed by the prosecution—in essence, after they lost the *Brady* claim—that it became reasonable to plead the *Strickland* claim in the alternative.

Thomas's argument is unpersuasive. By arguing that his state habeas counsel had no reason to doubt the affidavits of trial counsel, Thomas conflates the issue of whether an IATC claim is reasonably available with whether it is strategically desirable to bring such a claim. But to show cause, a petitioner "must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first . . . habeas petition." *Prible*, 43 F.4th at 514 (citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). In assessing the availability of a claim's factual basis, "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through

the habeas process." *Id.* at 516 (citations omitted). If a claim was "reasonably available" at the time of the first petition, a default may not be excused for cause. *Id.* at 514 (citing *Ford*, 910 F.3d at 237).

Despite believing trial counsels' recollection that they were not informed of Shockey's deal, the factual basis of Thomas's IATC claim was still available had Thomas exercised reasonable diligence. In fact, Thomas could have obtained a sufficient basis for both his *Brady* and *Strickland* claims at the same time, as both of those claims stem from the same foundation—Shockey did in fact have a deal with the State to move closer to his mother, a fact that was not used on cross-examination to impeach his credibility. While the state habeas trial court's finding of disclosure (and against a *Brady* violation) certainly bolstered the prospects of a *Strickland* claim, it was by no means the first time such a claim was available. *See Prible*, 43 F.4th at 516 (distinguishing the "availability of the factual basis" for claims with "access to evidence supporting them."). No objective impediment therefore prevented Thomas from raising the *Strickland* allegation in his initial state habeas application.

There was also nothing preventing Thomas from raising the IATC claim while his initial state habeas application was pending. At the latest, Thomas was aware of the operative facts of the allegation by February 2018, when the State opposed Thomas's *Brady* assertion and alleged that the deal with Shockey had been disclosed to defense counsel. (ECF No. 12-7 at 57). Although his initial application had already been filed, Thomas could have filed a successive application under Article 11.071, § 5(a) of the Texas Code of Criminal Procedure and argued that the claim was just recently made available.[21] The fact he did not demonstrates either a lack of diligence or

[21] Indeed, counsel did file a pleading during Thomas's state habeas proceedings that alleged two additional, but unrelated, IATC claims that weren't raised in the initial application. (ECF No. 12-8 at 539-45). The state habeas trial court made findings on the allegations before the TCCA determined the pleading was a subsequent writ application and dismissed the allegations as an abuse of the writ. *Ex parte Thomas*, 2022 WL 3642125, at *1-2.

lack of interest in raising such a claim, both of which preclude a finding of cause to excuse Thomas's default. *See Coleman*, 501 U.S. at 753 (finding "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error."); *Prible*, 43 F.4th at 518 (same).

In short, Thomas "possessed, or by reasonable means could have obtained, a sufficient basis to allege [Claim 3] in the first petition and pursue the matter through the [state] habeas process." *Prible*, 43 F.4th at 519 (citing *McCleskey*, 499 U.S. at 498). For this reason, Thomas fails to show cause. Because he has not shown cause, the Court need not consider whether Thomas can demonstrate prejudice. *Id*. at 514 (citing *Murray v. Carrier*, 477 U.S. 478, 494 (1986)).

### D. <u>The *Martinez* Exception</u> (Claims 3, 5)

Thomas next contends that he can overcome the procedural default of his allegations through the limited exception established in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). (ECF No. 23 at 39-40). Prior to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause" to excuse a procedural default. *Coleman*, 501 U.S. at 755. *Martinez* and *Trevino* carved out a "narrow" exception to the *Coleman* rule for IATC claims. *Trevino*, 569 U.S. at 422. Now, a petitioner may meet the cause element by showing (1) that habeas counsel provided ineffective assistance during the petitioner's first state habeas proceeding, and (2) that the underlying IATC claims are "substantial," meaning they have "some merit." *Tong v. Lumpkin*, 90 F.4th 857, 865 (5th Cir. 2024); *Garza*, 738 F.3d at 676.

As discussed below, neither of these prongs are satisfied in this case.

1. <u>State Habeas Counsel</u>

Allegations of ineffective assistance in the habeas context are reviewed under the familiar two-prong test requiring a petitioner to establish both deficient performance and prejudice. *Strickland*, 466 U.S. at 687-88, 690. To be deficient, counsel's representation must fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (citing *Strickland*, 466 U.S. at 686, 688). Judicial scrutiny of counsel's performance is "highly deferential," and must consider "whether counsel's assistance was reasonable considering all the circumstances." *Hinton*, 571 U.S. at 273.

To excuse the procedural default of his IATC claims, Thomas faults the representation he received from his state habeas counsel, OCFW, during his state habeas proceedings. (ECF No. 23 at 39, 49). Three attorneys from OCFW—Joanne Heisey, Asley Steele, and their supervisor, Benjamin Wolff—are listed on the initial state habeas application filed on Thomas's behalf in August 2017. (ECF No. 10-8 at 52). The application spanned nearly 300 pages and raised nine thorough and well-briefed claims for relief. (ECF Nos. 10-8 through 10-10). To support these allegations, counsel submitted 60 exhibits that totaled almost 1,200 pages. (ECF Nos. 10-11 through 12-6). Another OCFW attorney, Nat Lombardo, later raised an additional three claims on Thomas's behalf that the TCCA eventually construed as a subsequent habeas application. (ECF No. 12-8 at 539-46); *Ex parte Thomas*, 2022 WL 3642125, at *2-3. Steele, Lombardo, and another attorney, Mark Fuller, then represented Thomas at a two-day evidentiary hearing where an additional 86 exhibits were presented in support of the applications. (ECF Nos. 13-6 through 18-7).

In light of the extensive efforts conducted by Thomas's team of lawyers, the record does not support his assertion that OCFW acted below an objective standard of reasonableness when

representing him in state court. Thomas nevertheless asserts that OCFW rendered ineffective assistance by not including other available IATC allegations (Claims 3 and 5) with his initial state habeas application. But to establish deficient performance under *Strickland*, Thomas must do more than just identify issues or claims that OCFW did not raise that are now barred. 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."). He must demonstrate that "a particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

Thomas makes no attempt to demonstrate that the IATC claims he now raises for the first time in federal court are clearly stronger than the nine allegations set forth by OCFW in his initial state habeas application. Nor does he rebut the presumption that counsel were exercising their inherent discretion to focus on certain issues while foregoing others, given that habeas counsel are not required to raise every nonfrivolous claim. *See Ayestas v. Davis*, 933 F.3d 384, 394 (5th Cir. 2019) (finding habeas counsel may engage in "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.") (citation omitted); *Vasquez*, 597 F. App'x at 780 (habeas counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citation omitted). Thus, contrary to Thomas's assertion, OCFW was not deficient simply because they failed to raise a claim available to them.

Again, to demonstrate that he was denied effective assistance during his state habeas proceedings, Thomas must demonstrate that OCFW's representation fell below an objective standard of reasonableness. *Van Hook*, 558 U.S. at 7. This showing is not made by the mere fact that current federal habeas counsel, with the benefit of hindsight, was able to unearth new IATC

claims. *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). Such an argument is based solely on the type of second-guessing and subjective hindsight that *Strickland* prohibits. 466 U.S. at 689-90 (finding "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence"). Because OCFW provided Thomas with "aggressive, competent, and professional representation," cause has not been shown. *Ayestas*, 933 F.3d at 390-91.

2. <u>Thomas's Claims are Insubstantial</u>

Regardless of the effectiveness of OCFW, Thomas still is not entitled to excuse the procedural default under *Martinez* because the underlying defaulted claims are meritless. Again, to overcome a default under *Martinez*, a petitioner must demonstrate that the underlying IATC claim "is a substantial one." *Martinez*, 566 U.S. at 14 (citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003)). "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'" *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 14). "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'" *Id.*

Neither of Thomas's defaulted IATC claims meet this criteria.

(a) <u>The Shockey deal</u> (Claim 3)

Thomas first alleges an IATC claim related to the *Brady* allegation discussed previously in this opinion. *See* Section IV(B), *supra*. There, Thomas asserted that his due process rights were violated by the prosecution's failure to disclose the full extent of its promises to jailhouse informant Steven Shockey. Thomas now argues that if the prosecution did, in fact, disclose the details of Shockey's deal to the defense, then trial counsel were constitutionally ineffective for failing to use

that information when cross-examining Shockey. Thomas believes that by pleading his IATC claim as an alternative to his *Brady* claim, he is necessarily entitled to relief under one or the other. This is incorrect.

To prevail on an IATC claim, a petitioner must establish two things: (1) that his trial counsel performed deficiently, and (2) such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. For the first element, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" *Id*. at 687-88. For the second, he must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A failure to establish either prong of the *Strickland* analysis is fatal to an IATC claim. *See Pondexter v. Quarterman*, 537 F.3d 511, 520 (5th Cir. 2008) (finding that an IATC claim may be rejected for want of either deficient performance or prejudice, and thus the absence of either prong of the *Strickland* analysis is dispositive) (citing *Strickland*, 466 U.S. at 697).

Thomas contends his trial counsel must be considered ineffective for not using evidence of Shockey's entire deal to impeach Shockey on cross-examination given the state court's determination that this information was indeed disclosed by the prosecution. While this Court already expressed its concern over the state court's disclosure finding, Thomas's *Brady* allegation was ultimately rejected because he could not demonstrate materiality—that is, that the result of his trial would have been different had the allegedly suppressed information been disclosed to the defense. *See* Section IV(B)(2), *supra*. The result is the same for Thomas's IATC claim because "[t]he materiality standard under *Brady* . . . is identical to the prejudice standard under *Strickland*." *Guidry v. Lumpkin*, 2 F.4th 472, 492 (5th Cir. 2021) (citation omitted).[22]

---

[22] Under the third prong of *Brady*, evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 289. And to demonstrate prejudice under *Strickland*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at

As discussed previously when addressing materiality under *Brady*, evidence of Shockey's deal with the State to move closer to his mother would not have made a difference at Thomas's trial given that Shockey's credibility had already been impeached by his prior criminal history and his attempts to curry favor with the State in exchange for his testimony. The fact that he was also promised a prison transfer for this testimony would do little to further impeach Shockey's already questionable credibility. Moreover, cross-examining Shockey with evidence of his prison-transfer deal would not have altered the outcome of Thomas's trial because Shockey's testimony was ultimately not critical to the State's case. Considering the State's case relied primarily on the presence of Thomas's sperm DNA and his fingerprint on or near the victim's body, in all likelihood the jury would have convicted Thomas even if counsel had fully discredited Shockey's testimony.

Because there is no reasonable probability that the outcome of his trial would have been different had counsel further cross-examined Shockey with evidence of his deal with the State, Thomas fails to establish prejudice as required under *Strickland*. Consequently, his IATC claim is insubstantial under the *Martinez* framework. *Reed*, 739 F.3d at 774.

(b) DNA expert (Claim 5)

Thomas next contends that his trial counsel rendered ineffective assistance by failing to retain a DNA expert to investigate and identify flaws in the State's DNA evidence. Similar to his fourth claim for relief (accusing the State of presenting false and misleading DNA evidence), Thomas maintains that the State's three DNA experts testified erroneously that the DNA profile recovered from the sticky ribbon (Item 3) that matched Thomas originated from sperm. By not consulting a DNA expert prior to trial, Thomas argues, counsel were unable to properly evaluate

---

694. As such, "[t]he test for prejudice under *Brady* and *Strickland* is the same." *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir. 2006).

the State's DNA evidence and therefore unable to properly impeach the State's witnesses or present their own.

Thomas is correct that trial counsel must engage in a reasonable amount of pretrial investigation. *Strickland*, 466 U.S. at 690-91 (requiring counsel to undertake a reasonable investigation); *Charles*, 736 F.3d at 389 (same). "Purportedly tactical decisions not preceded by reasonable investigations are not sufficiently informed and thereby not entitled to the 'deference typically afforded' to trial counsel's decisions." *Neal v. Vannoy*, 78 F.4th 775, 790 (5th Cir. 2023) (citing *Escamilla v. Stephens*, 749 F.3d 380, 392-93 (5th Cir. 2014)). To be reasonable, counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). But counsel is given wide latitude to determine how best to utilize the limited investigative resources that are available. *Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Despite Thomas's assertion to the contrary, the record here indicates that counsel did indeed seek and obtain the services of a DNA expert prior to trial. (ECF No. 9-1 at 58-69). In August 2013, counsel filed a "Motion for Independent Analysis of DNA evidence," citing their right to use of a partisan defense expert under *Ake v. Oklahoma*, 470 U.S. 68 (1995). *Id.* at 64-66. The parties agreed that certain items, including Item 3, should be retested using the latest Y-STR technology and also agreed to have Cellmark Laboratories conduct the testing. *Id.* at 68-69. The trial court then ordered the State to forward the evidentiary items to Cellmark for testing, noting that the result of such testing could be used by either party at trial. *Id.* In the end, the testing

conducted by Barbara Leal at Cellmark favored the State, and her testimony was presented by the prosecution at trial. (ECF No. 9-28 at 47-95).

Given the complexity of the subject matter, it was reasonable for counsel to rely on the opinion of the expert they had contacted instead of continuing to search for a more favorable viewpoint. *Murphy v. Davis*, 901 F.3d 578, 592 (5th Cir. 2018) ("[C]ounsel should be able to rely on [an expert] to alert counsel to additional needed information . . ."); *Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (refusing to find counsel ineffective for relying on "reasonable expert evaluations" of evidence). While Thomas now believes, with the benefit of hindsight, that counsel should have sought another expert to review the results of the new DNA testing, there was no reason for them to have doubted the conclusions given by the experts they consulted at the time. *See Murphy*, 901 F.3d at 592 ("Without a red flag . . . it is too much to insist that counsel second-guess [his expert].").

Further, when counsel focus on certain issues to the exclusion of others, there is a "strong presumption that [they] did so for tactical reasons rather than through sheer neglect." *Yarborough*, 540 U.S. at 5-6, 8 (finding "counsel has wide latitude in deciding how best to represent a client. . ."); *see also Pinholster*, 563 U.S. at 196 (indicating a "strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment."). The burden of rebutting this presumption "rests squarely on the defendant," and "[i]t should go without saying that the absence of evidence cannot overcome [it]." *Reeves*, 594 U.S. at 739 (citing *Titlow*, 571 U.S. at 22-23).

Despite this presumption, Thomas has not provided any statements from counsel themselves on this issue even though he is asserting that counsels' performance was unreasonable. This omission is significant given the "range of possible reasons [Thomas's] counsel may have

had for proceeding as they did." *Reeves*, 594 U.S. at 740 (citing *Pinholster*, 563 U.S. at 196). Counsel may very well have determined that hiring more experts was unlikely to lead to persuasive, admissible evidence had they investigated further. But without a chance to testify, counsels' strategic considerations remain unknown. Thus, absent evidence to the contrary, Thomas cannot overcome the presumption that counsels' failure to retain another DNA expert was the result of sound trial strategy. *See Trottie v. Stephens*, 720 F.3d 231, 243 (5th Cir. 2013) (holding the failure to present a particular line of argument is presumed to be the result of strategic choice).

Even assuming counsels' investigation was deficient, Thomas also fails to demonstrate that the results of his trial would have been different had counsel investigated the DNA evidence further. *Strickland*, 466 U.S. at 694. Thomas's claim centers on the argument that while Thomas's DNA was found on Item 3 attached to the victim's body, it was not necessarily DNA that derived from sperm. This theory stems almost entirely from the affidavits of Simon Ford, a molecular biologist and forensic DNA technology consultant retained by OCFW during Thomas's state habeas proceedings to evaluate the DNA evidence presented at Thomas's trial. (ECF Nos. 1-13; 13-12 at 361-77). Without the expert knowledge of someone like Ford, Thomas argues, counsel lacked the ability "to cross-examine the State's DNA witnesses and to present the testimony described in Dr. Ford's declarations." (ECF No. 23 at 48).

Thomas's claim is, at least in part, a claim of uncalled witnesses, as he faults counsel for failing to present their own expert—someone like Ford—to challenge the State's DNA evidence. *See Gregory*, 601 F.3d at 351-53 (analyzing the investigation claim in light of the fact that he intended to present evidence through witnesses). But "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a

matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). To prevail on such a claim, a petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Gregory*, 601 F.3d at 352; *Day*, 566 F.3d at 538.

Thomas fails to make this showing, as he offers no evidence that Ford (or any other witness) were available and willing to testify at the time of Thomas's trial in 2014. *See Day,* 566 F.3d at 538 ("[T]he petitioner must . . . demonstrate that the witness was available to testify and would have done so"). These requirements "[are] not a matter of formalism." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented witnesses, including expert witnesses. *Id*. Thomas has not done so, and thus falls short of establishing that he was prejudiced by counsels' allegedly deficient investigation.

In any event, it is unlikely that the result of Thomas's trial would have been different had Ford's concerns about the methods and conclusions of the State's DNA experts been presented to the jury either through direct testimony or cross-examination. *See Richter*, 562 U.S. at 112 (finding the "likelihood of a different result must be substantial, not just conceivable."). As the Court noted previously when addressing Thomas's *Napue* allegation (Claim 4), Ford's criticism of the State's DNA evidence is nothing more than a disagreement between experts and does not establish that the testimony concluding that Thomas's DNA came from sperm was false.[23] *See* Section IV(C),

---

[23] In fact, Ford does not attempt to show that the DNA definitively did not come from sperm; rather, he only takes issue with the assumption that the DNA must be from sperm cells because it shows up in the sperm fraction of the tested sample. (ECF No. 13-12 at 372-73). This, of course, leaves open the possibility that the DNA did originate from sperm as the expert's testified.

*supra*. The jury still had testimony from three qualified and credible experts that the DNA profile extracted from the medical tape found on the victim's finger was from sperm and that Thomas could not be excluded as a contributor. Thomas's presence at the crime scene was also corroborated by his fingerprint found on the alarm clock near the victim's body and, to a lesser extent, by the questionable testimony of Steven Shockey.[24] Thus, when considering the "totality of the evidence" establishing Thomas's guilt, the Court concludes that Thomas was not prejudiced by counsels' allegedly deficient investigation. *Mejia v. Davis*, 906 F.3d 307, 315 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 696) (internal quotation marks omitted).

3. Lack of Prejudice

Assuming that Thomas has demonstrated that (1) OCFW provided ineffective assistance during his state habeas proceedings, and (2) the underlying IATC claims discussed above are substantial, he must still show "actual prejudice" in order to overcome procedural default. *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014). That is, he must demonstrate "a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings." *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014). But "[t]he likelihood of a different result must be substantial, not just conceivable." *Wessinger v. Vannoy*, 864 F.3d 387, 391 (5th Cir. 2017) (quoting *Richter*, 562 U.S. at 112). In effect, Thomas "must show that *all* fairminded jurists *would* agree there *was* prejudice." *Sanchez v. Davis*, 936 F.3d 300, 307 n.39 (5th Cir. 2019) (emphasis in original).

---

[24] The Court gives little credence to Thomas's repeated assertions that the presence of his fingerprint and non-sperm DNA could be explained by his previous pest-control service in McKinney's home. (ECF Nos. 1 at 33, 49, 74; 23 at 10, 16, 48). While testimony supports the fact that Thomas worked for his brother's pest-control service at the time of the offense and that McKinney was possibly a client, no evidence affirmatively established that Thomas had previously been in her home. In fact, when questioned by Detective Foster, Thomas denied ever seeing McKinney before or being in her home. (ECF No. 9-24 at 141-42).

As discussed at length above, Thomas failed to establish that OCFW was ineffective in their representation during Thomas's state habeas proceeding or that his new IATC claims were substantial. Counsel raised nine multifaceted and well-briefed allegations (including an IATC claim) in his original state habeas application that were supported by 60 exhibits, then represented Thomas at an evidentiary hearing by presenting the trial court with another 86 exhibits. With the heavy deference given to OCFW under *Strickland*, Thomas has not shown a reasonable probability that the state habeas court would have granted relief had counsel advanced his unexhausted IATC claims, much less that the new claims had a better chance of success than the claims actually raised by OCFW in the original state habeas application. Accordingly, Thomas has not shown that OCFW's representation was either deficient or prejudicial enough to overcome the procedural bar of his unexhausted claims.

**E. <u>The Miscarriage-of-Justice Exception</u> (Claim 5)**

Finally, Thomas relies on the doctrine of "fundamental miscarriage of justice" to overcome the procedural default of his fifth claim for relief.[25] (ECF No. 23 at 50). This exception is limited to cases where a petitioner can make a persuasive showing that he is "actually innocent" of the charges against him. *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citing *Coleman,* 501 U.S. at 750). Such is a difficult obstacle to traverse, as a convicted defendant "comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Schlup v. Delo*, 513 U.S. 298, 326 (1995). As a result, "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Wilkerson v. Cain*, 233 F.3d 886, 889 (5th Cir. 2000) ("[A] substantial showing of actual innocence is extremely rare").

---

[25] Thomas does not assert that this exception applies to Claim 3 concerning trial counsels' alleged failure to adequately cross-examine Steven Shockey regarding his deal with the State.

To make a threshold showing of actual innocence, a petitioner must demonstrate that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329).[26] To do so, he must support his allegations of constitutional error with "new reliable evidence" that was not presented at trial. *Schlup*, 513 U.S. at 324. Examples of such evidence are "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Fratta v. Davis*, 889 F.3d 225, 232 (5th Cir. 2018) (quoting *Schlup*, 513 U.S. at 324). The habeas court must then decide on the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id.*

In the instant case, Thomas asserts that a fundamental miscarriage of justice will occur if the merits of his IATC claim is not reviewed because trial counsel's error "probably resulted in the conviction of an innocent person." (ECF No. 23 at 50). According to Thomas, Ford's declaration affirmatively proves that the DNA found on Item 13 "was not necessarily sperm," thus no reasonable juror would have voted to convict him had counsel presented this evidence at trial. But Thomas's argument does not assert that he is *factually* innocent of the substantive crime—rather, his argument is essentially that he would not have been convicted had trial counsel not performed deficiently. This is not enough to show that he is actually innocent of capital murder. *Bousley v. U.S.*, 523 U.S. 614, 623 (1998) (finding the actual innocence to excuse a procedural default requires "factual innocence," not "mere legal insufficiency"); *Vargas-Soto*, 35 F.4th at 999

[26] The miscarriage-of-justice doctrine also allows a death-sentenced individual like Thomas to challenge that sentence by demonstrating with clear and convincing evidence that, "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Busby*, 925 F.3d at 710 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). Thomas makes no argument that his allegation, which concerns only the guilt-innocence phase of trial, would affect his eligibility for the death penalty. As such, the Court will focus solely on Thomas's alleged innocence of the crime.

(finding "exclusively legal" claim of innocence insufficient); *McGee v. Lumpkin*, No. 22-10188, 2022 WL 18935854, at *1 (5th Cir. 2022) (unpublished) (same).[27]

Furthermore, the evidence relied upon by Thomas to support his claim of innocence—namely, Ford's declaration—is not "new" because it was available upon reasonable investigation either before or during Thomas's trial. Thomas effectively concedes as much by arguing that trial counsel was ineffective for not retaining a DNA expert like Ford who could have evaluated and contradicted the conclusions of the State's experts. This is fatal, as evidence that was "always within the reach of [Thomas's] personal knowledge or reasonable investigation" does not qualify as "new" under the *Schlup* actual-innocence standard. *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018); *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008) (finding evidence was always within reach if the allegation is that trial counsel should have presented it).

In any event, assuming Ford's declaration is considered new and reliable evidence, it still does not show that Thomas is actually innocent of the charges against him. In order to prevail, Thomas must provide new "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." *Schlup,* 513 U.S. at 316. As discussed previously in this opinion, however, Ford's declaration does not undermine confidence of the jury's decision in this case. *See* Section V(D)(2)(b), *supra*. Rather, it only shows that he disagreed with the methods of the State's DNA experts and their conclusions that the DNA found on Item 13 was *definitely* from sperm. This is not enough to establish that no reasonable juror would have found Thomas guilty beyond a reasonable doubt had they considered the new evidence. *See Reed*, 739 F.3d at 770 (rejecting

[27] To conclude otherwise "would mean that actual innocence amounts to little more than what is already required to show prejudice," allowing a petitioner to avoid showing cause before a federal court reviewed the merits of a defaulted claim. *Vargas-Soto*, 35 F.4th at 999 (quoting *Sawyer*, 505 U.S. at 345).

affidavit that merely presents the possibility that Reed was innocent). Accordingly, Thomas has not established a miscarriage of justice.

## VI. Stay and Abeyance

Throughout his petition and reply, Thomas stated his intent to file a motion to stay and abate these proceedings so that he could return to state court to exhaust his unexhausted claims. (ECF No. 1 at 59, 74; No. 23 at 35, 48, 58). No such motion was ever filed. Nevertheless, out of an abundance of caution, the Court has determined that a stay would be inappropriate in this case.

When an applicant fails to exhaust claims in state court, a federal district court has authority to issue a stay in certain "limited circumstances." *Rhines v. Weber*, 544 U.S. 269, 277 (2005). However, any stay must be compatible with AEDPA's purpose to reduce delays in the execution of state and federal criminal sentences. *Id*. at 276; *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). For these reasons, a stay and abeyance should be granted only when (1) "good cause" exists for the failure to exhaust; (2) the unexhausted claims are not "plainly meritless;" and (3) there is no indication that the applicant has engaged in "abusive litigation tactics or intentional delay." *Rhines*, 544 U.S. at 277-78.

Thomas does not fall within these "limited circumstances." As discussed in the previous section, Thomas has not established cause or prejudice to excuse his failure to raise his unexhausted claims in the state court. *See* Section V, *supra.* Further, his unexhausted claims are plainly meritless because they would be procedurally barred under the state law governing successive state habeas applications. *See Williams v. Thaler*, 602 F.3d 291, 305 (5th Cir. 2010) (holding a procedurally barred claim is "plainly meritless" under *Rhines*); *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005) (same). Even when reviewed under a *de novo* standard of review,

Thomas's unexhausted IATC claims (Claims 3 and 5) lack merit. Because Thomas offers neither good cause nor potentially meritorious claims, a stay and abatement is unwarranted in this case.

## VII. Certificate of Appealability

The Court must now determine whether to issue a certificate of appealability (COA). *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)). A district court may deny a COA *sua sponte* without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). But a COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires Thomas to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 580 U.S. at 115 (citing *Miller-El*, 537 U.S. at 327).

The Supreme Court has explained that the showing required under § 2253(c)(2) is straightforward when a district court has rejected a petitioner's constitutional claims on the merits: The petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The issue becomes somewhat more complicated when the district court denies relief on procedural grounds. *Id.* In that case, the petitioner seeking COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012) (citing *Slack,* 529 U.S. at 484). Whatever the basis for the denial, however, the Court must bear in mind that, as Thomas faces the death

penalty, "any doubts as to whether a COA should issue must be resolved in [Thomas]'s favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020).

In this case, the Court determined that Thomas was not entitled to relief on his *Napue* allegation (Claim 1) or his *Brady* allegation (Claim 2) because the underlying evidence supporting both claims—jailhouse informant Steven Shockey's deal with the State to move to another facility in exchange for his testimony—was ultimately immaterial and would not have affected the outcome of Thomas's trial had it been known to the jury. *See* Sections IV(A) and (B), *supra*. Because this materiality determination was a close and difficult one, the Court relied heavily on the findings and conclusions of the state habeas court, which are afforded substantial deference under AEDPA. *Id.* In doing so, the Court acknowledged the possibility that fairminded jurists could disagree with this assessment before denying federal habeas corpus relief under AEDPA's deferential framework. *Id.*

Given that (1) reasonable jurists could find this Court's assessment of Thomas's first two claims debatable or wrong, and (2) a COA should issue in a death penalty case if any doubt exists, the Court will grant Thomas a COA on Claims 1 and 2 as to whether Shockey's deal with the State was material. For the remaining allegations raised by Thomas, he has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor could reasonable jurists debate the denial of federal habeas corpus relief on either substantive or procedural grounds, or find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). As such, no further COA is warranted.

## VIII. <u>Conclusion and Order</u>

The Court has thoroughly reviewed the extensive record and pleadings submitted by both parties in this case. After careful consideration, the Court concludes Thomas has failed to establish

that the state court's rejection of his exhausted allegations (Claims 1, 2, 4, 6, 7, and 8) on the merits during his state habeas proceedings was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) based on an unreasonable determination of the facts in light of the evidence presented during Thomas's state trial, appellate, and habeas corpus proceedings.

With regard to Thomas's unexhausted allegations (Claims 3 and 5), the Court concludes the allegations are procedurally barred from federal habeas review. Thomas has not shown cause and prejudice to excuse the procedural default, or demonstrated that the Court's failure to consider the claims will result in a "fundamental miscarriage of justice." Alternatively, even when evaluated under a *de novo* standard of review, the claims do not warrant federal habeas relief because they lack merit. As a result, Thomas's federal petition does not warrant relief.

Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Federal habeas corpus relief is **DENIED** and Petitioner Steven Alan Thomas's Petition for Writ of Habeas Corpus (ECF No. 1) is **DISMISSED WITH PREJUDICE**;

2. Thomas's request for a stay in abeyance is likewise **DENIED**;

3. A limited Certificate of Appealability is **GRANTED** in this case; and

4. All other remaining motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

**SIGNED this the 13th day of November, 2026.**

**ROBERT PITMAN**
**UNITED STATES DISTRICT JUDGE**